Stanley McDONALD, Norman R. Hagfors
and Clayton Jensen, Plaintiffs,

v.

JOHNSON & JOHNSON, Defendants.

Civ. No. 4–79–189.

United States District Court,
D. Minnesota,
Fourth Division.

April 14, 1982.

Gray, Plant, Mooty, Mooty & Bennett by Daniel R. Shulman and John Q. McShane, Minneapolis, Minn., and Alioto & Alioto by Joseph M. Alioto, San Francisco, Cal., for plaintiffs.

Maslon, Edelman, Borman, Brand & McNulty by Charles Quaintance, Jr., Minneapolis, Minn., Patterson, Belknap, Webb & Tyler by David F. Dobbins and Theodore B. Van Itallie, Jr., New York City, and James E. Farrell, Jr., Johnson & Johnson, New Brunswick, N. J., for defendants.

## TABLE OF CONTENTS

I. INTRODUCTION
II. EVIDENCE
III. THE DEFENDANT'S CLAIMED BASES OF RELIEF
IV. DISCUSSION
 A. PLAINTIFFS' STANDING TO RECOVER FOR ANTITRUST VIOLATIONS
 B. THE UNCONSTITUTIONAL APPLICATION OF THE SHERMAN ACT
 C. THE SHERMAN ACT CLAIMS
 1. Section 1
 (a) Sufficiency of the Evidence to Establish a Suppression of the TENS Industry
 (b) Concerted Action
 (c) Sherman Act § 1 *Per Se* Charge to the Jury
 2. Section 2
 (a) Specific Intent
 (b) Dangerous Probability of Success
 D. THE CLAIM OF INCONSISTENT VERDICTS
 E. THE CONTRACT CLAIM
 F. THE FRAUD CLAIM
 G. EVIDENTIARY RULINGS
 H. DAMAGES
 1. TENS Sales for Acute Pain in U. S. and Canada
 2. TENS Sales for Acute Pain in U. K. and Europe
 3. TENS Sales for Chronic pain
 4. TENS Sales for Japan
 5. TENS Sales for Post-Operative Pain
 6. Sales of Chronic Pain Electrodes
 7. Sales of Acute Pain Electrodes
 8. Sales of Post-Operative Electrodes
V. CONCLUSION
APPENDIX

## MEMORANDUM OPINION AND ORDER

MILES W. LORD, Chief Judge.

### I INTRODUCTION

On May 2, 1979, Norman R. Hagfors, Clayton Jensen, and Stanley McDonald, hereinafter plaintiffs, filed this suit against Johnson & Johnson, a health care corporation headquartered in New Brunswick, New Jersey, alleging breach of contract, fraud, and conduct designed to foreclose competition in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court's jurisdiction is based on §§ 1332 and 1337 of 28 U.S.C.

Following a five and one-half month trial in which the jury awarded the plaintiffs

$56,800,000.00 (before trebling) on the Sherman Act claims, $6,275,000.00 as actual and compensatory damages and $25,000,000.00 as punitive and exemplary damages on the fraud claim, and $5,700,000.00 on the contract claim, the defendant Johnson & Johnson moves this Court, pursuant to Rule 50(b), F.R.Civ.P. for judgment notwithstanding the verdict or, in the alternative, for a new trial. For the reasons stated below, the motion is denied.

The essential elements of the plaintiffs' contentions are as follows:

1) Johnson & Johnson induced the plaintiffs to enter into stock purchase and employment agreements on September 20, 1974, on the basis of numerous promises and representations of Johnson & Johnson's intention to foster the rapid and successful development of StimTech, a corporation owned by the plaintiffs which manufactured and sold heart pacemakers and electronic nerve stimulators for the control of pain;

2) From the time of StimTech's acquisition by Johnson & Johnson until the present, Johnson & Johnson intentionally caused StimTech to languish close to the point of extinction;

3) During the same period of time, Johnson & Johnson placed tremendous resources and support at the disposal of its pain control drug business, which enjoyed phenomenal growth and profitability in the sale of drugs used to treat the same pain conditions that the transcutaneous electronic nerve stimulators (TENS), manufactured by StimTech, could have effectively treated; and

4) All of the aforementioned activity, designed to foreclose competition between TENS devices and pain control drugs, occurred with the full knowledge and participation of the top executives of Johnson & Johnson.

## II THE EVIDENCE

This Court considered the evidence in the light most favorable to the non-moving parties, the plaintiffs, and because of the magnitude of the 13,000 page transcript generated in the course of the five and one-half month trial, summarized only that evidence which is relevant to the plaintiffs' claims, together with the inferences which may properly be drawn therefrom. Even so, this summary by no means purports to be complete and exhaustive. The transcript itself should be referred to as the ultimate source of the evidence; therefore, where helpful, cites to the record (Tr. . . .) are included in parentheses.

In 1970, plaintiff Norman Hagfors set up an office and workshop in the basement of his home and began making plans to start a new business. Mr. Hagfors, until the time of his new venture, had been employed for 13 years at Medtronic Inc., most recently as head of New Product Research. While at Medtronic, Mr. Hagfors did extensive work in the area of nerve stimulation for the treatment of pain, in addition to his earlier work in the heart pacemaker field.

In August of 1970, Mr. Hagfors incorporated Stimulation Technology, Inc. (StimTech) and began looking for a foreign heart pacemaker company willing to enter into a licensing arrangement with him for the manufacture and distribution of pacemakers in the United States.

During that same time period, Dr. Donlin Long, a neurosurgeon at the University of Minnesota, discussed with Mr. Hagfors the possibility of designing a transcutaneous (non-implantable) electronic nerve stimulator (TENS). Dr. Long and Mr. Hagfors, along with several other experts in the pain control field, had, in the late 1960's, developed a surgically implantable device known as a dorsal column nerve stimulator for use in the treatment of certain types of pain. The interest in these devices had grown out of a theory proposed in a paper published by two medical doctors in 1965. The paper, entitled "The Gate Theory of Pain," described a mechanism by which nerve fibers transmit pain signals to the brain. The success of the surgically implanted devices, developed as a result of clinical applications of the gate theory, led Dr. Long to consider the development of an external stimulator

which would achieve the same results as the implantable stimulator. After joining Dr. Long in work at the University, Mr. Hagfors designed the first modern solid state TENS device. The device, consisting of an electronic package in a metal box, provided electrical stimulation to nerve fibers on the skin, thereby blocking the transmission of pain sensations along the nerve fibers deeper in the body and reducing pain in the patient. This use of stimulation, with the resultant effect of controlling pain in the patient, represented the most sophisticated application of the gate theory of pain. The electrical impulses were transmitted along wires to pads (electrodes) which were attached to the patient's skin at the pain site. The first StimTech TENS device was constructed by Mr. Hagfors in his basement from parts purchased from electronics supply stores.

In September of 1971, a short time before StimTech built its first TENS unit, Mr. Hagfors was joined in his new corporation by Mr. Stanley McDonald. From 1967 until 1971, Mr. McDonald had been with Medtronic in a marketing position, and prior to that he had worked in sales for the E. R. Squibb Company, where he won a number of sales awards. Together the two men continued the search for a foreign heart pacemaker manufacturer interested in a licensing arrangement with StimTech. It was Mr. Hagfors' plan to use the sale of heart pacemakers as a financial base to support the development and marketing of TENS devices, which had not attained the same level of acceptance among the medical profession as that of the pacemaker. This lack of acceptance of TENS among doctors was due in large part to the doctors' lack of awareness of the device and to the fact that studies showed doctors were more drug-oriented than device-oriented. Mr. Hagfors believed, however, that once the medical profession could be sold the *concept* of stimulation, the potential market for the TENS device far exceeded the potential for the already substantial pacemaker market. The evidence revealed that in introducing a new drug or medical device, the patient's confidence in the device is much greater if it is prescribed for him by a physician. As a consequence, many drugs and devices are marketed through the prescription method. This is not necessarily a result of the need to use them under the supervision of a physician but rather because the physician's prescription constitutes an endorsement of the product, and it is simpler and less expensive to educate the physicians than the population generally.

It appears from the evidence that after the drug or device is established and used, it is frequently taken off the prescription list, or the so-called "ethical" prescription list, and sold over the counter (OTC). Since a great deal of the physician's education depends on the advice given him by the drug company "detail" men in whom he has confidence, the best available way to put a new drug or medical device into the market is to have the detail men contact the doctor, endorse the product, and convince the doctor that the medicine or the device should be purchased. In the course of educating the doctor, it is most helpful to have available for presentation to the physician research articles, experiments, and surveys made by other reputable physicians who endorse the new drug or device. Thus, the usual way in which to proceed is to have the promoter of the drug "fund" the research by prominent practitioners or researchers, and also to have these researchers present learned treatises to the various segments of the medical professions and publish the work in the medical journals. These requirements for obtaining "respectability and acceptability" are expensive, time-consuming, and create genuine problems for a new company with a new product entering into the medical field.

In achieving proper introduction and marketing, a TENS device would face many of the above obstacles, whereas much of the ground work had already been laid for the pacemaker's endorsement. It was for this reason that these plaintiffs made a decision to sell pacemakers. If they could obtain a pacemaker and sell it, they would not face the barriers to market entry that they faced in marketing the TENS device. The

pacemaker was already accepted both by the physicians and the public; therefore, the extensive research and development both in the product and the market were unnecessary. Since Mr. Hagfors and Mr. McDonald were thoroughly familiar with the manufacture and sale of pacemakers, it was their plan to manufacture and sell pacemakers and to use the profits therefrom to "carry them" financially while they developed the TENS device and promoted the marketing of it.

During the summer of 1971, Mr. Hagfors invited Mr. P. J. Reynolds, head of marketing for Devices, Ltd., an English heart pacemaker company, to visit him on one of Mr. Reynolds' trips to the United States. In August of 1971, Mr. Reynolds came to the United States and met in Minneapolis to discuss a licensing agreement. As a follow-up to the August meeting, Mr. Hagfors and Mr. McDonald went to England in October of 1971 for further discussions with Devices. During the October meeting, a verbal understanding between the two companies was reached in which it was agreed that StimTech would distribute and manufacture heart pacemakers for Devices, Ltd. in the United States. Pursuant to a later written agreement, StimTech began importing and selling Devices' pacemakers in the United States.

Following the agreement with Devices, all three plaintiffs pledged their financial and professional support to the development of StimTech, and in the summer of 1972, Mr. Clayton Jensen assumed a full-time position as Vice President in charge of manufacturing. Mr. Jensen graduated in 1960 from the University of Minnesota with a degree in mechanical engineering and, before coming to StimTech, worked in various electrical and mechanical engineering positions with the McQuay Corporation. With Mr. Jensen's arrival at StimTech, the executive staff consisted of Mr. Hagfors, President; Mr. McDonald, Vice President for Marketing; and Mr. Jensen, Vice President for Manufacturing.

During 1972, StimTech sold heart pacemakers and TENS devices in Minnesota and California. At the same time, the company was engaged in product research and market evaluation with the idea of improving its product lines and expanding its sales territory. Dr. Long, the pain expert, signed an exclusive consulting agreement with StimTech. Clinical studies during this period indicated the growing possibilities for the successful use of TENS devices in new areas such as sports medicine. Already TENS had proved successful in treating conditions such as headaches, back pain, post-surgical pain, and phantom limb pain without any risks to the patient. As a result of TENS' proven effectiveness in these areas, TENS devices were promoted as alternatives to drugs. A strong selling point for TENS was the fact that TENS have virtually no side effects, while pain-killing drugs, as indicated in the evidence, have proven dangerous side effects, especially when used for extended periods of time.

The pacemaker StimTech was importing from Devices was the Model 3821 mercury-powered device, which contained the first hybrid integrated circuits in pacemaking as well as the first hermetically sealed container for pacemaker electronics. By 1973, StimTech had improved upon Devices' 3821 by designing its own 3821T with a tangential entry for the pacemaker electrode.

In addition to designing the 3821T pacemaker, StimTech did extensive planning in 1973. In August of that year, before Johnson & Johnson became a factor in the operation of the company, Mr. McDonald presented his 1973–74 sales and marketing plan for StimTech which included the following emphases:

1) research and new product development: in heart pacemakers, development and manufacture of a *programmable pacemaker* which would permit the alteration of pacemaker rate and other parameters without the necessity for additional surgery; the development of a lithium powered pacemaker; in TENS, the development of a smaller TENS device with a separate battery pack, rechargeable batteries, recessed knobs, and rounded cor-

ners; the development of new stimulating electrodes;

2) expansion of marketing: sales in the Far East and other international markets; marketing of TENS for sports injuries; development of a TENS rental program; formation of a nationwide staff of nurses to work with doctors and salesmen;

3) market analysis: potential for TENS—existence of 18 million arthritics, 7.5 million back patients, 1.2 million amputees.

Underlying Mr. McDonald's sales and marketing plan was the emphasis on the company's urgent need for additional funds to support its projected research and development. Without additional capital, StimTech believed it would not be able to exploit fully its potential.

From mid-1972 through mid-1973, StimTech contacted a number of potential lenders and investors. The plaintiffs estimated that they would need approximately $7 million to provide "up front" financing for research and development for new pacemaker and TENS products. They planned to raise $5 million of this amount through an initial stock offering of $750,000.00, followed by a placement of $2 million, and then a public offering of $3 million.

Because of the fact that Devices, too, was in serious need of additional working capital, the plaintiffs also considered purchasing Devices or having a public offering for a combined StimTech/Devices company. Plaintiffs informed Devices of their interest in "combining forces."

In late May of 1973, StimTech entered into an agreement with Piper, Jaffray & Hopwood, Minneapolis's leading investment bankers, giving that firm the exclusive right for 120 days to find investors for StimTech. Piper, Jaffray was also given the first choice to handle any public offerings or private placements for StimTech over the next five years.

During the same period of time in which StimTech was seeking additional funding, Mr. Hagfors was sought out by Dr. Jack McConnell who had heard of StimTech and

had begun to make overtures. Dr. McConnell was the Director of Corporate Development for Johnson & Johnson. Corporate development is a major activity for Johnson & Johnson, which actually consists of a "family" of approximately 150 companies, separately incorporated, which operate in an autonomous fashion. Testimony from Johnson & Johnson officials indicated that Johnson & Johnson has a highly decentralized posture, and each Johnson & Johnson company is run as a separate profit center with its own budget, President, and Board of Directors. Although Johnson & Johnson is in the health care field generally, the greatest percentage of Johnson & Johnson's overall sales is in the pharmaceutical area. Within that pharmaceutical segment of the corporation, McNeil is the Johnson & Johnson owned company engaged in the sale of the pain control drugs Zomax and Tylenol. This last statement is significant because, as the plaintiffs contend and it appears from the record, the agents and officers of the Johnson & Johnson companies, specifically McNeil, working in the drug pain control area, moved in and took over StimTech and its affairs; this is more fully developed *infra.*

In the fall of 1972, before visiting Mr. Hagfors, Dr. McConnell, who had previously been the chief of new product development for McNeil, took the precaution of visiting the English company Devices, on which StimTech was dependent for its "bread and butter." Approximately six months later, Dr. McConnell approached and spoke with Mr. Hagfors at a StimTech booth at a medical convention. StimTech and its cashflow problems were discussed at this visit. Later in the spring of 1973, Dr. McConnell again met with the plaintiffs at the StimTech office in Minneapolis. While in Minneapolis, Dr. McConnell explained that he was seeking corporate opportunities for Johnson & Johnson and that the purpose of his visit was to consider Johnson & Johnson's buying an interest in StimTech.

Following his meeting at StimTech, Dr. McConnell reported to his superior, Foster Whitlock, Johnson & Johnson Executive

Committee Vice Chairman, that StimTech represented a genuine opportunity for Johnson & Johnson. The nature of this "opportunity" was not made clear in the letter. As the evidence adduced at trial demonstrated, the jury was entitled to conclude that what Dr. McConnell had referred to was the "opportunity" to take over the company, to stifle it, and to continue to promote and to protect the sale of pain killing drugs, Johnson & Johnson's most lucrative products. Dr. McConnell also informed Mr. Whitlock of StimTech's need for additional funding and of his plans to show Mr. Hagfors a Johnson & Johnson subsidiary in Texas as a part of the Johnson & Johnson program to impress the plaintiffs with the wisdom of being a part of the Johnson & Johnson family.

The Johnson & Johnson Executive Committee, of which Mr. Whitlock was a member, is the top management group for the entire Johnson & Johnson organization. Each of the Johnson & Johnson companies reports directly to an Executive Committee member, or to a Johnson & Johnson executive who, in turn, reports directly to an Executive Committee member. As such, every Johnson & Johnson company has an Executive Committee member ultimately responsible for it.

The Executive Committee is in charge of the development of business, development of products, examination of acquisition candidates, and the general orchestration of the Johnson & Johnson corporation as well as having considerable management responsibilities for the "family" corporation. More specifically, the Executive Committee annually reviews each Johnson & Johnson company, annually reviews and approves a budget and forecast for each Johnson & Johnson company, annually reviews the performance of every Johnson & Johnson executive at every Johnson & Johnson company, reviews and approves expenditures above certain levels, and reviews and approves all executive compensation at Johnson & Johnson companies above certain levels.

Mr. Whitlock, as Vice Chairman of the Johnson & Johnson Executive Committee, was the committee member to whom Dr. McConnell brought news of the StimTech opportunity because, in Dr. McConnell's estimation, Mr. Whitlock was "likely to be most closely related to that particular business being looked at". Therefore, Mr. Whitlock, the President of the Pharmaceutical Manufacturers Association and the Committee member with the ultimate responsibility for the Johnson & Johnson pharmaceutical companies, including McNeil, added StimTech to his list of charges. The plaintiffs contend that the singling out of Mr. Whitlock by Dr. McConnell as the Committee member most closely related to StimTech is evidence of the fact that Johnson & Johnson itself was fully aware of the relationship of TENS devices and pain control drugs and the potential for competition.

In keeping with his report to Mr. Whitlock, Dr. McConnell induced the plaintiffs to travel to Arbrook, a Johnson & Johnson subsidiary near Dallas, in the summer of 1973. During that visit, the plaintiffs saw a Johnson & Johnson company in action and discussed with Dr. McConnell the nature and extent of Johnson & Johnson's support of StimTech should the proposed acquisition take place. Dr. McConnell showed the plaintiffs the research and technology at Arbrook. At trial, Dr. McConnell admitted wanting to impress the plaintiffs with what Johnson & Johnson could do, and he told them that "Johnson & Johnson encourages them to market their products as widely as possible." Dr. McConnell also described international sales, "how that's encouraged," and the use of other Johnson & Johnson companies to assist acquired companies. (Tr. 5,012–24.) Both Mr. Whitlock and Dr. McConnell testified to the fact that Johnson & Johnson had numerous salesmen, and it would be to StimTech's benefit to become part of the family for a number of reasons, including marketing assistance. (Tr. 5,490–91; 3,798–99.) The plaintiffs were indeed impressed by the trip and satisfied by Dr. McConnell's responses to their questions.

As Dr. McConnell proceeded to negotiate for the acquisition of StimTech, he also

indicated an interest in acquiring Devices. Mr. Hagfors, who at the time of the Arbrook visit could see no harm in Johnson & Johnson's simultaneous acquisition of Stim-Tech and Devices, wrote a letter to the Chairman of Devices when he returned from Texas and stated that "Johnson & Johnson has one goal with all of their companies, and that is to make them number one in their field. Their goal would be to make Devices number one in pacemakers and to spend the required monies to make it happen". (Tr. 2,590–95.)

Dr. McConnell told the plaintiffs at the conclusion of the trip to Arbrook that Johnson & Johnson was interested in buying 40–60% of StimTech, with an option for the remainder. At the same time, Dr. McConnell reported to Mr. Whitlock that the visit was worthwhile, that the opportunity was attractive, and that he had responded to the plaintiffs' many questions regarding the possible acquisition. Dr. McConnell emphasized the fact that the three persons who were the principals of StimTech, and are the plaintiffs here, worked very well together and certainly constituted the most valuable asset of the company. He began his memo to Mr. Whitlock with the following observations:

July 5, 1973

Mr. F. B. Whitlock

Last Thursday and Friday I visited in Dallas with the three principals from Stimulation Technology of Minneapolis. I wanted to show them an example of a company that grew from a single product and also give them a chance to visit with other personnel in the company.

Their Sales Manager, Mr. Stan. McDonald, had previously been with Medtronic. He is a bright, accomplished salesman and probably a very good manager from the sales record. He is extremely talkative and in a group discussion one often ends up with a monologue. Mr. Norman Hagfors, the President, is the quiet, controlled, competent type and tends to use Stan. as a tracking horse. Sooner or later, Stan. will ask the questions that Norm. wants asked. I may under-rate Stan. He may even speak for the corporation as a whole at times. Under any circumstances, there is a very good relationship among the three principals. The third is Clayton Jennsen who is Vice President in charge of operations. He speaks very little in a group. That is probably because he is the least experienced of the three—a hard worker and knowledgeable in operations, but would not make a good manager.

The visit was very worthwhile. I continue to be impressed with this group. There is a real substance in the company. They have competed with one of the giants in the field (Medtronic which does $50,000,000 and over per year) and have come out extremely well in the contest. In the area of pacemakers, where they compete with Medtronic, they get their share of the market and more. They need capital to expand their marketing effort.

In the area of research (dorsal column stimulators) they are ahead of Medtronic.

. . . . .

This one has an enormous amount of potential. The main characters have a proven track record which is enviable; they have basic technology in an area which is considered to be one of the truly emerging areas and the marketing and manufacturing know-how to accompany it. It is the most attractive opportunity I have seen in quite some time. When one couples it with the potential that Devices brings to this discussion, it suggests that this will be a major business for us in a few years.

. . . . .

Jack B. McConnell

After receiving Dr. McConnell's account of the trip, Mr. Whitlock instructed Dr. McConnell to continue with negotiations with StimTech.

The plaintiffs contend that this memorandum was ambiguous and was subject to several interpretations. The "attractive opportunity" could have meant the chance to get involved and really make a profit in a

new industry, or it could have meant the chance for Johnson & Johnson to destroy a potential competitor of drugs at an early stage before the business had a chance to fully develop. The plaintiffs' contention, apparently adopted by the jury, is that the evidence supported the latter interpretation.

Before serious and formal negotiations were begun, Messrs. Whitlock, McConnell, and Anderson, at various meetings, had made promises and representations to plaintiffs that after acquisition by Johnson & Johnson, StimTech Company and its TENS therapy would be actively promoted by the Johnson & Johnson sales force of 4,000 people, who were capable of contacting every physician in America on very short notice; that adequate financing would be given to promotion, development, experimentation, research, and marketing of TENS devices; that StimTech would be given management and sales assistance; and that StimTech would have available to help it in its marketing the already established worldwide sales organization of Johnson & Johnson. Insofar as athletic medicine was concerned, Johnson & Johnson had a salesman "in every locker room" throughout America, and the assertion was that those persons would be available to promote TENS devices for sports medicine. The representation was that the projected sales would easily make millions of dollars for the plaintiffs.

Based upon these representations and many others, the negotiations with Stim-Tech continued.

In August of 1973, the plaintiffs and their attorney, Michael P. Sullivan, Esq., met in Minneapolis with Dr. McConnell and other representatives of Johnson & Johnson. At that meeting, Johnson & Johnson orally agreed to buy 37.1% of StimTech's outstanding stock for approximately $750,-000.00, with the plaintiffs agreeing that they would sell the rest of StimTech to Johnson & Johnson under certain conditions, which are hereinafter explained. It was also understood at this meeting that Johnson & Johnson's continued interest in StimTech was contingent on StimTech's not seeking additional funding from any source other than Johnson & Johnson.

Dr. McConnell's contemporaneous reports of the meeting, written to Mr. Whitlock, outlined the terms of the agreement and elaborated on StimTech's concern over the possibility of being isolated from Devices. Dr. McConnell explained that if a company hostile to StimTech purchased Devices, the plaintiffs would face "a very awkward situation." Such an "arrangement would interrupt the smooth flow of technical information important to their research and manufacturing operations," wrote Dr. McConnell. (Tr. 3710–16.) The plaintiffs contend that this "awkward situation" is precisely what Johnson & Johnson created and confronted StimTech with later in the preacquisition negotiations.

Later in August of 1973, Mr. Hagfors met with Dr. McConnell and Mr. Whitlock in Mr. Whitlock's New Brunswick office. Mr. Whitlock gave Mr. Hagfors a placard entitled "Our Track Record in Acquisitions" which stated in essence that Johnson & Johnson always underestimated the capital required for new companies. Thus, plaintiffs contend, it could reasonably be assumed that if Johnson & Johnson were consistent in following its track record, Johnson & Johnson would, in reality, invest a great deal more in StimTech when the acquisition became final than it originally promised.

On September 5, 1973, StimTech, the plaintiffs, and Johnson & Johnson executed a Securities Purchase and Option Agreement ("1973 Agreement") providing that Johnson & Johnson would pay $700,000.00, plus commissions, to Piper, Jaffray in return for a 37.1% interest in StimTech's stock. This initial investment was to be known as Phase I. The 1973 Agreement also contemplated a Phase II, which was to be the complete conveyance of all remaining shares of StimTech stock to Johnson & Johnson. The effectuation of Phase II was to be attempted by the parties within 180 days of the signing of the 1973 Agreement. The agreement also provided that "the shareholders hope to negotiate a pay-out

over 5 to 10 years for said shares purchased in Phase II of an amount approximating 10 million dollars conditioned upon the performance of the Company in the manner which they contemplate." The fact that Johnson & Johnson had not acquiesced in the purchase price but had agreed to negotiate with the knowledge of the plaintiffs' range was also included in the agreement.

After Dr. McConnell's original contact with StimTech, but before the purchase of 37.1% of StimTech's stock, Johnson & Johnson formed a new subsidiary, Johnson & Johnson Development Company, whose sole purpose was to acquire or invest in new or developing companies. Charles M. Anderson was made President, and StimTech was his first investment. Following the formation of the Development Company, Johnson & Johnson placed a "tombstone" ad in the Wall Street Journal to announce Johnson & Johnson Development to the financial community. However, when the plaintiffs attempted to run a similar announcement of their 37% sale to Johnson & Johnson in a local newspaper, Dr. McConnell asked them to cancel the ad. It is the plaintiffs' contention that the refusal to permit StimTech to advertise its association with Johnson & Johnson was one of the first manifestations of Johnson & Johnson's disguised intent to suppress StimTech.

Pursuant to the 1973 Agreement, Mr. Whitlock, the Executive Committee's pharmaceutical man, was appointed to the StimTech Board of Directors. Mr. Whitlock came to Minneapolis for the October 21, 1973, meeting of the Board and talked with plaintiffs about the purchase negotiations for the remainder of the StimTech stock. The possibility of opening a Japanese market for StimTech was discussed at the meeting and followed up by Mr. Whitlock with the suggestion that the plaintiffs contact a Johnson & Johnson Japanese subsidiary to obtain additional information about the potential Japanese distributor. It should be noted that this apparent willingness to have StimTech sell in Japan was manifested before the purchase of the remaining shares of StimTech stock. The evidence is that once the acquisition was

complete, such sales were prohibited by Johnson & Johnson, and no effective intercompany cooperation or communication was allowed.

Following the October 21 meeting, Mr. Whitlock also informed plaintiffs that he did not want Mr. Sullivan, plaintiffs' attorney, at any future meeting between himself and plaintiffs. Mr. Sullivan, after being told by the plaintiffs of Mr. Whitlock's request, resigned from the StimTech Board of Directors.

A short time after the signing of the 1973 partial acquisition agreement, several unexpected changes occurred in the relationship between StimTech and Johnson & Johnson, some of which served to disrupt the progress of the negotiations and caused delays in much needed research and development for StimTech. Mr. Charles Anderson took over the responsibility of face-to-face negotiations from Mr. Whitlock. Hagfors requested, but was not shown, an evaluation of Devices, Ltd. prepared for Johnson & Johnson by a prominent cardiologist. This report pointed out Devices' need for substantial funds if the company were to remain viable. Plaintiffs contend that Johnson & Johnson knew of the need for the infusion of funds into Devices, Ltd. but did not provide sufficient funds because better heart pacemakers from Devices, Ltd. would generate profits for StimTech, which, in turn, could be used to promote TENS in competition to pain drugs. During this same period of time, Dr. McConnell, in person and later by letter, suggested that the originally agreed upon 180 day negotiating period be extended.

The plaintiffs became concerned about the extension of the negotiation period requested by Johnson & Johnson but reluctantly agreed to it. They had little alternative because of increasing financial difficulties caused by the delay and by Johnson & Johnson's insistence that they not deal with others for finances. Both StimTech and Devices had been forced to delay the development of new programs because of the time demands for the negotiations on their

personnel and the uncertainties created by the extension. On March 13, 1974, with the future of the acquisition still unclear, the plaintiffs requested and were given a $100,-000.00 loan from Johnson & Johnson. Stim-Tech subsequently borrowed from Johnson & Johnson a total of $300,000.00, which was set by Johnson & Johnson as the limit of its line of credit. StimTech was aware that if the acquisition did not proceed to completion it would have to seek outside financing to enable it to repay the $300,000.00 to Johnson & Johnson. The plaintiffs also testified that they wondered what would become of StimTech's agreement with Devices should the Johnson & Johnson-StimTech negotiations fail, a fear expressed earlier to Dr. McConnell.

During the period between September 5, 1973, and the eventual acquisition of Stim-Tech by Johnson & Johnson, the plaintiff continued to meet with Mr. Anderson to work out the details of the potential purchase. At Mr. Anderson's request, the plaintiffs provided Johnson & Johnson with continually updated projections of Stim-Tech sales and profits for the next five year period. Mr. Anderson, at that time, stated that his reason for seeking revised projections was that the figures then being used by StimTech were too conservative. At a later time, after a dispute developed, however, the plaintiffs were told that Johnson & Johnson believed the projections were very optimistic and therefore unrealistic.

On April 9, 1974, Mr. Anderson met with the plaintiffs in Minneapolis to present a proposal for the completed acquisition of StimTech stock. Mr. Anderson's proposal consisted of a handwritten document containing the following provisions:

1) cap on maximum earn-out payment to the plaintiffs of $12 million, based upon a multiple of StimTech's profits over the next five years;

2) contribution of additional financial support by Johnson & Johnson as required in good business judgment; and

3) intercompany loans as required.

At this same meeting, Mr. Anderson asked for and received a summary of projected financial requirements for Stim-Tech which would follow the acquisition. In that projection, Mr. Hagfors' estimation totalled $7 million, including $1.5 million in working capital before the end of 1975, total financial commitments of $1.3 million for the remaining eight months of 1974, and $1.3 million for 1975.

The potential for international sales was also discussed at the April 9 meeting, and Mr. Anderson told the plaintiffs that if it made sense after the acquisition, Johnson & Johnson would support it. At the conclusion of the April 9 meeting, Mr. Anderson told plaintiffs that he would present the $12 million earn-out proposal to the Johnson & Johnson Executive Committee for approval.

On May 9, 1974, the plaintiffs were informed by Mr. Anderson's superior at Johnson & Johnson, Mr. Whitlock, that he would be presenting an acquisition proposal for StimTech to the Executive Committee the following week and that Johnson & Johnson was completing its acquisition of Devices on May 10, the next day. Prior to Mr. Whitlock's telephone call, the plaintiffs were not aware that Johnson & Johnson's purchase of Devices was so near to completion. The plaintiffs contend that when they received the news that Johnson & Johnson was on the verge of owning and controlling their source of pacemakers on which they relied to fund their development of the TENS business, they became very concerned about the loss of their bargaining position with Johnson & Johnson. The plaintiffs later learned that in order to acquire Devices, Johnson & Johnson had paid nearly the full asking price, despite strong warnings from its own experts regarding Devices' financial condition and net worth. This excessive expenditure for Devices is cited by the plaintiffs as an indication of Johnson & Johnson's urgent desire to gain control over StimTech for its own purpose, which was to suppress it as a competitor in the pain control field. This acquisition of Devices effectively gave Johnson & Johnson the power to cut off all heart pacemaker components, which, as the evidence demonstrated, was

the lifeblood of StimTech and its main hope for the profits needed to fund research and development for TENS.

On May 13, 1974, rather than asking the Johnson & Johnson Executive Committee to approve the $12 million proposal outlined to the plaintiffs, Mr. Whitlock presented an $8 million earn-out proposal to the Executive Committee and received authority from them to spend up to his requested amount in acquiring the remainder of StimTech stock. Furthermore, Mr. Whitlock testified that neither he nor Mr. Anderson ever intended to request approval for the $12 million proposal, and any mention of that amount to plaintiffs was "pure negotiation." Johnson & Johnson never told the plaintiffs that the request to the Executive Committee had been $8 million, not $12 million.

On May 20, 1974, having secured Johnson & Johnson Executive Committee approval for the $8 million package, Mr. Anderson met with the plaintiffs and presented a proposal on a "take it or leave it" basis. According to Mr. Anderson, the cap was $6.5 million, and the time and method of payment were not negotiable. Mr. Anderson also told the plaintiffs that Johnson & Johnson's acquisition of Devices had been completed. In light of StimTech's indebtedness to Johnson & Johnson, Johnson & Johnson's ownership of Devices, and Johnson & Johnson's intransigent offer, the plaintiffs became aware of the fact that they were in a very poor bargaining position.

A subsequent meeting between the plaintiffs and Johnson & Johnson was held on May 23. This time, Mr. Whitlock came to Minneapolis to answer the plaintiffs' questions relating to their concern over the change in Johnson & Johnson's proposal. Mr. Whitlock encouraged the plaintiffs to take the new, lower cap because StimTech's association with Johnson & Johnson would make the plaintiffs eligible for Johnson & Johnson executive benefits. Mr. Whitlock discussed salaries and informed the plaintiffs that his own package amounted to $500,000.00. He also discussed cash bonuses, stock options, stock grants, and retirement programs and convinced the plaintiffs that the executive benefits would more than make up for the reduction in the cap from $12 million to $6.5 million. Mr. Whitlock, according to Mr. Hagfors' contemporaneous notes of the meeting, told the plaintiffs to take a look at McNeil Laboratories' Henry McNeil who believed Johnson & Johnson and made $100,000,000.00. In addition, Mr. Whitlock assured the plaintiffs that Johnson & Johnson had the resources and would put them to work for StimTech so that the relationship would be profitable for Johnson & Johnson as well as for the three principals.

Several weeks after the May 23, 1974, meeting with Mr. Whitlock, the plaintiffs reached agreement on an acquisition with a maximum earn-out of $7 million. Once the verbal agreement on the acquisition had been reached, Johnson & Johnson, represented by Mr. Anderson and the Johnson & Johnson in-house corporate attorney Peter Galloway, met with the plaintiffs and Mr. Sullivan, who was allowed to re-enter negotiation, in Minneapolis to negotiate the terms of a written agreement. Although Mr. Whitlock's visit had succeeded in allaying the plaintiffs' fears to the extent that they were willing to agree to the acquisition, the plaintiffs testified that the residual effect of the long, uncertain negotiating period on their part was a basic distrust of Johnson & Johnson.

As a result of that distrust, which was obvious to Johnson & Johnson witnesses, who testified to that effect, the plaintiffs attempted to include contractual provisions in the written agreement which were not acceptable to Johnson & Johnson. Specifically, one of the plaintiffs' requests was for provisions relating to the details of calculating the earn-out, which was to be based on a formula applied to the performance of StimTech over the following five years. These provisions reflected both plaintiffs' understanding of those elements agreed to in earlier stages of the negotiations and their concerns that changes might occur which would adversely affect their poten-

tial to achieve the maximum earn-out. One provision the plaintiffs sought and obtained called for measuring the earn-out based on 5% of total sales over the earn-out period, which would have yielded the $7 million cap on $140 million of sales.

Two other of plaintiffs' requests, one, that Johnson & Johnson provide that it would not compete with StimTech in TENS devices or pacemakers during the earn-out period and two, that Johnson & Johnson agree that it would not sell or dispose of StimTech's business during the earn-out period, were refused by Mr. Galloway. At a later date, however, Mr. Anderson assured the plaintiffs that Johnson & Johnson had no intention of competing with StimTech or disposing of the business but that these understandings could not be part of the agreement. Rather, they had to be left to mutual trust and good will, according to Johnson & Johnson through Mr. Anderson.

The concept of mutual trust became an important element of the stock purchase agreement executed on September 20, 1974, by the plaintiffs and Johnson & Johnson. Over the negotiating period, a number of representations had been made by Johnson & Johnson to the plaintiffs, which influenced their willingness to sell the remaining shares of StimTech stock. Among these representations were the following:

1) StimTech would get financial and managerial backing from Johnson & Johnson;

2) StimTech could avail itself of the Johnson & Johnson sales force which consisted of more than 4,000 persons;

3) StimTech could make use of the Johnson & Johnson worldwide sales organization, which had distribution to all but a few countries in the world;

4) StimTech would be able to realize the maximum earn-out based solely on sales of $140 million; and

5) StimTech could expect the cooperation of the Johnson & Johnson athletic division in introducing TENS for sports medicine.

StimTech sought to include many of these representations in the contract, but Mr. Anderson again informed the plaintiffs that everything could not be put in writing. Mr. Anderson told the plaintiffs they had to trust that Johnson & Johnson would do the things they had said they would do. At Mr. Sullivan's suggestion, paragraph 10(a) was included in the stock purchase agreement to assure the plaintiffs those items not in writing would be dealt with in good faith. Mr. Hagfors was further advised by Mr. Sullivan that the "umbrella" of paragraph 10(a) would incorporate any representations made during the negotiating period.

In its final draft, paragraph 10(a) of the September 20, 1974, stock purchase agreement read as follows:

Stockholders [plaintiffs] and Johnson & Johnson recognize and acknowledge that *the relationship* which will exist between Johnson & Johnson, the Company [StimTech] and the Stockholders upon consummation of the transactions contemplated herein, *must be based upon a high degree of mutual trust and confidence by the Company, Stockholders and Johnson & Johnson.* Stockholders and Johnson & Johnson agree that each will at all times act in respect to its dealings with the Company and its operations, and subject to the exercise of reasonable business judgment, act [sic] in such a way as to promote to the extent reasonably possible the successful operation and growth of the Company. (Emphasis added)

In testimony adduced at trial, Mr. Galloway, attorney for Johnson & Johnson, stated that if Johnson & Johnson intentionally withheld adequate financial backing, marketing assistance, administrative assistance, overseas marketing assistance, and help in research and development, in his mind there would be no question of its being in violation of paragraph 10(a). This, according to Mr. Galloway, would be true even though none of the aforementioned were provided for, specifically, in the contract. Thus, the chief counsel of Johnson & Johnson, the man involved in the drafting of the contract, admitted on the witness stand that many of the previous promises and representations were effectively incorporated

into paragraph 10(a). The plaintiffs' testimony as to each of these promises and representations were largely admitted by one or more of the defendant's witnesses or the Johnson & Johnson documents introduced at trial.

In his testimony the chief counsel for Johnson & Johnson admitted the need for parol evidence to explain the promises to be incorporated into the contract, and there is, thereafter, very little genuine dispute as to what the promises were and no dispute that they were to be read into the contract. (Tr. 8197–98; 8210–11.)

The stock purchase agreement also provided that the compensation for the stock would be roughly $2.00 for every $1.00 of profit earned by StimTech during the five year earn-out period, with a guaranteed minimum of $1.3 million and a cap of $7 million.

In addition to the stock purchase contract, on September 20, 1974, the plaintiffs entered into three year employment and five year non-compete agreements, which prevented their competing in the pacemaker or the pain control industry for the next five years, except as employees of StimTech. With the signing of the agreements, StimTech became a wholly-owned subsidiary of Johnson & Johnson.

Once the acquisition was completed, Johnson & Johnson instituted a number of new policy changes at StimTech, which adversely affected growth and development. Initially, Charles Anderson became the Chairman of the Board for both StimTech and Devices, Ltd.; as such, he had the major responsibility for both companies. Although Mr. Hagfors remained in the position of President of StimTech for a period of time following acquisition, it was conceded in the evidence that Mr. Anderson could overrule Mr. Hagfors, and the plaintiffs had no power to outvote Mr. Anderson. Mr. Anderson made all the basic management decisions at StimTech and relieved the plaintiffs of any effective role in the operations of the company. Plaintiffs introduced evidence showing that at a very early time after the total acquisition, Mr. Anderson,

acting for Johnson & Johnson, took many steps which were very damaging to Stim-Tech as a corporation and thus to the plaintiffs as individuals. The plaintiffs were now divested of their stock and relegated to the role of employees of Johnson & Johnson under the control of Mr. Anderson. They were later able to protest Johnson & Johnson decisions successfully on only two occasions, both of which involved steps which would have had serious legal implications if enacted. These instances will be discussed in connection with the electrodes and the pricing policies attempted to be imposed upon them by Johnson & Johnson in certain patent matters.

Exactly three months after Johnson & Johnson acquired StimTech, Mr. Anderson imposed a hiring freeze in the marketing area. Later, in February of 1975, a total freeze was imposed on hiring and extended to include Devices as well as StimTech. All hiring decisions had to be made with Mr. Anderson's approval; one janitor was added to the staff but even the hiring of secretaries was not permitted.

In addition, even though StimTech had become a subsidiary of Johnson & Johnson, on December 31, 1974, Mr. Anderson announced that StimTech would not be permitted to use the Johnson & Johnson name in connection with marketing or labeling its products or in dealing with its customers. Several months later, StimTech was also informed that Johnson & Johnson would not permit the StimTech products to be displayed at the Johnson & Johnson annual meeting to be held at the end of March in 1975.

One of Mr. Anderson's earliest orders which was alleged to be detrimental to StimTech established a transfer pricing policy at StimTech which applied to any sale of StimTech products to other Johnson & Johnson companies. The original transfer price was manufacturing cost plus 10%. This price, which created a loss for Stim-Tech, was protested by Mr. Hagfors and was later increased to manufacturing cost plus 25%, but the normal StimTech markup, absent transfer pricing, was at least two

times the manufacturing cost. This newly instituted pricing created dissension between StimTech and Devices, Ltd. and deprived StimTech of badly needed profits.

Another of Mr. Anderson's earlier directives adversely affected StimTech's future sales and expansion plans. On December 12, 1974, Mr. Anderson announced that Devices, Ltd. would have exclusive distribution rights for StimTech's products for the United Kingdom and Europe. If StimTech wanted to sell TENS in that part of the world, it could do so at transfer prices and only through Devices, Ltd., even though Devices, Ltd. had only one salesman for TENS in all of the United Kingdom and Europe. At a later date, Mr. Anderson extended Devices, Ltd.'s territory to the Far East, which foreclosed StimTech from making any effective sales efforts in the Far East.

From the inception of StimTech, the plaintiffs had planned to expand the marketing of TENS to include international sales. This intention was reflected in Mr. McDonald's 1973–74 marketing plan and discussed with Johnson & Johnson during the negotiation period. Letters of inquiry to StimTech from all over the world, prior to acquisition, indicated the existence of a market potential for companies interested in purchasing or distributing TENS devices. However, the Johnson & Johnson imposed distribution arrangement with Devices served to lessen that potential because of the sheer inability of Devices, Ltd.'s one salesman to cover any extensive territory.

In addition, Mr. Anderson initially refused to permit StimTech to hire an international salesman, indicating that StimTech, instead, should concentrate its efforts on the domestic market. In the spring of 1976, however, StimTech did hire an international salesman, Shimon Gibori. Mr. Gibori, who was subsequently fired by Mr. Anderson, was somewhat erratic and irresponsible. However, evidence adduced at trial indicated that Mr. Gibori, before his termination, made a sales trip to South America and returned with what appeared to be orders of approximately $100,000.00. These orders were not filled. Although the parties stipulated that no evidence existed to show that StimTech stifled the orders, the most it was possible to glean from the activities of Mr. Gibori was reflected in a stipulation which stated that he "indicated in several instances possible availability of StimTech distributorships in foreign countries and that StimTech didn't follow through". Gibori's testimony and his other activities were "not to be considered" by the jury.

Another international sales incident, peripherally related to Shimon Gibori, was Mr. Anderson's termination of StimTech's relationship with Cilag-Chemie, a Johnson & Johnson subsidiary in Sweden. Mr. Gibori, while an employee of StimTech, arranged for Cilag-Chemie to distribute TENS devices for StimTech in Sweden. Devices, in the meantime, however, had established a distributorship for TENS with Ethicon in Sweden, another Johnson & Johnson subsidiary. Ethicon, upon learning that it would be competing with Cilag-Chemie in the sale of TENS, expressed its displeasure over the arrangement to Brian Cornish of Devices and Charles Anderson of StimTech. Specifically, the company stated that "It is perhaps needless to say that we are chagrined to find ourselves in this situation and so are our friends at Cilag-Chemie who also have spent time and money on this project." Ethicon made it perfectly clear that it was that company's understanding that Devices, Ltd. was to "have full responsibility for their own products as well as StimTech's products on the European market". (Tr. 8432.) Mr. Anderson, upon learning of Ethicon's annoyance, immediately terminated the arrangement with Cilag-Chemie and prevented StimTech from setting up its own direct relationships. Thus, not only did Johnson & Johnson fail in its contractual obligation to promote StimTech products, but actually refused to allow the Johnson & Johnson subsidiary Cilag-Chemie to compete, in the sale of stimulators after its assistance had been solicited by StimTech and had agreed to the distribution arrangement.

Aside from the question of the international suppression of StimTech, we have here an instance where the two independent companies and StimTech were not allowed to compete with Devices and Ethicon which, in and of itself, gives indication of Johnson & Johnson's reluctance to foster an atmosphere in which competition can thrive.

During that same period, late 1974 to early 1975, Mr. Anderson told StimTech that there would be no planning and construction of foreign "mini-plants." These factories, already in use by Medtronic, were designed to serve as final assembly plants for StimTech products in foreign countries as a means of avoiding tariff barriers, receiving favorable government treatment and lowering the prices of the goods. As such, these proposed mini-plants had been an integral part of StimTech's original international marketing plan, the essence of which was well known by Johnson & Johnson before the purchase of StimTech.

Despite these restrictions on international sales, many inquiries came from Europe, the British Isles, Central and South America, the Middle East, the Far East, Australia, and even the Iron Curtain countries. The plaintiffs, during the case, argued that this evidence showed a deliberate intent by Johnson & Johnson to suppress their sales and prevent their competition. Johnson & Johnson never gave any explicit explanation for prohibiting these sales, and no plausible explanation for these acts, other than plaintiffs' theory, came into the evidence in this case.

Another futile attempt to expand StimTech's sales internationally was made by Mr. McDonald during a European trip in 1975. Mr. McDonald called on several European dealers and physicians in an attempt to enhance the sales of both electronic pain control devices and heart pacemakers. Brian Cornish, the Devices' managing director, who, like many of the men who controlled StimTech's destiny, had come to the company from McNeil (the Tylenol Company), later wrote to Mr. Hagfors complaining about Mr. McDonald's activities and insisting that the previous ground rules relating

to "assigned markets" be observed. This was true in spite of Mr. McDonald's invitation to Devices to come to the United States to sell its products to customers. When Mr. McDonald returned from his trip, he encouraged the securing of government approvals of payment for TENS under national health insurance programs as quickly as possible. He theorized that TENS would be cheaper and more effective than drugs to treat pain over a long period of time and concluded that the European market was potentially larger than the domestic market because of the European system of socialized medicine. No action was taken in response to Mr. McDonald's report, and StimTech received no assistance from other Johnson & Johnson companies to sell its products internationally.

As stated earlier, shortly after the acquisition, Mr. Anderson required StimTech to concentrate on its domestic rather than its international market.

However, Mr. Anderson would not even allow StimTech to expand its U.S. market. Specifically, in January of 1975, Mr. Anderson told StimTech that its sales efforts must be concentrated in three of four geographic areas in which the company was already successfully selling its product and that the domestic territories would not be permitted to expand. In keeping with his directive, Mr. Anderson vetoed any significant expansion of the very effective nurse liaison program under which StimTech employed registered nurses to assist in sales, patient instruction, and research of TENS devices. No rational explanation for these moves was ever given by Johnson & Johnson except that it was their business judgment. The jury could well have concluded, however, that the steps were taken with a deliberate intent to injure StimTech and to prevent its competition.

Another StimTech-owned innovation, designed to assist in sales, education, and research in regard to TENS, was Midwest Pain. This center was the prototype of pain control clinics to which doctors could refer patients for instruction in the use of TENS devices and a place where prescrip-

tions for TENS could be filled. A memo from Mr. Galloway to Mr. Anderson sent six months after acquisition evidenced Johnson & Johnson's prior intention to dispose of Midwest Pain "at an early date". This was done despite the plaintiffs' long-held plan to expand the Midwest Pain concept by opening such centers in other parts of the country. As a result, no additional pain control centers were opened by Johnson & Johnson, and Midwest Pain was eventually sold to Mr. McDonald when he left StimTech in 1977. The plaintiffs contend that the curtailment of this marketing technique was very effective in keeping the sales of TENS devices down and even more significant in keeping the medical profession and the public oblivious to the benefits available through TENS therapy.

As a further example of what plaintiffs allege was intentional suppression, evidence was introduced to show that in November of 1977, StimTech received a request from Pain Control Centers International, a chain of pain clinics, to buy at least $200,000.00 of TENS devices for its 25 centers. Mr. DeAngeli, the Johnson & Johnson man in charge of StimTech, sought and obtained legal advice from Mr. Galloway to the effect that StimTech did not have to sell to PCI, and he subsequently refused their business. The defendant contends the sale was not made because the prospective purchaser PCI's credit was poor. The plaintiffs responded at trial, however, that a "cash on delivery sale" would have provided adequate protection for StimTech. Johnson & Johnson had no satisfactory explanation for refusing to allow StimTech to sell its products, and one could conclude on the record that Johnson & Johnson never asked for the products to be sent C.O.D. The failure to sell to PCI further served to depress StimTech's profits.

During the period in which most of the foregoing policy directives were being handed down, several other major changes were implemented, which directly and adversely affected the financial and managerial underpinnings of the StimTech Company.

On December 17, 1974, three months after full acquisition, Mr. McDonald, who had been praised earlier by Mr. McConnell in his memo to Mr. Whitlock, presented his marketing plan to the StimTech Board and was openly criticized and humiliated by Mr. Anderson at the Board meeting. Mr. Anderson accused Mr. McDonald of preparing a totally inadequate marketing plan and shortly thereafter relieved Mr. McDonald of all significant duties and responsibilities. Mr. Hagfors testified at trial that Mr. Anderson told him the decision to replace Mr. McDonald had been made by Mr. Whitlock before the acquisition took place. (Tr. 2,921–23.)

Mr. McDonald and the other plaintiffs had sold their stock to Johnson & Johnson with the expectation that they would make millions of dollars as Johnson & Johnson executives, based on Mr. Whitlock's assurances of benefits. However, in February of 1975, six months after acquisition, Mr. Anderson formally told Mr. McDonald that he was being replaced as Vice President of Marketing by Frank Clark, an executive from Ethnor, another Johnson & Johnson company. Mr. McDonald was given a position as Vice President of Market Development, but he had no job description nor anyone reporting to him. In 1976, Mr. McDonald was prevented from receiving a raise which would have been equivalent to those of Mr. Hagfors and Mr. Jensen. Because of his employment contract and his non-compete agreement, Mr. McDonald remained at StimTech until 1977, even though his position was devoid of responsibility.

While he was still at StimTech, however, in an effort to achieve his earn-out, Mr. McDonald made a number of suggestions to StimTech's management. He pointed out the fact that Medtronic TENS devices were being used by a pro football team and in the Olympics; and although Mr. McDonald suggested that StimTech should investigate the use of TENS for sports injuries, there was no follow up with the Johnson & Johnson athletic division, which had a "man in every locker room".

In mid-1976, an orthopedic surgery professor at Yale Medical School sent Mr. McDonald a proposal for a study of TENS for sports injuries. Mr. McDonald sought funding for the study with the idea that the results could have been used as a promotional and marketing aid for StimTech. StimTech management, under the leadership of Mr. Anderson, refused to approve funding.

Mr. McDonald also suggested that StimTech follow up on the veterinary uses of TENS. There was no follow up, although Johnson & Johnson owned a company specializing in veterinary medicine and supplies.

Other areas in which Mr. McDonald recommended investigating the possible uses of TENS included the following: 1) treatment of multiple sclerosis; 2) treatment of arthritic pain; 3) treatment of visceral pain; and 4) treatment for pain from acute injury. Again, there was no follow up. The plaintiffs contend that Johnson & Johnson intentionally ignored these opportunities for StimTech because the medical conditions Mr. McDonald recommended investigating were being treated by pain-killing drugs.

The arrival at StimTech of Mr. Clark, Mr. McDonald's replacement, marked a new period of change for the worse in the company management. In the first place, the decision to bring Mr. Clark to StimTech was made by Mr. Anderson and Mr. Whitlock without consulting Mr. Hagfors or anyone else at StimTech. Secondly, when Mr. Clark was transferred to StimTech, he was receiving a salary 1.5 times greater than that of Mr. Hagfors and by the end of 1975, the discrepancy was corrected only to the extent that Mr. Hagfors was receiving $35,000 a year and Mr. Clark was receiving $47,000. In addition to the higher salary, Mr. Clark had stock grants and options, none of which the plaintiffs had. Mr. Whitlock was aware that the salary difference might cause disharmony at StimTech because he knew that Mr. Hagfors was aware of the discrepancy.

Although Mr. Clark was Executive Vice President of Marketing for StimTech and Mr. Hagfors was President, Mr. Clark extended his authority into areas beyond marketing and soon began communicating directly with Mr. Anderson, without involving Mr. Hagfors. On several occasions, Mr. Hagfors was unable to overrule Mr. Clark's decisions. Other Johnson & Johnson executives often referred to StimTech as "Mr. Clark's company". Mr. Clark's arrival served to reinforce the reality that Mr. Hagfors, Mr. McDonald, and Mr. Jensen had lost all control of the company. Management and operating decisions were in Johnson & Johnson's hands.

At approximately the same time Mr. Clark was brought to StimTech, Mr. Anderson announced to the plaintiffs that any funds for research and development would have to come out of the gross profits of StimTech and not from Johnson & Johnson. Mr. Hagfors took his concerns over this development to Mr. Whitlock, who confirmed Mr. Anderson's decision, even though Mr. Hagfors explained that the plaintiffs had agreed to be acquired by Johnson & Johnson because StimTech didn't have money. Mr. Whitlock then told Mr. Hagfors that Johnson & Johnson was expecting those companies it bought to develop their own monies for research and development. Mr. Hagfors later heard that the same policy was also in effect at Devices. Mr. Galloway, in his testimony, had admitted that an intentional failure to provide adequate financing would be actionable and a breach of contract. There is no evidence that Johnson & Johnson so limited other companies which it acquired.

The evidence clearly established the fact that the understanding, based on representations of Johnson & Johnson before acquisition, was that Johnson & Johnson would invest a substantial sum of money "up front" to cover expenses for research and development and to boost sales. Instead of utilizing this arrangement, however, Johnson & Johnson established a line of credit for StimTech through which the company could borrow money to cover losses as incurred. The cash from Johnson & Johnson

was made available only in amounts sufficient to keep the business solvent and (the plaintiffs contend) out of bankruptcy, where it could be acquired by others and, with proper funding, become a greater threat to drugs within the pain control market.

Various witnesses, including some called by the defendant, explained the difference between providing money up front and providing it through a line of credit. It was generally established that money up front permits the company receiving the funds to develop new products and exercise its discretion in doing so, while a line of credit is more of a maintenance arrangement. The former method, according to the evidence and especially the testimony of the presidents of two smaller TENS companies called as witnesses by Johnson & Johnson, is the only way to build up a company. A whole series of restraints were placed upon StimTech which had the effect of stifling its growth and development. After acquisition, it became apparent that the necessary funds would not be forthcoming. The effects of this arrangement, which maintained StimTech in a state of suspended animation, were felt at StimTech shortly after it was announced that research and development funds must come out of StimTech's profits.

Plaintiffs also point to another order made by Mr. Anderson which rendered it impossible for them effectively to do business. In early February of 1975, Mr. Anderson said that inventories must be reduced by 10%, even though StimTech was already having problems in filling orders because of a low inventory.

During that same month, February 1975, a meeting was held in England with Mr. Hagfors, Mr. Anderson, and two men from Devices at which the pros and cons of the programmable pacemaker, long planned by the plaintiffs, were discussed. Hagfors and Jensen at StimTech had improved upon the Devices' pacemaker and had close relationships to the world's leading expert on programmable pacers. They had long planned to invent a programmable pacer that could

be adjusted through electronic impulses outside the body. The first to develop such a pacer would preempt the market and prosper greatly. The profits so reaped could be used to develop TENS which had even greater profit potential. However, in February 1975, Mr. Anderson indicated that the speed of development of the programmable pacemaker was to be determined by Devices, not StimTech. Brian Cornish, the marketing director of Devices, since his arrival from McNeil Pharmaceutical Laboratories, expressed concern over whether or not the programmable pacemaker was important. Mr. Hagfors, who knew that the development of the programmable pacemaker would bring great profits to StimTech, which profits could be used to develop and market TENS therapy, reviewed the advantages of the device. Everyone at the meeting seemed to agree that Devices should proceed to develop the programmable pacemaker and that its development was very important. A month later, however, a memo from Mr. Anderson ordered StimTech and Devices to provide more marketing data before he would permit funds to be invested in the programmable pacemaker program. Mr. Anderson's order slowed the pacemaker program down considerably and created a concomitant delay in the development of new stimulators and their sales.

It should be noted that the natural, proper, and normal thrust of a modern corporate business is to make a profit. The thrust of the plaintiffs' case is that StimTech was not allowed to make a profit so that other Johnson & Johnson companies could make much greater profits from the sale of drugs. There is little dispute about the evidence since nearly everything to which the plaintiffs testified was corroborated and in many instances made stronger and more compelling by the defendant's own documents and admissions.

There was, however, much debate over the inferences to be drawn from the evidence. From the evidence, it appeared that the greatest need of this small company was to get funds to use in teaching doctors,

hospital personnel and nurses of the benefits of TENS therapy. The potential profit could be measured in several hundred million dollars each year. Once Johnson & Johnson controlled StimTech and they announced that the research must be funded from profits, the potential for sufficient funding for research, teaching, and development became rather remote.[1]

Since the only source of research was profits, and if, as contended, Johnson & Johnson did not wish the research and development to go on, then any profit from any source represented a threat to what plaintiffs contend was Johnson & Johnson's plan to suppress TENS. It mattered not whether the potential profit came from the sale of TENS devices, electrodes, or pacemakers. If the Johnson & Johnson alleged plan was to succeed, there could be no substantial profit for StimTech from any such sources. The jury considered evidence relating to actions and omissions by Johnson & Johnson, which can have no other explanation than that of a deliberate course of conduct designed to prevent StimTech from making a profit. Without profit, of course, there could be no earn-out for the plaintiffs. The more important aim appeared from the evidence to be that Johnson & Johnson sought to prevent the growth and development of TENS therapy and thus avoid competition with drugs in the pain control field.

From the time of incorporation, StimTech had looked upon the pacemaker as a "bread and butter" item, the sales of which would provide a source of funding for the development of TENS devices. With the slowing down of the pacemaker program and the general scarcity of funds, StimTech's plans to engage in new product development were greatly affected. In the initial stages of the company's planning, Mr. McDonald had presented as part of the 1973–74 marketing plan for StimTech a proposal for the

development of a new, smaller TENS device. Within six months of the acquisition, Mr. Jensen and a StimTech technician built two engineering prototypes of stimulators in cases approximately the size of a square cigarette lighter, both with recessed controls. The two stimulators were samples of what plaintiff wanted StimTech to do and represented a tangible expression of what Mr. Jensen believed were the desires of the marketplace.

These prototypes were shown to Mr. Anderson in late 1974 or early 1975 as a basis for a stimulator development program. Mr. Anderson told Mr. Jensen that limited assets would not permit StimTech to develop something of that sort and that the emphasis at that time should be on the sales of the existing stimulator. The plan was thus abandoned, and StimTech did not develop the new stimulator until five years later in 1978. In the interim, StimTech did not realize its expected volume of sales and, in fact, lost market share to other TENS companies.

StimTech was not alone, however, in being starved for funds by Johnson & Johnson. From the beginning of the "courtship" period between Johnson & Johnson and Devices, Johnson & Johnson was aware of the fact that Devices would need additional funding to build up its inventory, improve its delivery schedule, and bring its pacemaker operations up to date.

In spite of this need for infusion of substantial capital to enable Devices to build up its marketing organization, the combination of StimTech and Devices offered a "unique opportunity" for Johnson & Johnson; Johnson & Johnson readily acknowledged this in an internal memorandum. Devices had a 6% share of the world pacemaker market at the time of acquisition and offered, in alliance with StimTech, considerable expertise in the pacemaker field.

1. Early in the trial, defense counsel questioned the notion that there had been any limitation on research and development to funds derived from "profits". After further proof and admissions, the question became one of whether the limitation was to "profits" or "gross profits". Later in the trial this distinction was abandoned entirely by defense counsel. In any event, it makes little difference since earnings can not be spent for research over a period of time unless they exceed expenses, and they never did in StimTech during the relevant period of time.

In addition, Devices had the most advanced electronics in the industry, an excellent reliability record, good relations with government officials, and quality employees.

As previously stated, however, shortly after acquisition, the Johnson & Johnson directives imposing a hiring freeze and requiring research and development funds to come out of company-generated gross profits were applied to Devices as well as StimTech. Mr. Anderson made several additional moves and gave orders and instructions to Devices, which could only be construed as damaging Devices as a company and ultimately destroying it as a source of pacemakers and pacemaker profits to StimTech. Mr. Anderson instructed Devices to cut its inventory to a bare minimum and to delay its work on a programmable pacemaker until he could obtain more marketing information. At the same time, the lack of a lithium-powered pacemaker was hurting Devices and StimTech in the marketplace. No funding was made available for such new product research.

One of the most serious weaknesses of the StimTech/Devices pacemaker program, however, was the companies' failure to secure a second source for the electronic circuitry necessary for pacemaker manufacturing. Mr. Jensen, aware of the fact that no company should attempt to do business without a second source for its essential components, attempted to find one. He presented a price estimate to Mr. Anderson, in late 1974, for preliminary research and development and circuitry design, but Mr. Anderson squelched Mr. Jensen's efforts by responding that there was no money available for his project. This failure to have available a second circuitry source was later used by Johnson & Johnson as its justification for closing Devices.

In May and June of 1977, a quality problem known as ESR drift developed in several of Devices' 3821 pacemakers. The drift involved an increase in rates which was caused by a defect in some of the pacemaker circuits manufactured by ITT in England, the sole source of supply for the electronic circuits. At the time the drift occurred, Mr. Frank DeAngeli, who had replaced Mr. Anderson as the StimTech/Devices Chairman, described the problem to Johnson & Johnson Chairman Burke as "minor". Had Mr. Anderson followed Mr. Jensen's suggestion and obtained a second source of circuitry, there would have been absolutely no problem in carrying on production while the ITT circuitry was being corrected.

In late July of 1977, Mr. DeAngeli, who was then Johnson & Johnson's man in control of StimTech, went to England to meet with government health officials and to investigate further Devices' quality problem. Without a second circuitry source, Devices was dependent on ITT to resolve the difficulty, which ITT said it could do in a very few months.

In the fall, despite the fact that British health officials urged Mr. DeAngeli to keep Devices open and offered assistance in locating a second power source, and despite the fact that ITT promised to have a new electronic system available within three months of that time, Mr. DeAngeli decided to close Devices. This was done in mid-September of 1977. Production of the 3821 pacemaker was permanently stopped, thus depriving Devices of between 80 and 90% of its sales volume and destroying StimTech's "bread and butter" pacemaker business. The plaintiffs contend, and the jury could reasonably find, that the decision to close Devices was a deliberate act done for the purpose of suppressing StimTech in order to foreclose TENS from competing with the drugs Tylenol and Zomax.

At the trial, Mr. Alan Smale, an eminent British scientist and one of the men who sold Devices to Johnson & Johnson, testified through his deposition that he was certain that the ESR drift problem could have been corrected in a very short time. He also stated that Devices' quality problem was no more serious than problems experienced by its competitors in the pacemaker industry. Those competitors, Medtronic and Cordis, recalled their defective pacemakers and persisted in the market in spite of their difficulties. It is plaintiffs' contention that

Johnson & Johnson could have and should have done likewise.

Johnson & Johnson did not persist, however. Devices' production capacity was idle, and after a year, Johnson & Johnson entered into an agreement with American Pacemaker Corporation, which paid Johnson & Johnson a small amount for Devices and assumed all of Devices' outstanding warranty obligations. The evidence was sufficient to allow the jury to conclude that this potential liability, plus the purchase price, was inadequate compensation for the sale of Devices. The plaintiffs argue that it amounted to "giving away" the company. At no time during the period that Johnson & Johnson was looking for a buyer did it inform Mr. Hagfors of the proposed sale, nor did it give him an opportunity to make an offer for Devices.

Mr. Hagfors had been hopeful that a lithium powered programmable pacemaker would be available in 1976. Instead, while he was still with StimTech in 1976, one researcher was hired to work on the programmable pacemaker, and his only assistance came from Dr. Keller, an outside consultant. This researcher, Mr. Bailey, testified that even though there was a lack of coordination in the program and the program was quite inadequate, it still continued. The rate at which this research program proceeded was to be determined by Devices, and the separation of Devices and StimTech by the Atlantic Ocean made coordination rather difficult.

Nevertheless, after Devices had closed and with StimTech continuing on its own, a lithium programmable pacemaker was developed in 1978. The new pacemaker was considered "a step beyond anything that was available at the time." This programmable pacemaker showed great promise for the future of StimTech. In August of 1978, StimTech management met with Johnson & Johnson Chairman Burke and Mr. DeAngeli to review the proposed marketing plan of the new pacemaker.

At the conclusion of the meeting, the project's engineer and the StimTech officers left, convinced the funding to support the marketing plan would be forthcoming and that StimTech would prosper. Within sixty days, however, Johnson & Johnson closed the StimTech pacemaker business and offered it for sale, programmable pacemaker and all. The plaintiffs contend that Johnson & Johnson knew the programmable pacemaker was a very valuable asset and further contend that if it had been marketed by StimTech, StimTech would have benefitted greatly. In that case, however, there would have been funds available for research and development in the TENS therapy, and Johnson & Johnson's desire to curtail competition with drugs by TENS therapy caused them to sell the programmable pacemaker business at a very low price. As a part of the evidence that Johnson & Johnson knew it was selling a very valuable asset when it sold the lithium programmable pacemaker, plaintiffs point out that Johnson & Johnson provided potential purchasers of the business with sales estimates for the new pacemaker starting at $4.3 million in 1979 and rising to $56 million by 1988, with after tax profits of $5.7 million. In January of 1979, Johnson & Johnson sold the StimTech pacemaker business to Biotronik, a German company. Although Mr. Hagfors made his interest in buying the business known to Johnson & Johnson, he was never given the opportunity to bid.

Testimony at trial indicated that StimTech had the proper technology and planning capacity to develop the very pacemakers which later captured the market. The pacemaker company which developed the programmable lithium-power pacemakers went on to make sales and profits in the hundreds of millions of dollars. The evidence indicated that StimTech, had it been given proper funding and research assistance, would in all probability have done as well as any of the other pacemaker companies. According to the plaintiffs, StimTech was not given the proper assistance and was in fact held back. As a result thereof, in 1979, although StimTech possessed a fully competitive lithium programmable pacemaker, it was not allowed to market the

product, rather the whole program was sold by Johnson & Johnson.

At trial, the plaintiffs introduced evidence to show that Johnson & Johnson was in haste to divest itself of Devices and the StimTech pacemaker business, allegedly in order to cripple the TENS production and sales. The plaintiffs argued that the defendant wanted to be in the pacemaker business and to make the high profits that were available there, but not if the profits could be used by StimTech to develop the TENS market and to compete with Johnson & Johnson's lucrative drug market. As evidence of this desire to be in the pacemaker market without developing the TENS business, the plaintiffs point to Johnson & Johnson's interest in buying a pacemaker company that would not benefit the TENS industry, even as it prepared to sell a pacemaker that was ahead of the state of the art.

In mid-1978, Mr. DeAngeli asked Mr. Anderson to look at the pacemaker industry to see if it still offered a good opportunity and, if so, to suggest ways Johnson & Johnson might take advantage of that opportunity.

The study made by Mr. Anderson was called "Project Summer." It started with a survey of the whole pacemaker industry and then gradually focused on possible acquisitions, with particular emphasis on CPI, which became the code name "Summer" of the study title. CPI management was seriously considering selling the company, and Mr. DeAngeli was seriously considering buying it on behalf of Johnson & Johnson.

In his interoffice review of the pacemaker industry, Mr. Anderson pointed out that major market opportunities existed in international sales and in the development of programmable pacemakers. Although the evidence demonstrated that StimTech, a wholly-owned subsidiary of Johnson & Johnson, had a lithium-powered programmable pacemaker that was beyond the state of the art, the plaintiffs argued that Johnson & Johnson did not choose to market it because any profits generated for StimTech would be used to make funds available for research and development of TENS devices.

Likewise, the plaintiffs would have earned their payout and after their termination, they could have used the proceeds of the payout to fund a new TENS company to compete against the entire pain-control industry—not only Johnson & Johnson but all dispensers of pain-controlling drugs. An explanation which the jury could have rationally arrived at was that Johnson & Johnson, in divesting itself of one pacemaker company, even as it sought to buy another, was doing it for anti-competitive reasons.

The most interesting opportunity for "acquisition as an entry" was CPI, according to Mr. Anderson. In making his assessment of the value of CPI, Mr. Anderson did in actual practice that which the plaintiffs did in arriving at their "values" in their damage studies. Mr. Anderson took the after-tax profit for CPI for the past year and multiplied it by a factor of 17. This multiple of 17 gave him a value of $134.3 million. In order to acquire CPI, Mr. Anderson concluded that Johnson & Johnson could pay $113 million assuming earnings of $2.41 per share, or $127 million assuming earnings of $2.71 per share, without diluting Johnson & Johnson's stock. Mr. Anderson and Mr. DeAngeli secretly flew to Bemidji, Minnesota, and discussed the possible acquisition with CPI's president, Mr. Arthur Schwalm. Mr. Schwalm, a Johnson & Johnson witness undergoing cross examination, testified at trial that although he spoke with the Johnson & Johnson executives, he decided not to sell to them because of information he had about the manner in which Johnson & Johnson had acted in its handling of the Devices and StimTech situation. Mr. Schwalm did not convey his doubts to Johnson & Johnson, however, and while Johnson & Johnson was still in the process of evaluating the purchase, Schwalm sold CPI to Eli Lilly for just over $100 million.

During the time that Johnson & Johnson was preparing to sell the StimTech-developed lithium-powered pacemaker, and at the same time, seeking to purchase another company with a lithium-powered programmable pacemaker, Hagfors, McDonald,

and Jensen had many friends in the Stim-Tech organization. In an apparent effort to keep its action hidden from McDonald, Hagfors, and Jensen, Johnson & Johnson took affirmative steps to see that none of the plaintiffs' friends in StimTech learned of its efforts to buy another pacemaker company. The secret was kept within the top Johnson & Johnson executives' knowledge only. Mr. Anderson, who had been with StimTech, was the person attempting to make the acquisition. When a meeting was called in August of 1978 to discuss the marketing of the StimTech-developed programmable pacemaker, it was evidently concluded before the meeting took place that the StimTech pacemaker would never be marketed. This becomes apparent when one considers the evidence which shows that before that meeting took place, Mr. Anderson warned Mr. DeAngeli to warn Mr. Burke, Chairman of the Board of Johnson & Johnson, not to reveal to anyone at Stim-Tech that as Johnson & Johnson was looking at StimTech's pacemaker with a purported view of marketing it, it was actually in the process of considering the purchase of another pacemaker company, CPI.

Mr. Hagfors testified at trial, without objection or contradiction, that if Johnson & Johnson had spent one-tenth of the amount it was considering paying for CPI on StimTech's pacemaker business at the appropriate time, StimTech would have been extremely successful. Thus, Johnson & Johnson could have owned a company at least as good as CPI. The plaintiffs argue that Johnson & Johnson's attempts to buy Cardiac Pacemakers, Inc. underscore the fact that although Johnson & Johnson wanted a pacemaker company, it did not wish to build up Devices because that would have had the effect of strengthening Stim-Tech and its competitive posture against pain drugs.

At the same time StimTech and Devices were floundering, another of Johnson & Johnson's subsidiaries was flourishing. McNeil, the Johnson & Johnson company primarily responsible for the manufacturing and marketing of pain control drugs, was experiencing considerable success in the marketplace with Tylenol and Tylenol with codeine. In addition, it was engaged in laboratory tests on Zomax, a prescription, non-narcotic drug with the potency of morphine. McNeil is the former employer of many of the men who ultimately controlled StimTech's destiny.

Tylenol with codeine rose from number 127 among U.S. prescription drugs in 1971 to number 1 in 1980. The Johnson & Johnson 1980 third quarter report to shareholders attributed the drug's success to programs that educated physicians regarding the advantages of a drug which gave potent pain relief without the adverse effects of aspirin. This type of educational program for TENS was promised to the plaintiffs prior to the purchase as part of the marketing program and was to have been accomplished by using other Johnson & Johnson salesmen to educate the physicians. This education was never forthcoming.

Over-the-counter Tylenol started out as a prescription drug, but its status was eventually changed. This pattern is consistent with the method of introducing drugs through the physician's prescription until the product becomes well known to the public. When the public becomes familiar with the drugs, it is sold in the same or another form over the counter. At the time of trial, OTC Tylenol had 27.1% of the over-the-counter, non-prescription, oral analgesic market; and its market share was larger than Anacin, Bufferin, and Bayer (the next three largest competitors) combined.

The road to OTC Tylenol's success was not always smooth, however. In 1975, McNeil learned that one of its competitors had introduced Datril, another analgesic, to compete against Tylenol, and it was being priced lower and mass marketed to consumers. Johnson & Johnson's current Chairman, James E. Burke, engineered an effort to stop the "Datril threat". Johnson & Johnson formed McNeil Consumer Products Division with a sales force of 100 salesmen from Johnson & Johnson's Domestic Operating Company, cut the price of Tylenol by

30%, gave $23 million in rebate checks to pharmacists selling Tylenol, and instituted mass advertising to consumers. The sales force sent in to help McNeil eventually reached 200. This 23 million dollar give-away stopped the "Datril threat", and the Consumer Products Division was separately incorporated as a result of its successful campaign. Nevertheless, the Consumer Products Division continued to provide the McNeil Company with sales and marketing help. No transfer pricing was imposed between the two companies, unlike the arrangement Johnson & Johnson required of Devices and StimTech.

During the plaintiffs' earn-out period, 1975 through 1979, Johnson & Johnson's combined total sales for Tylenol with codeine and OTC Tylenol amounted to $690,-476,000.00; the combined profit on those sales during the earn-out period totalled $134,400,000.00.

The newest of McNeil's pain control drugs is Zomax, which is both analgesic and non-narcotic. It was developed by Johnson & Johnson in 1969 and came to market in late 1980.

Underscoring the advantages of TENS over pain control drugs, the plaintiffs introduced evidence of the dangers of Zomax. The FDA report on Zomax, which was read into evidence at trial, contained a full picture of both the efficacy of Zomax and its potential side effects, as shown by results of clinical studies on the drug. The report indicated that "gastrointestinal adverse reactions were common", while other possible side effects included dizziness, edema, rash, muscle weakness, and urinary tract problems.

In spite of these possible adverse reactions, Zomax proved successful through 18 clinical studies in the treatment of the following kinds of pain: dental pain, arthritis pain, post operative pain, acute orthopedic pain, muscle contraction, headache, and chronic orthopedic pain. Because Stim-Tech's clinical studies had found TENS to be effective in the treatment of these same conditions, Mr. DeAngeli testified that in the broad market for the relief of pain, there was clearly an overlap for these two products—Zomax and TENS. TENS, however, have essentially no side effects.

The total research and development expenditures for Zomax amounted to more than $14 million during the seven years before the drug was put on the market. That is $3 million more than Johnson & Johnson's total expenditure on StimTech.

In contrast to what was done with the TENS device, the evidence is that once McNeil established the efficacy of Zomax, a marketing strategy was adopted in order to tap the substantial potential market. Market survey companies interviewed doctors, and numerous clinical studies of Zomax were conducted. In addition, an extensive advertising and promotional campaign was planned, which included the sending of introductory letters to office and hospital-based physicians in patient care and the production of a five part educational program on pain, moderated by Dr. Frank Field and broadcast in approximately 81 markets across the country. Planned advertising included several pages of color ads in mass circulation medical journals, hospital exhibits, radio spots, speaker bureaus, and a walk-through exhibit for use at medical meetings.

The total estimated sales force for Zomax was 512 people. These people were to cover 440 separate sales territories and were equipped with manuals on pain management; Zomax pens, mirrors, key chains, and pads; and a hospital formulary sales kit. McNeil projected total Zomax marketing expenses for the first twelve months at $13,861,000.

The plaintiffs refer to this evidence as an example of the kind of support Johnson & Johnson promised to StimTech before Stim-Tech was sold to Johnson & Johnson. Had Johnson & Johnson delivered what it promised, the plaintiffs would have earned their payout, and StimTech would have been very successful in the pain-control area. StimTech's abortive advertising campaign illustrates Johnson & Johnson's disparity in the treatment of its subsidiaries. In November of 1977, StimTech attempted to

capitalize on TEN's absence of side effects and devised an advertising campaign to promote the device as an alternative to drugs. Mr. Mashburn, who was then President of StimTech, required Larry Sigurdson, the StimTech Advertising Manager, to show his proposed campaign to the Advertising Manager of McNeil Laboratories for suggestions. The McNeil Advertising Manager, in response to Mr. Sigurdson's letter disclosing his advertising plans, responded that although McNeil and StimTech appeared to be in competition, he thought it was good to keep such competition "in the family". The ad which was permitted to run was a "watered down version" of the one originally anticipated by Mr. Sigurdson and was used for only eight months.

Another example cited by the plaintiffs as evidence of Johnson & Johnson's suppression of StimTech involved Johnson & Johnson's actions in depriving StimTech of an opportunity to develop and market an electrode for use with the TENS device.

The medical testimony in this case indicated that a great many of the most severe problems associated with surgery are those caused by the drugs taken to relieve post-surgical pain. The more severe the surgery, the greater the need is for more and stronger drugs, and the side effects of these drugs are those which are often associated with surgery. The typical bloated, gas-filled intestinal tract results from a paralysis of the involuntary peristaltic contracting movements of the bowels by drugs. The drugs given to alleviate the pain have a side effect of paralyzing the bowels, and the gas, pain, discomfort, and sometimes serious bowel problems follow. The administering of large amounts of pain-control drugs also paralyzes the cilia in the lungs—the small hairlike protuberances jutting out from the surface of the lungs. These cilia, in their natural condition, fluctuate back and forth like grass in the wind and carry fluids, foreign matters, and mucus out of the lungs up into the bronchi, where it is coughed out and swallowed or excreted. When these hairlike fingers are paralyzed, the fluids and the mucus remains in the lungs and pneumonia develops, not so much from the surgery as from the drugs that are used to relieve the pain in surgery. Post-surgical drugs also affect the heart rhythm and the equilibrium of the patient and can put him in a state of mental confusion. The evidence in this case demonstrates that most of these side effects in large part could be eliminated by placing an electrode on each side of the surgical wound in an appropriate place and stimulating the surface of the skin to block off the intense pain which is usually associated with surgery. One of the prime requisites for proper administration of such stimulation is an electrode which would attach smoothly to the skin over a large area.

The electrodes in use at the time were made of aluminum foil or similar material and were usually fastened to the skin of the patient with adhesive tape of some kind. These electrodes tended to be irritating to the patient's skin from time to time and constituted one of the very few adverse effects in TENS therapy. A better method of attaching the electrode to the skin was needed; StimTech found the answer to this need.

In late 1974, a Minneapolis surgeon, Dr. Alan Hymes, told Mr. McDonald that he believed an effective electrode could be made using a natural gum, karaya, as an electrical conducting adhesive. This electrically conducting adhesive could be spread on a fabric backing material to which a wire would be attached and would adhere to the surface of the skin in such a way as to make a smooth and uniform electrical connection with the entire area to be "stimulated". Mr. Hagfors took this information to Johnson & Johnson through Mr. Anderson and Dr. McConnell. They, in turn, put StimTech in touch with the Patient Care Division of Johnson & Johnson for help in developing a new stimulating electrode. The plaintiffs contend, and the evidence demonstrates, that the Patient Care Division, at the direction of Johnson & Johnson's top management, used the information given them in such a way so as to benefit themselves and to harm both Stim-Tech and Dr. Alan Hymes. Patient Care

Division (hereinafter PCD) received the initial information and, thereafter, on several occasions in late 1974, Mr. Hagfors wrote to Charles Hartman, Product Manager at PCD, enclosing materials on the karaya and also information regarding the use of stimulators for treating post operative pain. On one of these occasions, Mr. Hagfors enclosed electrode samples.

Mr. Hagfors also wrote to Mr. Galloway, an attorney at Johnson & Johnson, reporting on a meeting with Dr. Hymes in which further information on the karaya was provided. He suggested that a consulting/license agreement be arranged between StimTech and Dr. Hymes. Dr. Hymes indicated that he intended to patent this idea.

In early 1975, a group of scientists from Patient Care Division met with Dr. Hymes in Minneapolis in order to gain more knowledge about the formulation, features, and workings of the karaya. Dr. Hymes freely and fully disclosed to them his secrets and know-how. Dr. Jeffrey Berg, a PCD scientist, attended the first meeting with Dr. Hymes, made several other visits to Stim-Tech and received all available information from StimTech and Dr. Hymes on the karaya electrode project. The plaintiffs and Dr. Hymes believed at this point that they were involved in a joint development program with the Patient Care Division of Johnson & Johnson. Dr. Berg returned to PCD after having obtained the information and soon came up with a substance very similar to Karaya, which he called hydro-colloid. He concluded that this hydro-colloid might be developed for the same uses as karaya. The material was very similar, although during the trial, Johnson & Johnson made a point of the fact that the hydro-colloid withstood radiation better than Karaya. There is no evidence that prior to Johnson & Johnson's receiving the information from Dr. Hymes, it ever had considered using hydro-colloid or any other such material as a part of an electrode.

A market analysis conducted during this time by PCD estimated the potential market for post-operative stimulating elec-trodes at $22 million per year, based on a selling price of $3.00 per pair of electrodes. [The electrodes 3 years later went on the market priced at $15.00 per pair.] This estimated sales figure of $22 million was based upon the market for TENS devices then in existence. The plaintiffs contend that had the electrode program been developed as originally planned and had Stim-Tech been allowed to sell the electrodes, the sales would have contributed greatly toward their achieving their earn-out and toward StimTech's ability to compete in the pain control field.

Johnson & Johnson, through its Patient Care Division, attempted to set the prices at which StimTech could sell electrodes and also undertook steps tending to exclude StimTech from one of the most lucrative markets—the post-operative pain market.

Johnson & Johnson's Patient Care Division, which at the time had acquired substantially all of the know-how from Stim-Tech concerning the electrode, prepared to commence the sale of the item. In June of 1975, Mr. Anderson conveyed to StimTech a proposal made by PCD whereby PCD would market a post-operative stimulator and electrode. PCD, according to the proposal, would sell its electrodes only in the hospitals. StimTech, although free to sell in the same market, could not undercut PCD's price on either stimulators or electrodes. This arrangement and its legality were much discussed during the trial.

Another term of the proposal required StimTech, which had never been permitted to use the Johnson & Johnson name on its products, to sell TENS devices to PCD at a much reduced "transfer price", after which PCD would put the Johnson & Johnson name on the TENS and sell them through the Patient Care Division. The Johnson & Johnson rationale for this disparity of treatment was never explained by its agents.

Mr. Hagfors, who was still at StimTech and anxious to get his earn-out, protested and rejected the above PCD proposals. At this point in time, StimTech was without any new electrodes. Dr. Hymes' karaya had been returned to Dr. Hymes, as will

later be explained, and PCD would not supply the hydrocolloid to StimTech. It appears from the evidence that Hagfors' uncooperative attitude on pricing was a cause of the delay.

In December of 1975, following the attempt to reach a marketing agreement on electrodes, PCD hired Larry Lazar, an organic chemist. Although Lazar was brought in to work on the hydrocolloid electrode, he quickly came across another substance which could have been of much use to StimTech. Mr. Lazar went to StimTech with Dr. Berg to become acquainted with the electrode development program. Although StimTech wanted the hydrocolloid electrode and could not get it, Mr. Lazar thought StimTech might be able to use an electrically conductive adhesive gel for attaching its old-fashioned electrodes. This would eliminate a patient's having to use a non-adhesive conducting gel in addition to having to secure the electrodes by means of adhesive tape.

Approximately three days after his return to PCD labs, Mr. Lazar developed such an adhesive gel in the laboratory and suggested that it be turned over to StimTech. In spite of the fact that a PCD market analysis showed that the gel market was too small to interest PCD, PCD initially decided against disclosing the gel to StimTech because of StimTech's "past intransigence". The evidence indicated that the "past intransigence" was StimTech's refusal to agree to the sales and pricing arrangements on the hydrocolloid electrode. Despite PCD's initial refusal to disclose the gel to StimTech, six weeks after the gel's formulation, PCD revealed its existence to StimTech and sent the company one small tube of the product. Mr. Hagfors was interested in the gel and asked for additional tubes, but StimTech never received more of the substance. Mr. Hagfors thought it would have been very valuable to StimTech. Mr. Lazar had it and wanted to give it to StimTech for its use and profit, but the persons who decided otherwise never came to court to tell of their reasons for depriving StimTech of this potentially profitable adhesive gel.

In January of 1976, Mr. Lazar began work on hydrocolloid; and, by April of that year, he had developed the hydrocolloid electrode and devised a technique for its manufacture. The necessary manufacturing equipment was designed, but it was not used by PCD. The technique for development was never suggested to StimTech nor was it supplied with the electrodes until after the earn-out period. Plaintiffs contend that the withholding of this item was done to prevent them from successfully marketing the electrode during the earn out. The electrode presently sells for approximately five times the price originally contemplated.

Even though Johnson & Johnson delayed in developing and marketing the hydrocolloid, PCD nevertheless conducted marketing and clinical tests on the electrode. Information resulting from the PCD studies confirmed earlier studies which indicated that patients using TENS post-operatively had less pain and used fewer drugs than those using more traditional methods of post-operative treatment. In spite of these indications, however, in December of 1976, Mr. Lazar was told by Dr. Berg to stop work on the hydrocolloid electrode and to start developing a hydrocolloid grounding pad instead. Johnson & Johnson's fear of Dr. Hymes' patent claims on the electrode seemed to underlie this decision.

Testimony at trial was to the effect that at a time prior to the date on which Mr. Lazar was asked to change the focus of his work from electrodes to grounding pads, Dr. Hymes met with Mr. John Simkanich, Johnson & Johnson patent attorney, to discuss his invention and the terms of a license agreement between Dr. Hymes and StimTech. Following that meeting, Mr. Simkanich received information about the karaya electrode from Dr. Hymes, drafted a patent application for a stimulating electrode using karaya, and sent it to Dr. Hymes for his approval. Dr. Hymes did approve the application, and it was filed by Mr. Simkanich on November 25, 1975.

While Mr. Simkanich, the patent attorney, was working on Dr. Hymes' karaya patent application, he was approached by Dr. Berg, the PCD scientist who had been given all of Dr. Hymes' information about the karaya electrode on the premise that he was to orchestrate the joint development of the product. Dr. Berg spoke not of the information he had received from Dr. Hymes but instead asked Simkanich to prepare a patent application for an electrode using hydrocolloid, a "synthetic karaya".

There was, thereafter, a period of time during which Mr. Simkanich was working on both the karaya patent for Dr. Hymes and its present day competitor, the "synthetic karaya" hydrocolloid patent for Johnson & Johnson. In the process of so doing, Mr. Simkanich used a good deal of identical language in describing and making the various claims and assertions in each of the two patent applications. Meanwhile, as Simkanich was working on both patents simultaneously, Dr. Hymes was claiming to Johnson & Johnson that he would demand royalties on any patents or production, based upon his disclosure to Johnson & Johnson. Before the patent applications were actually filed, it occurred to Mr. Simkanich that if the same Johnson & Johnson lawyer were attempting to patent the same or very similar inventions for both his employer and an outsider, Dr. Hymes, he might be in a conflict of interest posture. Had he not done so, this same thought might later have occurred to Dr. Hymes' lawyers as they read the same attorney's name on both patent applications. The drafting of the two patents apparently "dovetailed" enough so that they both ultimately issued, but Mr. Simkanich's name does not appear on the hydrocolloid application. He had seen the conflict and asked his superiors to relieve him of the duties on the hydrocolloid patent. Hydrocolloid was given to another attorney, Mr. Steve Berman, who worked with Mr. Simkanich in the same department under the same superior. It was Mr. Berman who actually signed the hydrocolloid patent application. The evidence as to just what, if any, actual work he did on it is unclear. There was evidence that Mr. Simkanich had done considerable work on both materials before Mr. Berman took over.

In the meantime, Dr. Hymes was continuing to insist to PCD that he had a right to be compensated for any electrode PCD might develop based on knowledge given by him about karaya. In August of 1976, Dr. Hymes told StimTech he was dissatisfied with the progress of the karaya electrode program and he wanted another agreement which would provide royalties for "any and all gum-like electrodes that would be manufactured by StimTech." The grounding pad, however, was one item not mentioned in the letter Dr. Hymes wrote to demand royalties. Within a few days after receipt of this letter from Dr. Hymes, Mr. Anderson directed StimTech to stop all development work on the hydrocolloid electrode; PCD thereafter directed its efforts towards the hydrocolloid grounding pad, the one not specifically claimed by Dr. Hymes as resulting from his knowledge. The grounding pad · is actually an over-sized electrode which is attached to the body of a patient undergoing surgery and is intended to prevent electrical sparks from being given off in the presence of the oxygen and other gases used during surgery.

PCD, at this point, sought legal advice from Steve Berman, the lawyer who signed the hydrocolloid patent application. It asked Mr. Berman· about any obligations PCD would have to Dr. Hymes if the hydrocolloid electrode were marketed. At trial, the plaintiffs introduced a Johnson & Johnson intra-office memo written on November 2, 1976, containing the following summary of Dr. Hymes' letter and Steve Berman's response:

Based on the September 9, 1976, letter attached from Dr. Allan Hymes to Frank Clark, *Dr. Hymes wants* the following from Johnson & Johnson:

a) A 3% royalty for synthetic or Karaya electrodes regardless of whether the patent on Karaya electrodes issues or not,

b) An increase in the maximum royalty paid to $100,000 per year with a built-in annual escalator for the cost of living,

c) A mutually agreed upon minimum royalty retroactive to June of 1976,

d) A restriction on the license to the pain control "field of use" with new contracts negotiable for the EEG, EKG, and EMG applications (no mention was made of electrosurgical grounding pads).

The following represents Steve Berman's views regarding Dr. Hymes' rights:

a) Dr. Hymes has the right to get his Karaya patent rights back (including his patent application) from StimTech should StimTech terminate their agreement with him,

b) Jeff Berg's invention is not derived from Dr. Hymes' invention,

c) Some form of Jeff Berg's invention is probably patentable and we are working on the application presently,

d) There are no envisioned patent conflicts between the Berg invention and the Hymes invention.

The following represents Steve Berman's assessment as to what is likely to happen if StimTech cancels their agreement with Dr. Hymes:

a) Dr. Hymes is likely to sue Johnson & Johnson if and when an electrode product is marketed. His suit is likely to be based on the following two premises: 1) If it had not been for Dr. Hymes and his relationship with StimTech, Johnson & Johnson would or could not have marketed their electrode, 2) Based on his patent claims written by a Johnson & Johnson attorney, he could claim that he brought more than Karaya to Johnson & Johnson.

b) If Dr. Hymes sues in front of a jury, he is liable to win and will receive judgment from either StimTech, Johnson & Johnson Corporate or Patient Care. Since Patient Care would be receiving the benefit from marketing the electrode, it is likely that we would be liable for damages to Dr. Hymes. (Plaintiffs' Exhibit 344.)

As is evident, Mr. Berman's memorandum summed up Dr. Hymes' demands and briefly stated the grounds for a potential lawsuit brought by Dr. Hymes against Johnson & Johnson, if and when an electrode was marketed. Mr. Berman's memo concluded that Dr. Hymes was likely to win if he sued in front of a jury, and if he did win, he would receive judgment from either StimTech, Johnson & Johnson Corporate, or PCD on the basis that one or more of the corporate entities had wrongfully appropriated the technology suggested to them by Dr. Hymes. Mr. Berman added that PCD would likely be liable for damages since it would be receiving the benefit from marketing the electrode.

Dr. Hymes' proximity to StimTech and his demands upon Johnson & Johnson for royalties were a source of trouble to Johnson & Johnson. The evidence shows that StimTech was ordered to get rid of Dr. Hymes. Mr. Hagfors was told by Mr. Anderson to give the karaya electrode back to Dr. Hymes and to dissassociate with him. Mr. Hagfors was anxious to market any electrode and was reluctant to discontinue his efforts to market karaya. He was told by Mr. Anderson that unless he terminated the karaya electrode agreement with Dr. Hymes, he would not be given the hydrocolloid electrode, which he expected to have available at any time. Mr. Hagfors had been pressing PCD for years to make the hydrocolloid electrode available to StimTech. He reluctantly agreed to give up on Dr. Hymes' karaya electrode idea in the hope of getting hydrocolloid soon. Dr. Hymes apparently had no special expertise in manufacturing and production of medical devices, yet he was able to accomplish in a few months that which Johnson & Johnson's experts said they could not accomplish in a much longer period of time. Dr. Hymes was able to produce and sell karaya electrodes in early 1977 within a few months after receiving the release from StimTech.

PCD, however, did not supply the hydro-colloid material to StimTech for electrodes until later 1978, even though PCD was using the same material to manufacture grounding pads; and it was not until mid-1979 that StimTech was able to attach the hydrocolloid material to a blocking strip to make an electrode and to begin selling the hydrocolloid commercially. One of the reasons for the delay from the time PCD abandoned its electrode program until it began supplying the hydrocolloid to StimTech was caused by PCD's insistance on PCD's setting the price at which StimTech could sell the hydrocolloid electrode.

Once the karaya electrode was returned to Hymes, Hagfors was demoted. He was given the title of Vice Chairman of the Board of Directors with no responsible duties. Mr. Hagfors was replaced as president by Mr. Laine Mashburn, who came from another Johnson & Johnson operation in Australia. Mr. Anderson left the board and was replaced by Mr. Frank DeAngeli, who was a member of the Johnson & Johnson executive committee, with primary responsibility in international sales. He had worked closely with Mr. Whitlock in the pharmaceutical association.

When Mr. Mashburn was made president, he agreed to allow PCD to set the prices at which StimTech would sell the hydrocolloid electrode. The hydrocolloid electrode had been in existence, perfected, and in limited production by PCD since April of 1976.

Despite the fact that Mr. Mashburn agreed to the pricing arrangement, the finished electrodes were not given to StimTech until one year later. Plaintiffs argued that this failure to market the electrodes by PCD, available since April 1976, and the blocking of StimTech's ability to sell them, was a deliberate delay created to injure StimTech and the plaintiffs. The potential for profit was postponed until after the payout period had passed. The delay also served the purpose of not providing money for exploiting the TENS therapy, which, according to the plaintiffs, was the real threat, since Johnson & Johnson's profits in drugs would be diminished if TENS were successful.

The plaintiffs pointed out that the Johnson & Johnson men who ran StimTech while it lost ten million dollars and took those steps which appear to have been calculated to ruin the StimTech Company have suffered no ill-effects from running a failing operation. Quite to the contrary, according to the testimony at the time of trial, they have since been promoted by Johnson & Johnson into higher corporate status.

Mr. DeAngeli had never had any experience in pacemakers or TENS devices, yet he became Chairman of the Board. Mr. Mashburn likewise had no experience in this field, yet became President. Mr. Hagfors, the founder of the company, once hailed as "the quiet, controlled, competent type" by Johnson & Johnson, was relieved of all duties. The evidence in the case indicates that promotions are made on the basis of the employee's having done a "good job." Plaintiffs point out that the "good job" done here was certainly not in promoting StimTech and must, by inference, have consisted of preventing StimTech from effectively competing in the pain control field and saving Johnson & Johnson great profit thereby.

The plaintiffs point out that as Johnson & Johnson prepared to remove them from their leadership posts in StimTech, it brought in Johnson & Johnson people who had no experience whatsoever in the TENS or pacemaker business and placed them in the top positions at StimTech. Mr. DeAngeli, whose experience was largely in the American Pharmaceutical Association and in foreign sales, was appointed Stim-Tech Chairman of the Board, but, as the plaintiffs indicate, even his experience in foreign sales was never used to benefit StimTech. Mr. Laine Mashburn, who had been associated with an Australian Johnson & Johnson subsidiary, had no experience with TENS or pacemakers.

In an effort to orient them to the business, Mr. Hagfors submitted a memorandum containing an overview of StimTech to Mr. DeAngeli and Mr. Mashburn which in-

cluded criticism of past practices and recommended emphases for the present and future. This memorandum contained much information which would have been helpful in correcting past mistakes and many recommendations to the new management, which, if followed, would have helped a great deal in making StimTech profitable and able to compete with drugs. Johnson & Johnson followed none of them. Even as Mr. Hagfors was writing his overview Johnson & Johnson was preparing to fire him. The newly arrived Mr. DeAngeli requested information from Johnson & Johnson attorney, Mr. Galloway, regarding Johnson & Johnson's contractual obligations to the plaintiffs, including advice on the issue of whether and when he could fire the plaintiffs.

Galloway Memo

February 17, 1977

CONFIDENTIAL

SUBJECT: StimTech—Acquisition Agreement

Mr. F. DeAngeli:

"With respect to the principal stockholders, each has agreed to the agreement not to compete with StimTech for the five year determination period. There is also a non-compete agreement in their employment agreement in the event they are employed past the five year period. The employment agreements for each provide that they shall be employed until September 20, 1977. The agreements automatically renew for successive one year periods unless the agreement is otherwise terminated. With respect to termination, the agreement provides that StimTech can terminate the agreement any time after September 1, 1977 upon three months' prior notice. Accordingly, if termination was to be effective on September 1, 1977, notice would have to be given three months prior to that time."

The employment agreements are rather standard and provide that the employee will not be assigned duties which would require him to change his residence. The minimum annual salary levels for Hag-

fors, McDonald and Jensen were set at $33,000, $31,000 and $31,000 respectively. I believe the above summarizes the basic provisions of the acquisition agreement and related documents. Please don't hesitate to let me know if you desire any clarification or amplification of any of these points.

Peter S. Galloway

PSG:lak

cc: Mr. L. Mashburn

Once Mr. DeAngeli received this information, he took steps to get rid of Mr. Hagfors and Mr. McDonald.

On April 20, 1977, Mr. DeAngeli met with Mr. Hagfors at Johnson & Johnson headquarters in New Brunswick and informed Mr. Hagfors that his employment agreement was being terminated. A follow-up letter confirmed Mr. DeAngeli's decision to discharge Mr. Hagfors and set September 20, 1977, as the date of termination.

A month after the New Brunswick meeting with Mr. DeAngeli, Mr. Hagfors received a proposed consulting agreement from Mr. DeAngeli, which would have relieved Mr. Hagfors of his job as Vice Chairman of StimTech and made him a consultant, at his same monthly salary, through September 1977. Mr. Hagfors refused the termination and the consulting offer and, instead, moved his office to his home, where he stayed until September 20, 1977, to finish out the term of his employment agreement. He was never released from his non-compete agreement.

Plaintiff McDonald was described in the preacquisition memo of Dr. McConnell to Mr. Whitlock, who was the vice chairman of the board of Johnson & Johnson, as follows:

Their Sales Manager, Mr. Stan. McDonald, had previously been with Medtronic. He is a bright, accomplished salesman and probably a very good manager from the sales record. He is extremely talkative and in a group discussion one often ends up with a monologue. Mr. Norman Hagfors, the President, is the quiet, controlled, competent type and tends to use Stan. as a tracking horse. Sooner or la-

ter, Stan. will ask the questions that Norm. wants asked. I may under-rate Stan. He may even speak for the corporation as a whole at times.

Within five weeks after the acquisition, McDonald was denounced and derided by Mr. Anderson for his incompetence in writing a marketing projection.

During the trial, Mr. Anderson was taken through the very document which was the cause of the criticism and admitted that the marketing projection contained all of the elements which Mr. Anderson thought appropriate. Thus, the jury was provided with ample evidence for reaching the conclusion that Mr. Anderson's unjustified criticism of McDonald had been made to accomplish some unexplained purpose.

This purpose became apparent later in the evidence, when it was brought out that Mr. McDonald had been removed from his sales position and given a meaningless job in which he could not effectively promote the sale of TENS devices and obtain his earn-out. The only way Mr. McDonald could get his earn-out would be for the StimTech company to be a success. If StimTech were successful, the profits would be used by the plaintiffs (so long as they were in control) to spread the word to the physicians that the TENS therapy would make the use of dangerous, pain-killing drugs unnecessary in many instances.

The evidence demonstrates that Johnson & Johnson took the only course which was open to them if they were to prevent and stifle this competition. They had to "throttle" the company and "contain" the plaintiffs. The voice of their most vocal member was the first to be muted. He was criticized and demoted very early, and in March of 1977, he was hounded out of the company. As he prepared to leave, he was allowed to buy Midwest Pain but not until considerable inquiry had been made into the possibility that he might even then pose a competitive threat to Johnson & Johnson. There was much delay and discussion as to whether he should be released from his non-compete agreement. Johnson & Johnson concluded that he did not pose a threat to them because he (McDonald) would, by virtue of his wanting to see StimTech succeed so that he could get his earn-out, do nothing to hurt StimTech. Additionally, they noted his "lack of technical and manufacturing" capabilities. Even if McDonald were the fine TENS salesman which Johnson & Johnson once thought him to be, he posed no competitive threat to them. He would be burdened with the obligation to buy out Midwest Pain, and, even more important, he could not develop a product with Jensen and Hagfors because they were both still under the non-compete agreement. His funds had been dissipated in his investment in StimTech.

These considerations were present when Johnson & Johnson released McDonald to take over Midwest Pain in March of 1977.

Both Mr. Hagfors and Mr. Jensen, the last of the three plaintiffs to leave StimTech, had technical and manufacturing responsibilities. They were never released from their non-compete agreements.

On August 15, 1977, five months after Mr. McDonald left, Mr. Jensen received notice from Mr. Mashburn that his employment was to be terminated as of September 20, 1977. Mr. Jensen was never given a reason for his firing. He was never released from his non-compete agreement.

Following the termination of Mr. Hagfors' employment, he twice attempted to repurchase StimTech. Both times Johnson & Johnson refused. Even though it was considering the sale of StimTech's programmable pacemaker business, they never offered it to Mr. Hagfors.

In the last half of 1980, Johnson & Johnson transferred the StimTech operations from Minnesota to Massachusetts to become part of Codman and Shurtleff, a Johnson & Johnson subsidiary which manufactures medical instruments.

On May 2, 1979, Messrs. Hagfors, Jensen, and McDonald filed suit against Johnson & Johnson in United States District Court alleging that Johnson & Johnson breached its contract with the plaintiffs, defrauded the plaintiffs, and engaged in a course of

conduct in restraint of trade in violation of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.

## III THE DEFENDANT'S CLAIMED BASES FOR RELIEF

Johnson & Johnson asserts, as bases for the relief sought, the following claimed errors:

1) The lack of evidence that Johnson & Johnson conceived of and carried out a plan to suppress the TENS market requires dismissal of claims brought under §§ 1 and 2 of the Sherman Act;

2) The Sherman Act is unconstitutional as applied by the Court;

3) The verdicts rendered on the § 7 claims conclusively establish lack of suppression of the TENS market;

4) The lack of proof of a conspiracy, combination or contract between Johnson & Johnson and any other entity to suppress the TENS market requires dismissal of the § 1 claim;

5) The Court's *per se* charge on Sherman Act § 1 coupled with its instruction that Johnson & Johnson's size and past marketing practices were relevant on its ability to suppress StimTech virtually directed a verdict on an untenable theory of liability;

6) The verdict against Johnson & Johnson on the attempt to monopolize charge is insufficient as a matter of law;

7) The trial court's charge on the attempt to monopolize claims was erroneous and inflammatory;

8) Plaintiffs lack standing to sue for damages under the antitrust laws and any alleged injury they supposedly suffered was not of the type the antitrust laws were intended to prevent;

9) The antitrust damage schedule used as a basis for the jury's award was bottomed upon untenable legal theories, contained legally unsupportable claims and lacked any foundation in fact;

10) There was no substantial evidence to support the claim for breach of contract. Even if there was, the contract claim was submitted under an erroneous theory and instructions;

11) Plaintiffs' fraud claim was legally insufficient and required a directed verdict for defendant. Improper fraud instructions and the failure to submit defendant's fraud *in pari delicto* defense requires a new trial; and

12) Various erroneous evidentiary rulings substantially prejudiced the defendant;

The plaintiffs' position is essentially that the evidence adduced at trial was sufficient as a matter of law to create issues of fact for a jury on the contract, fraud, and antitrust claims, and the jury was properly instructed on all claims. This Court agrees with the plaintiffs' argument. In addition, it is the opinion of this Court that the verdict was a reasonable and appropriate conclusion, based upon the evidence.

## IV DISCUSSION

Johnson & Johnson carries a heavy burden in moving the Court to overturn the jury's verdict. Because the effect of granting the defendant's motion would be to deprive the plaintiffs of the jury's determination of the facts, either a directed verdict or a judgment notwithstanding the verdict should be "sparingly granted". *See Jeanes v. Milner*, 428 F.2d 598, 601 (8th Cir. 1970) and *Compton v. United States*, 377 F.2d 408, 411 (8th Cir. 1967). The United States Court of Appeals for the Eighth Circuit recently reasoned that a jury verdict should be overturned "only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party." *Kayser v. Rockwell Graphic Systems, Inc.*, 666 F.2d 1233, 1235 (8th Cir. 1982) *quoting Giordano v. Lee*, 434 F.2d 1227, 1231 (8th Cir. 1970) (emphasis in original); *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 250 (8th Cir. 1978).

In ruling on the sufficiency of the evidence, the trial court is not free to "weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury". C.

Wright & A. Miller, Federal Practice and Procedure: Civil § 2524 at 543–44 (1971) (footnotes deleted). Rather, the scope of review is strictly limited. The Court must 1) consider the evidence in the light most favorable to the party against whom the motion is made; 2) assume that any variance in the evidence was resolved by the jury in favor of the prevailing party; 3) assume as proved all facts which the prevailing party's evidence tends to prove; and 4) give the prevailing party the benefit of all favorable inferences which may reasonably have been drawn by the jury from the facts proved. *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 250 (8th Cir. 1978); *Hanson v. Ford Motor Co.*, 278 F.2d 586, 596 (8th Cir. 1960). In light of the Eighth Circuit's mandate, therefore, it is incumbent upon the Court to give a great deal of deference to the verdict of the trier of fact.

The preceding statements speak of overturning the verdict of the jury and point out the rather gross and persuasive factors that must be found in order to do so. The language used applies equally to the standards used in appellate review of the jury's verdict. While it is possible to decide many aspects on the bare record, the appellate court does work under some handicaps that are not suffered by the judge who presided during the trial, watched the witnesses, made judgments concerning their credibility, and heard the many arguments which were allowed concerning the evidence as it was introduced. As a consequence, this Court has attempted to summarize the record as clearly and succinctly as possible in order to facilitate the task of the reviewing tribunal.

A threshold concern of this Court, however, is that even though defendant's counsel made frequent references on the record to the fact that defendant was receiving a fair trial, inherent in several of defendant's assignments of error is the implication that the jury was incompetent to render a rational verdict based on the law and the evidence. It is not unusual in these times to read or hear a suggestion that "the complexity of a case may exceed the ability of a jury to decide the facts in an informed and capable manner". *In Re Boise Cascade Securities Litigation*, 420 F.Supp. 99, 104 (W.D.Wash.1976).

As recently as 1979, Chief Justice Warren E. Burger questioned the practicality of empaneling a lay jury in protracted and complex civil cases. The Chief Justice stated that the following factors, among others, should be considered in judging a jury's ability to act as the trier of fact:

1) Only an expert is suited for the task of analyzing documents, expert testimony, and visual aids in an attempt to understand the enormous complexity of the factual issues present in some trials;

2) jury instructions on the law may take days in such cases; and

3) the protracted nature of the litigation may render the jurors incapable of understanding and remembering the issues raised throughout.

Address by Chief Justice Burger, Conference of State Chief Justices, at Flagstaff, Arizona (August 1, 1979) (Public Information Office text), cited in Comment, *Has the Right to a Jury Trial as Guaranteed Under the Seventh Amendment become Outdated in Complex Civil Litigation?*, 8 Pepperdine L.Rev. 189, 190 n.7 (1980).

■ This Court, having presided over a number of actions involving novel and complex issues, is fully aware of the problems encountered by juries in protracted litigation of the instant sort. An average jury in a 5½ month trial would surely be subject to criticism of the nature leveled by the Chief Justice in his speech if precautions were not taken by the Court and its officers to prevent confusion of the jury. In the case at bar, the problems inherent in a lengthy antitrust trial were anticipated by the Court, and several procedural remedies were devised, with the support of counsel for both parties, so that the jury could fully understand the evidence as it evolved throughout the course of the litigation.

Specifically, the following aids were instituted to enable the jury to maintain its perspective:

1) Jurors were permitted to take notes if they felt contemporaneous jottings would assist in refreshing their recollection;

2) Short breaks were taken every hour;

3) The attorneys were encouraged to summarize their arguments and explain the purpose and meaning of the evidence as it applied to the issues before, during, and after examination of witnesses, especially if it were anticipated the examination would be lengthy;

4) An overhead projector was used to show "transparencies" of exhibits so that the jury could read along when the exhibit was introduced and refer back to the exhibit while the witness was being questioned in regard to its meaning or content;

5) In order that there be no doubt of the import of any item of evidence or legal proposition or claim, both attorneys were allowed to argue at length as to the meaning thereof. This procedure was agreed to and commended by counsel for both parties time and again. The jurors were thus educated to the point that they could not help but understand the case as it unfolded. Counsel were from time to time invited to change this ground rule and in each of the several instances declined to change it and, instead, endorsed the continuing of the procedure toward the end that the fullest possible examination of the evidence was had. It was not at all uncommon for defense counsel to consume ten to thirty minutes in explaining a single item of evidence or explaining by way of argument his position on an issue. (See, e.g. Tr. 3,443–79.)

6) Where appropriate, with the consent of counsel, interim jury charges were given by the Court to reemphasize the law; and, finally.

7) Transparencies of the jury instructions were shown on the overhead projector and read aloud by the Court before the closing arguments. The attorneys were then permitted to argue the instructions or to refer to them in their closings. Complete instructions were sent to the jury room.

The Supreme Court in *Withrow v. Larkin* reiterated that a "fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), *quoting, In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). It is the opinion of this Court that fair procedures were provided and that no error can honestly be attributed to lack of understanding on the part of the jury.

The competence of a jury is often in the eye of the beholder, however. In spite of the aforementioned mutually endorsed procedures, the defendant, in its post-trial brief, refers, in at least one place, to the "prejudice and emotions of the jury cultivated by the plaintiffs," thereby calling into question the ability of the jury to render a rational verdict. There may be instances in which the background and experience of the jurors alone could call into question their ability to comprehend and rationally act upon the evidence; this is not such a case. The records of this Court indicate the following information concerning the jurors: 1) There were 14 jurors selected to hear the case (11 jurors actually deliberated); 2) only one of these jurors had less than a complete high school education; and 3) the most highly qualified of them, with regard to formal education, was the foreperson, a 35 year old school teacher with a masters degree. The following table gives the available information that appears in the records and files of this Court concerning these jurors:

| | Sex | Age | Education | Employment |
|---|---|---|---|---|
| 1) | F | 43 | 9 years | |
| 2) | M | 26 | 13 years | Student/aide at physical therapy center |
| 3) | F | 68 | 14 years | Pharmacy clerk |
| 4) | F | 52 | 14 years | Welfare eligibility technician |
| 5) | F | 59 | 13 years | |
| 6) | F | 54 | 12 years | |

| | Sex | Age | Education | Employment |
|---|---|---|---|---|
| 7) | F | 60 | 13 years | |
| 8) | M | 46 | 15 years | Manufacturers representative |
| 9) | M | 54 | 14 years | Grocer |
| 10) | F | 43 | 16 years | |
| 11) | F | 39 | 12 years | Document control clerk |
| 12) | M | 35 | 17 years | Teacher |
| 13) | M | 33 | 12 years | Stock controller |
| 14) | M | 63 | 14 years | Inventory control clerk |
| 15) | F | 50 | 12 years | Credit bureau clerk |

In selecting a criminal jury, we strive to secure a cross section that is representative of the general population; no less was done in the instant case. It appears to this Court that a decision reached by such a body would reflect a depth and balance equal to or greater than that which could reasonably be expected of an individual judge.

Time and time again the courts and the public are advised that the jury did not and cannot understand the issues in complex or protracted cases based, in some instances, on the jury's post-trial comments. *See, e.g., ILC Peripherals Leasing Corp. v. International Business Machines Corp.*, 458 F.Supp. 423, 447–48 (N.D.Cal.1978), *aff'd sub nom., Memorex Corp. v. International Business Machines Corp.*, 636 F.2d 1188 (9th Cir. 1980) (directed verdict affirmed; no disposition as to striking plaintiffs' demand for a jury trial). Such statements are accepted frequently as valid evidence that juries cannot understand complicated cases.

If such statements do constitute presumptive evidence of the jury's inability to understand the issues, what then should be done with statements made by other jurors to the effect that they *did* understand the issues? Is the Court to assume the jurors are so ignorant that they did not even *know* that they did *not* understand and thus effectively to vitiate jury decisions in all complex or protracted civil cases? It would seem much the better practice to give serious consideration to a jury's utterances to the effect that they comprehended the issues, even though such comments be unsolicited and unusual. In this instance, the jury was headed by what appeared to be an attentive, bright, and alert middle-aged school teacher with a masters degree who advised the Court in a letter, apparently written at the end of the jury's deliberations, that the jurors understood the case. A copy of this letter was delivered by the foreman immediately after the verdict, and it was read into the record as follows:

Dear Judge Lord:

I'd like to take this opportunity to thank you and other members of your court for an interesting and educational experience in the working of our court system. During the last five and a half months I have been impressed with the skill displayed by all of the lawyers. They have taken a random group of average citizens and educated them to the point where we understand the material in general and each side's view in detail. They have done an excellent job of enabling us to arrive at a fair and impartial decision. But more than that, the mechanics of the trial, we jurors have been shown a system that, with due regard for the law, still treats those involved in a respectful, humane way and with an enjoyable sense of humor. There have been times during the more than 80 days of the trial that have been tiring, sometimes less than interesting, and on occasion very inconvenient. Through all this I have been pleased with the support and encouragement I have received [comment by the Court] from my family and my employer, the Wayzata School District. They have helped me to meet the inconvenience and disruptions which have gone far beyond merely allowing me to serve, but have worked hard to smooth the rough places. For that I am most appreciative. The experiences I have had will color my teaching the rest of my career,

and I can now speak from experience, not only to the privileges of citizenship, but the responsibilities that must go with those privileges. I have had the bonus of serving with an outstanding group of people during the entire time. They have worked not only to educate themselves in the particulars of the trial, but to develop and foster a friendly relationship with each other. Having deliberated for a week and being granted the privilege as serving as foreman, I can attest to you to their collective knowledge of the case and the careful painstaking and conscientious way the verdicts have been reached. I feel that I could not have served with a finer group of people. The consideration and kindness shown to all of us, starting with Mary Gibbons [comment by the Court] in the morning and including each and every person during the day made this not only an educational time but a very enjoyable experience as well. Thank you for allowing me to serve on this jury in your court.

Charles M. Heuser.

(Tr. 13,245–47.)

The comments of the foreman, speaking for the jury as a whole, should essentially terminate any speculation as to whether the jury understood the evidence and the law upon which it was called to render a decision.

None of this is to say, however, that the jury system, even the jury system with safeguards, is perfect. If it were, Congress would not have provided procedures such as Rule 50(b) to enable courts to act as checks and balances to guard against unwarranted verdicts. Therefore, it is with the foregoing in mind that this Court considers each of the defendant's assignments of error in deciding whether, as a matter of law, the evidence, considered in the light most favorable to the plaintiffs, is insufficient to support the jury's verdict.

## A

### PLAINTIFFS' STANDING TO RECOVER FOR ANTITRUST VIOLATIONS

The defendant contends that the plaintiffs lack standing to sue for damages un-

der the antitrust laws because any injury plaintiffs allegedly suffered was not of the type the antitrust laws were intended to prevent. This contention is totally meritless.

Section 4 of the Clayton Act provides that treble damage suits may be brought by "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (Supp. IV 1980). Although the general terms of the foregoing provision appear to open the floodgates for plaintiffs seeking treble damages, the courts have limited the number of actions instituted by articulating several standards regarding a plaintiff's standing to sue. The principal doctrines are the direct injury test and the target area test, the requirements of which the plaintiffs meet sufficiently to have standing to sue in the instant case.

■ The direct injury test, as it was originally expressed in *Loeb v. Eastman Kodak Co.*, required the dismissal of an individual stockholder's claim because the injury complained of was directed at the corporation, not the stockholder. The Court found that any injury which the stockholder received was "indirect and consequential." *Loeb v. Eastman Kodak Co.*, 183 F. 704, 711 (3rd Cir. 1910). The *Loeb* Court feared a multiplicity of suits if every person whose injury was derivative in nature were permitted to institute an action when in fact the true victim of an alleged violation was the person directly injured. Since the initial articulation of the direct injury test in *Loeb*, other courts have further interpreted and approved the doctrine. *See, e.g., Reibert v. Atlantic Richfield Co.*, 471 F.2d 727 (10th Cir. 1973); *see also Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies*, 382 F.2d 925 (10th Cir. 1967). It now appears well settled that the requirements of the test are met and standing is not contested if the plaintiffs are competitors of the defendant, or are engaged in a direct business relationship with the defendant, and the defend-

ant's antitrust violation is responsible for damage to that relationship.

■ The record contains ample evidence to show that Messrs. Hagfors, McDonald, and Jensen were competitors of Johnson & Johnson in the pain control industry and were directly injured as a result of Johnson & Johnson's subjecting each of the plaintiffs to non-compete agreements. These plaintiffs conceived of an idea to enter into the business of controlling pain by stimulation and chose to do it in the corporate form. In the process, at least two of the men invested substantially all of their financial assets into that company. When Johnson & Johnson purchased the company, it took control of all of those personal assets. It took control of the idea and sealed it with non-compete agreements. Under the facts in this case, the non-compete agreements constituted a restraint and a suppression of the individual plaintiffs which effectively precluded them from any meaningful competition, actual or potential. Likewise, the defendant took, with the corporate stock, all of the money of at least two of the plaintiffs. The defendant's own documents substantiate the fact that the plaintiffs themselves were the object of the corporate search and were the object of the suppression that here took place.

Therefore, because of the defendant's unlawful acts and the plaintiffs' resultant injuries, this Court is of the opinion that the plaintiffs clearly have standing to sue under the direct injury test.

■ The other standard still widely used to determine standing in an antitrust action is the "target area" test. Under this test, in order

> [t]o establish that he has been injured "by reason of" an antitrust violation within the meaning of section 4, the private antitrust plaintiff must show that he was within the "target area" of the alleged violation. That is, he must "show himself within the sector of economy in which the violation threatened a breakdown of competitive conditions."

*Southern Concrete Co. v. United States Steel Corp.*, 535 F.2d 313, 316 (5th Cir. 1976). Many courts have found the "target area" test for standing far more flexible than the "direct injury" approach, and, although the Court of Appeals for the Eighth Circuit has not explicitly adopted either approach, it seems clear that the "target area" test meets with the Court's approval. *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 688–89 (8th Cir. 1966).

■ Under the "target area" test, it is the opinion of this Court that the plaintiffs have the requisite standing. The plaintiffs were quite clearly within the sector of the economy toward which the defendant "took aim". As manufacturers of TENS devices, the plaintiffs, collectively, were considered one of the most valuable assets of StimTech by Johnson & Johnson during the period in which it sought to acquire the new corporation. (Tr. 3681–89; 6002). By securing non-compete agreements from Hagfors, Jensen, and McDonald on September 20, 1974, Johnson & Johnson effectively prevented the plaintiffs from competing in the pain control or pacemaker industry over the next five years. The suppression of the plaintiffs individually was a necessary step for Johnson & Johnson to take in achieving the overall suppression of the TENS industry, since the plaintiffs constituted the essence of TENS expertise at that point in time. By effectively removing the plaintiffs from competition in the TENS area, Johnson & Johnson was free to buy the TENS leader and cause it to stagnate, thus eliminating a potential competitor of its pain control drug business. With the evidence strongly supporting a jury finding of Johnson & Johnson's intentional suppression of the plaintiffs, the plaintiffs unquestionably have standing under the target area test to recover the amount of damages they sustained as a result of being personally restrained.

In spite of the fact that the direct injury and target area tests have achieved a level of general recognition, some courts have rejected both approaches to antitrust standing. The Court of Appeals for the Sixth

Circuit in *Chrysler Corp. v. Fedders Corp.*, in a lengthy discussion of standing requirements in that circuit, articulated the following criticisms:

> The two approaches to standing described above purport to derive from the causative language in § 4 itself, i.e., absent a showing that the plaintiff suffered 'direct injury' or was within the 'target area,' no injury 'by reason of anything forbidden in the antitrust laws' is deemed to have occurred. Our refusal to apply either theory was based on the belief that both demand too much from a plaintiff at the pleading stage of his case. In effect, they require a court to make a determination on the *merits* of a *claim* under the guise of assessing the *standing* of the *claimant.* [*Malamud v. Sinclair Oil Corp.*] 521 F.2d [1142] at 1150 [(6th Cir.)].

*Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1233 (6th Cir. 1981) (emphasis in original).

Criticisms such as the foregoing ones have generated more flexible tests in some circuits with the result that the rather mechanical theories of standing are being replaced by a case by case analysis of whether standing to sue is appropriate. The Third Circuit in *Cromar v. Nuclear Materials* articulates the new approach:

> Each case, therefore, must be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws have effects throughout society, a court must decide whether this plaintiff is one 'whose protection is the fundamental purpose of the antitrust laws.'

*Cromar Co. v. Nuclear Materials & Equipment Corp.*, 543 F.2d 501, 506 (3d Cir. 1976).

This Court's instruction to the jury regarding standing covered all existing doctrines. The Court charged as follows:

> As stated, plaintiffs may establish their standing or right to recover damages by proving, by preponderance of the evidence, that they *personally* sustained a direct injury from the alleged violation, were *within the target area* of the alleged violation, *were potential competitors of defendant,* and *were prevented by the alleged violations from entering into competition with defendant.* In addition to direct injury and being within the target area, in order to establish their standing as potential competitors, plaintiffs must prove, by a preponderance of the evidence, two significant requirements: first, an *intention* to enter the business; and, second, a showing of *preparedness* to enter the business. Such a showing would require, for example, the taking of actual steps to arrange the financing of the business and purchase of the facilities and equipment necessary to enter the business; the consummation of contracts by the plaintiffs; affirmative actions by the plaintiffs to enter the business; and the background and experience of plaintiffs in the prospective business. Thus, for each of the plaintiffs to establish standing as a potential competitor, each of them must show that he intended to enter the TENS business, and was prepared and able to enter the TENS business.

(Tr. 12,720–21) (emphasis added.)

If the plaintiffs have standing under the more rigid tests, there can be no question of their meeting the requirements under the more flexible standard. From the inception of StimTech's relationship to Johnson & Johnson, the three plaintiffs were all objects of Johnson & Johnson's plans to suppress the TENS industry. The plaintiffs not only fell within the target area but were themselves targets of Johnson & Johnson's suppression tactics. If these three men who were directly injured by Johnson & Johnson's violations of the antitrust laws were denied standing under the facts of this case, it is hard to imagine who might have standing to sue for damages resulting from Johnson & Johnson's wrong-

doing. Both the owners of other TENS companies and the people who suffer from pain and were deprived of TENS have unquestionably been injured as a result of Johnson & Johnson's alleged misconduct, but the derivative nature of their injuries forecloses the possibility of their suing Johnson & Johnson directly. Messrs. Hagfors, Jensen, and McDonald, therefore, are the only appropriate plaintiffs in the instant case.

The record contains ample evidence to show that the jury could reasonably find, pursuant to this Court's instruction, that the plaintiffs had an intention to enter the business and had begun preparations to enter the same business. At the time Johnson & Johnson acquired StimTech, the plaintiffs had developed StimTech into a going concern. The plaintiffs had a successful licensing agreement with Devices, plans for the research and development of new products, a specific marketing plan, concrete ideas for continued expansion, and a program begun to raise sufficient capital to finance the future of their company. That the StimTech corporation, without the suppression of Johnson & Johnson, had the readiness and the expertise required to become a successful competitor in the pain control industry is sufficiently documented in this case. Therefore, it is apparent from all of the foregoing that the plaintiffs have the requisite standing to sue under any and all of the existing antitrust standing theories.

■ The defendant, however, challenges plaintiffs' standing on several grounds. Johnson & Johnson states that the plaintiffs, as shareholders and employees of StimTech, cannot have standing to assert antitrust claims. As stated earlier, the courts have denied standing to persons alleging injuries of a derivative nature where the "target" was elsewhere and the injury they received was incidental and not a foreseeable consequence of the antitrust violation. *See, e.g., Kreager v. General Electric Co.*, 497 F.2d 468 (2d Cir.) (shareholder denied standing), *cert. denied*, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970) (id.), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Jones v. Ford Motor Co.*, 599 F.2d 394, 397–98 (10th Cir. 1979). What the defendant contends, however, is only partially true. While an employee may be denied standing in a situation where his employer is the one aimed at, if the employee himself is directly and foreseeably injured as a result of the defendant's wrongdoing, that employee is accorded standing. The Supreme Court in *Perkins* found standing for a shareholder of a corporation which was injured by the defendant's violation of the Robinson-Patman Act reasoning:

> It is clear in this case, however, that Perkins was no mere innocent bystander; he was the principal victim of the price discrimination practiced by Standard. Since he was directly injured and was clearly entitled to bring this suit, he was entitled to present evidence of all of his losses. . . . "

*Perkins v. Standard Oil Co.*, 395 U.S. 642, 649–50, 89 S.Ct. 1871, 1875–76, 23 L.Ed.2d 599 (1969).

■ No victims could possibly have been more "principal" than the plaintiffs in the instant case, and, as such, they undeniably have the right to seek redress for all of the wrongs they suffered. The plaintiffs began with an idea and formed a corporation to promote the idea. They were owners, officers, directors and employees of the corporation. The predatory conduct of the defendant was found by the jury to consist of the fraudulent inducement to cause them to sell their corporation and to become employees of Johnson & Johnson under covenants not to compete. Johnson & Johnson is not in a position to complain that its former competitors do not have standing to sue because they were mere employees. It was the willful activities of the defendant that converted these plaintiffs from their positions as entrepreneurs and owners of a corporation to idle employees and ultimately ex-employees.

■ The defendant's next challenge to the plaintiffs' standing comes in the form of an argument to the effect that the evi-

dence was not sufficient to show that Mr. McDonald was not released from his non-compete agreement and that the other two plaintiffs asked for release or that their requests would have been futile. The jury was instructed as follows with regard to the non-compete agreements:

Plaintiffs assert they have standing to recover for the alleged violations of the antitrust laws because they were restrained individually from competing in the TENS business. Plaintiffs specifically claim that they were so restrained by, among other things, the noncompetition agreements which they signed when they sold their remaining shares of StimTech stock to Johnson & Johnson in September 1974.

You are instructed that an antitrust plaintiff cannot achieve standing as a consequence of being party to a covenant not to compete unless, at minimum, he undertakes a reasonable effort to obtain a release from such covenant and is thereafter denied such a release by the defendant, unless you find that such a demand in the circumstances of this case would have been futile.

Insofar as plaintiff McDonald is concerned, he was at a time released from his covenant. It is up to you to determine in light of all the circumstances of this case whether or not that release prevents him from recovering for any antitrust damages, if there were any, flowing from that covenant.

(Tr. 12,723–24.)

The evidence clearly establishes that Mr. McDonald was released from the non-compete agreement at his request, for the very limited purpose of working for Midwest Pain. Because of the fact that Midwest Pain was one of StimTech's biggest customers, Mr. McDonald's release in no way portended any competitive threat to StimTech. In fact, as the plaintiffs suggest, Mr. McDonald's release to an "extension" of StimTech was tantamount to his becoming a "salesman" for StimTech. Based on those facts, the jury could reasonably find that Mr. McDonald's limited release did not prevent his recovering for any antitrust damages flowing from the covenant not to compete. The jury could very consistently with this have found that the non-compete agreement was only a part of the restriction placed on Mr. McDonald. Once he had signed the contract with Johnson & Johnson and had realized substantially no financial gain therefrom, he was effectively economically neutralized as a competitor.

The jury was also free to find that any request for release on the part of Messrs. Hagfors and Jensen would have been futile in the circumstances of this case. In releasing Mr. McDonald from his agreement, Johnson & Johnson specifically stated that it was granting his requests because of Mr. McDonald's "lack of technical and manufacturing responsibilities." Not only did Mr. Jensen and Mr. Hagfors have technical and manufacturing responsibilities, but it was their mechanical abilities and backgrounds, as opposed to Mr. McDonald's salesmanship, which made them such valuable assets to StimTech. The evidence that Johnson & Johnson clearly set forth conditions for releasing McDonald that neither Mr. Hagfors nor Mr. Jensen could meet, because in contrast to Mr. McDonald they had technical manufacturing expertise, was sufficient to permit the jury to find that any request on their part for a release from the non-compete agreement would have been futile.

Mr. Jensen, however, did request a release; but after being told that he would probably be released, he was informed that Johnson & Johnson would consider such requests on a case-by-case basis only. The evidence was sufficient to support a finding that this response was tantamount to a refusal.

Mr. Hagfors testified that he made no request because he believed it would be futile in light of Johnson & Johnson's refusal to release Mr. Jensen and the conditions imposed on Mr. McDonald's release. Considering the overall pattern of Johnson & Johnson's behavior toward the plaintiffs and the foregoing evidence relating to the non-compete agreements, it is easily conceivable that a jury could conclude that

Johnson & Johnson did not intend to release plaintiffs Hagfors and Jensen from their non-competes and any request for release would have been futile.

The final challenge from Johnson & Johnson is that under *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir. 1981), the plaintiffs in the instant case lack standing because they withdrew from their business by selling to Johnson & Johnson and, therefore, should be precluded from suing to recover damages. *Chrysler* is, however, clearly distinguishable.

In *Chrysler*, the Chrysler Corporation entered into an agreement with Fedders to sell virtually all of the assets of Chrysler's Airtemp Division. Chrysler, under the agreement, covenanted, with limited exceptions, not to compete in the non-automotive air-conditioning market for a period of five years. After the execution of the contract, Chrysler became dissatisfied with the agreement and charged Fedders with conspiring to manipulate the non-automotive air-conditioning market in violation of § 1 of the Sherman Act.

In arriving at its decision, the Court relied on the Supreme Court's holding in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* which stated the following:

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), *quoting, Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969) (emphasis in original), quoted in *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1234 (6th Cir. 1981).

The *Chrysler* Court found that Chrysler's alleged injuries did not constitute antitrust injury within the definitions put forth in *Brunswick*. Rather, the Court held that

> By contracting to sell virtually all the assets of the Airtemp Division and all but two of its foreign subsidiaries, Chrysler *voluntarily withdrew* from competition in the non-automotive air-conditioning market. It did not contemplate continuing to compete in that market and in fact covenanted not to do so except through the Australian and South African subsidiaries.

*Chrysler*, 643 F.2d at 1235 (Emphasis added).

The record in the instant case is replete with evidence attesting to the fact that the plaintiffs, by signing non-compete agreements, in no way intended to withdraw from the TENS industry. Their preacquisition plans included the securing of additional funds to further the development of what promised to be a substantial market for the control of pain through TENS devices. The subsequent association with Johnson & Johnson was expected, by the plaintiffs, to provide the resources and expertise necessary for assuring that TENS would realize its enormous potential in the pain control industry and that the plaintiffs, individually, would achieve, at the very least, their anticipated earnout. The emphasis of *Chrysler* on voluntary withdrawal from a market and the total lack of evidence of voluntary market withdrawal in the instant case renders *Chrysler* inapposite to the facts presently before this Court.

It is the opinion of this Court that the jury was free to conclude, based on all of the evidence, that plaintiffs Hagfors, Jensen, and McDonald established the necessary connection between their injuries and the aims of the antitrust laws to achieve standing to sue.

B

## THE UNCONSTITUTIONAL APPLICATION OF THE SHERMAN ACT

The defendant argues that the Court's instruction to the jury relating to

the question of Johnson & Johnson's size permitted the jury to convict Johnson & Johnson solely on the basis of its status and is, therefore, violative of the fifth, sixth, and eighth amendments. The Court's complete charge was as follows:

In your consideration of the anti-trust claims in this case, you make take into account the defendant's size, its marketing practices, the past uses defendant has made of its size and marketing practices, the magnitude and nature of defendant's advertising, defendant's experience, trade connections, personnel, abilities, resources, and patterns and practices in responding to competition. You may consider these factors as bearing on defendant's motive and intent in acquiring and operating StimTech, and defendant's ability to make StimTech profitable and successful, or to suppress it.

(Tr. 12,738–39.)

From the foregoing instruction, the defendant has somehow extrapolated the imposition of an affirmative requirement on Johnson & Johnson to make StimTech successful solely as a punishment for Johnson & Johnson's having attained its present status in the health care products industry. Such is not the case. Information relating to the size of a corporation and its business practices, both past and present, is decidedly probative of an intent and ability to suppress competition. Even though the power and general practices of the corporation alone cannot convict, they may amount to "some evidence" of the alleged offense. The Supreme Court stated in *United States v. Swift & Co.* that

[m]ere size, according to the holding of this court, is not an offense against the Sherman act unless magnified to the point at which it amounts to a monopoly (*United States v. United States Steel Corp.*[,] 251 U.S. 417 [40 S.Ct. 293, 64 L.Ed. 343] [1920]; *United States v. International Harvester Co.*[,] 274 U.S. 693, 708 [47 S.Ct. 748, 753, 71 L.Ed. 1302] [1927]), but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past.

*United States v. Swift & Co.*, 286 U.S. 106, 116, 52 S.Ct. 460, 463, 76 L.Ed. 999 (1932).

The challenged instruction was given merely as a tool for the jury to use in attempting to answer the immediate question of whether or not Johnson & Johnson had market power and, ultimately, whether or not it abused that power. Today the courts have an increasing tendency to borrow the theoretical tools of the economist and to examine the response to threshold inquiries, such as 'what market does the firm engage in?, what is its share of that market?, are there entry barriers?", as a way of arriving at an answer to the power question. L. Sullivan, Handbook of the Law of Antitrust 38 (1977). However, the economist's approach is not the only method available to the Courts, nor is it necessarily the best in all situations. Historically, Courts utilized a more practical method for determining the existence of market power and that was to consider the very elements set forth in this Court's instruction to the jury. The defendant would have one believe this Court is unique in its use of the disputed charge; but some of the seminal decisions in antitrust law have included an examination of factors such as a firm's size, the firm's history, the firm's makeup, and the patterns of market conduct in evaluating the presence or absence of market power. *See Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) and *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

In addition to the preceding decisions, Judge Learned Hand articulated the following in regard to whether a sizeable defendant's continuing to increase its capacity is probative of an intent to foreclose competition:

It was not inevitable that it should always anticipate increases in the demand for ingot and be prepared to supply them. Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think

of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret "exclusion" as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not "exclusionary." So to limit it would in our judgment emasculate the [Sherman] Act; would permit just such consolidations as it was designed to prevent.

*United States v. Aluminum Co. of America,* 148 F.2d 416, 431 (2d Cir. 1945).

The Sherman Antitrust Act seeks to preserve a "system of free competitive economic enterprise" and to protect "the public against evils commonly incident to monopolies." 58 C.J.S. *Monopolies* § 18 at 972 (1948). If Johnson & Johnson possessed market power, which gave it the ability effectively to harm or destroy competition, and it abused that power by acting with the intent to suppress TENS, the statute has been violated. The jury in the instant case was instructed accordingly. "Whether there existed monopolistic power, the intent to destroy competition and the exercise of the power so to do were questions of fact for the jurors, whose province and prerogative to so determine are too often lost sight of in prosecutions of appeals from their judgments." *Kansas City Star Co. v. United States,* 240 F.2d 643, 660 (8th Cir. 1957).

C

## THE SHERMAN ACT CLAIMS

### 1. Section 1

Section 1 of the Sherman Act declares every contract, combination or conspiracy in restraint of trade to be illegal.[2] The sweeping language of the statute has caused some difference of opinion over the years. Some, along with the first Justice Harlan, interpreted the statute literally noting that Congress intended "no distinction ... between restraints of such commerce as were undue or unreasonable and restraints that were due or reasonable." *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 89, 31 S.Ct. 502, 527, 55 L.Ed. 619 (1911) (Harlan, J., concurring and dissenting). Others, such as Justice White, argued that even significant restraints on trade were not illegal so long as it could be shown that other social goals were achieved which outweighed the injury to competition. *United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 355–56, 373, 17 S.Ct. 540, 564–65, 571, 41 L.Ed. 1007 (1897) (White, J., dissenting). Present interpretation was intended to settle somewhere between the above two extremes and the statute is now held to prohibit only unreasonable restraints of trade.[3]

During the trial and in reflection and study thereafter, the Court has been unsuccessful in attempting to conjure up any reasonable explanation for the conduct of the defendant except that of intentionally

---

2. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

3. One prominent commentator expresses the present state of the law in the following fashion:

> Restated, the governing law has been that the Sherman Act bans all concerted arrangements which are adopted for the purpose of reducing competition, or which, regardless of purpose, have a significant tendency to reduce competition, but that arrangements which are adopted for and tend to achieve other purposes do not fall within the condemnation of the Act merely because of some incidental and inconsequential restraining effect on competition.

L. Sullivan, Handbook of the Law of Antitrust 166 (1977).

restraining trade. Any consideration given to the question of whether or not Johnson & Johnson's activities were made for the purpose of restraining trade should, of course, include whether or not there was some reasonable or rational alternative explanation. No such alternative explanation can be found in this record; even the somewhat tortured argument that reasonable business judgment dictated the course of conduct is irrelevant since the jury was told that they must find intentional, willful and deliberate conduct on each of the several counts including Count I. The defendant's argument that there is a total lack of evidence to indicate Johnson & Johnson conceived of and carried out a plan to suppress the TENS market is without merit. Even their own company witnesses corroborated much of the plaintiffs' case. Furthermore, there was compelling evidence before the jury to lead them to conclude that there existed either a contract, combination or conspiracy to unreasonably restrain trade.

(a) Sufficiency of the evidence to establish a suppression of the TENS Industry.

 The law is quite clear on the point that a suppression of competition is a restraint of trade. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 41–45, 80 S.Ct. 503, 510–12, 4 L.Ed.2d 505 (1960); *Shotkin v. General Electric Co.*, 171 F.2d 236 (10th Cir. 1948); *Otto Milk Co. v. United Dairy Farmers Co-op Association*, 261 F.Supp. 381, 385 (W.D.Pa.1966), *affirmed* 388 F.2d 789 (3rd Cir. 1967). Suppression does not require the destruction of a competitor. "The antitrust laws are as much violated by the prevention of competition as by its destruction" *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *citing, United States v. Aluminum Co. of America*, 148 F.2d 416, 428 (2nd Cir. 1945); *Kansas City Star Co. v. United States*, 240 F.2d 643, 644 (8th Cir. 1957).

 The evidence in this case indicates that the destruction of StimTech would not be nearly as effective as maintaining the company in a state of "suspended anima-

tion." Therefore, it is not enough for the defendant to point to the fact that StimTech and the TENS market experienced a sales growth during the relevant years. StimTech was the dominant firm when defendant acquired it and it simply remained so over the next five years. StimTech's market share remained flat at all times with about 25% to 30% of TENS industry sales. As the plaintiffs amply demonstrate, it behooved Johnson & Johnson to keep StimTech in a dominant market position in order to intimidate and keep in line smaller TENS competitors. Mr. Donald Maurer, the president of Empi, a smaller TENS company, testified that StimTech, as a result of this power, could control his ability to stay in business. Mr. Maurer, President and Chief Executive Officer of Empi, was called as a witness by Johnson & Johnson. On cross examination, he admitted that because StimTech had more research and development ability than Empi and more available resources, he believed that if Empi made an entry into the market with a new product, StimTech could come up with the same thing immediately thereafter and flood the market. Mr. Maurer testified that if StimTech ever innovated, they could give Empi such a tough time that his company could go out of business. Thus the evidence in this case indicates that it was necessary to keep StimTech "alive but not well." Had they "killed" StimTech, the principals who by Johnson & Johnson's own admission were the most knowledgeable men in the field would then have been free to seek employment with another company, and effectively exploit the TENS technology to the detriment of the drug business. The evidence indicates that in order to effectuate their plan of suppression, they needed to be in the TENS business.

Similarly, the allegation that the TENS industry grew from $3 million to $30 million in annual sales during the 1975–79 period does not prove a lack of suppression. The pain control drug market is a billion dollar plus industry. Once the jury found that TENS devices were interchangeable, i.e., in competition, with pain control drugs, then it could have found that such growth was

insignificant in light of the total market the TENS companies were trying to penetrate. As will become evident, there is more than enough evidence to demonstrate beyond all reasonable doubt stimulator devices are in competition with pain control drugs.

Johnson & Johnson also argues that its spending $10 million on StimTech during 1975–79 does not comport with the plaintiffs' charge that it suppressed the company. This investment, however, was in the nature of paying past due bills and covering deficits resulting from sales shortfalls, so as to keep StimTech out of bankruptcy. The defendant provided no up front money which was necessary to plan and fund research and development. Rather it simply covered losses in order to keep StimTech solvent, in business and out of bankruptcy. As noted before, for the defendant's suppression of the entire TENS industry to work, it needed StimTech around, but not as a leading innovator in the market.

Defendant's more general argument that there is not enough evidence for a jury to find a suppression is simply contrary to the facts. The plaintiffs introduced evidence of a rather involved series of actions taken by Johnson & Johnson and a number of its subsidiaries with respect to StimTech and the TENS market. Rather than an extensive recounting of this conduct, which in light of what has already been written would be unnecessarily duplicative, the Court will merely summarize the variety of conduct from which the jury could reasonably have found that Johnson & Johnson unreasonably restrained trade in violation of § 1 of the Sherman Act.

Signs of trouble began to emerge during the acquisition negotiations. The plaintiffs requested that Johnson & Johnson include a provision that it would not compete with StimTech in TENS devices or pacemakers and that Johnson & Johnson would not dispose of StimTech's business, in whole or in part, during the earn-out period. Johnson & Johnson, through Mr. Anderson, refused to write such a clause into the acquisition agreement arguing that "it would have to be a position of mutual trust and good will," and besides, "it was pointless to try to include all the details in the written agreement." This maneuver increased defendant's freedom to deal with StimTech in a manner best suited to achieve its suppression aims. Indeed Mr. Anderson even went so far as to promulgate a directive to StimTech that no StimTech employees should ever make direct contact with any other Johnson & Johnson company. All communications had to be filtered through Mr. Anderson.

Once Johnson & Johnson completed its acquisition of StimTech, the company: (1) delayed the introduction of new products by StimTech, in particular a more comfortable and more effective electrode for StimTech's TENS devices; (2) refused to provide StimTech with up front money with which to fund research and development, requiring instead that such funding be done out of gross profits even though plaintiffs made it clear that StimTech did not have such money and that was why they joined Johnson & Johnson; (3) imposed transfer pricing upon StimTech products sold to other Johnson & Johnson companies and thereby further weakened StimTech's cash position; (4) transferred all substantial pacemaker development work to another Johnson & Johnson subsidiary, thereby depriving StimTech of the necessary technical expertise to stay current in the industry and eventually leading to a drastic decline in what was once StimTech's "bread and butter" business, which, in turn, caused StimTech to be short of funds for development of its TENS business; (5) refused to permit the plaintiffs to develop a smaller and more commercially attractive TENS device in late 1974; (6) forbade the display of StimTech's products at its annual meetings; (7) refused to let StimTech use the Johnson & Johnson name; (8) imposed a hiring freeze on StimTech; (9) vetoed any significant expansion of StimTech's nurse liaison program under which registered nurses assisted its employees in sales, patient instruction and research with regard to TENS devices; (10) demoted and fired the plaintiffs; (11) turned down at least $200,000.00 of orders from Pain Control Centers International; (12) failed

to have its other companies provide assistance to StimTech; (13) through its subsidiary McNeil Laboratories, watered down StimTech's advertising campaign to promote TENS devices as an alternative to drugs; (14) failed to develop for StimTech a conductive gel which would have made the TENS device more marketable; (15) refused to resell StimTech to the plaintiffs; (16) failed to promote TENS devices with the same vigor and resources used to promote its pain control drugs; (17) subjected the plaintiffs to five year non-compete agreements; (18) failed to make use of Dr. Long as a consultant, while preventing him from performing consulting services to anyone else in the TENS industry; (19) maintained a high turnover rate of StimTech personnel, including going through three separate sales forces while under Johnson & Johnson ownership; (20) continually refused to pursue suggestions by the plaintiffs for the development of TENS; (21) instituted a "concentrated effort program" whereby StimTech was to concentrate its sales efforts in those geographic territories where it was already successfully selling its products and forego expanding its domestic sales efforts; (22) prohibited the planning and construction of small foreign factories and assembly plants, similar to those used by such competitors as Medtronic, for the purpose of producing StimTech products; (23) transferred Mr. Clark to StimTech as Executive Vice President of Marketing where his salary was 1½ times that of Mr. Hagfors, the President, and his authority included direct communication with Johnson & Johnson management; (24) decided not to expand either Midwest Pain or the concept of pain control clinics as centers where doctors could refer patients for instruction in the use of TENS devices; (25) provided no assistance in plaintiffs' efforts to market TENS devices for use in sports medicine, veterinary medicine and dental science even though Johnson & Johnson had subsidiaries in all three areas; and (26) prohibited StimTech from entering international markets even though Japan looked very promising and the United Kingdom and Europe which were serviced by Devices had only a single salesman and limited financial resources to market StimTech's TENS devices.

The defendant characterizes this evidence as nothing more than either a combination of independently arrived at business judgment decisions having a good business justification or the result of incompetent management. A large portion of the defendant's argument is directed at attempting to explain much of the above conduct in terms of its business judgment/incompetent management theory. Insofar as the defendant had ample opportunity to make these points before the jury, and in fact did so make these arguments, this part of its motion amounts to little more than a rearguing of the evidence. Courts have repeatedly stressed the importance of viewing the evidence as a whole to give the antitrust plaintiff the full benefit of his proof, rather than tightly compartmentalizing the case and wiping the slate clean after considering each piece of evidence. *United States v. Empire Gas Corp.*, 537 F.2d 296, 299 (8th Cir. 1976); *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 691 (8th Cir. 1966). Viewed in its entirety, this Court is quite satisfied that plaintiffs have made their case that defendant intentionally suppressed StimTech.

There was ample evidence presented to show that by suppressing StimTech the defendant was able to suppress the TENS industry. Mr. Donald Maurer, President and Chief Executive Officer of Empi, a small TENS company, testified on behalf of Johnson & Johnson that the major obstacle to the growth of the TENS industry was the lack of education of the medical profession concerning TENS devices. He admitted that he had thought of going to doctors with a marketing program to educate them about the superiority of TENS devices over drugs, but had not been able to afford such a program. Educating the public and the medical profession would have been an enormous undertaking. Except for StimTech, no company in the TENS industry had the resources, the experience, or the marketing organization to accomplish this

task of education. In addition, no TENS company but StimTech possessed the resources necessary to establish a distribution network to make TENS devices as available as drugs. This program of, as Mr. Maurer stated it, breaking doctors of the habit of writing prescriptions for their patients experiencing pain and instead treating pain with stimulator devices was and still is the principal barrier to entry into this market. While these devices can be made with relative ease, if the market is viewed as involving competition with drugs,[4] then the barriers to entry, given the need for this educational program, were extremely high. Furthermore, Mr. Maurer and Mr. Wingrove, President of Medical Devices, another small TENS manufacturer, both testified that what they did in their business was controlled by StimTech. Mr. Wingrove, another Johnson & Johnson witness, stated that his perception of StimTech was of an extremely powerful competitor, able to sustain huge losses for an indefinite period of time and intent upon staying in the market and policing its competitors. Medical Devices, therefore, simply tried to follow a safe distance behind StimTech and hang on to the small percentage of the market it already possessed. Mr. Wingrove further testified that StimTech was never first with product or technical innovations, but when another company introduced a successful new concept, StimTech would copy it, and thereby retain its dominant market share. This practice certainly stifled the incentive for others to improve their products, particularly when the overall size of the TENS market was kept relatively small when compared to the overall pain control market as a result of Johnson & Johnson's refusal to pursue, over plaintiffs' repeated admonitions, a program of product education.

This Court finds no difficulty with the jury's conclusion that the defendant's actions were taken with the intent to suppress competition within the TENS industry. Furthermore, the Court finds that the defendant was successful in its efforts to restrain trade within the TENS market. Un-

der the Sherman Act, "so far as concerns the public interest, it can make no difference whether an existing competition is put an end to, or whether prospective competition is prevented." *United States v. Aluminum Co. of America*, 148 F.2d 416, 429 (2nd Cir. 1945). Plaintiffs' contentions are, after all, not all that unusual. Judge Learned Hand in *Alcoa*, which is perhaps the most celebrated antitrust decision, confronted similar claims. The government "sought to convict 'Alcoa' of practices in which it engaged, not because they were necessary to the development of its business, but only in order to suppress competitors." *Id.* at 432. These practices included purchasing large amounts of bauxite and water power and purchasing interests in two Norwegian aluminum companies. The crux of the issue revolved around Alcoa's intent "if the purchases provided for the future needs of the business, or for what 'Alcoa' honestly believed were its future needs, they were innocent." *Id.* at 432–33. The resolution of the issue depended upon the credibility of the witnesses. Alcoa relied principally upon the testimony of its Chairman of the Board, President and a former Vice President. The testimony of each man was extensive. Judge Hand concluded, "[T]hus the judge had an unrivaled opportunity to observe how they bore themselves under a most prolonged and searching test; . . ." *Id.* at 434. The trial judge found their testimony to be highly convincing and as a consequence he with "industry and detail considered it for almost a year before he gave his opinion, in which he overruled all the plaintiff's contentions." *Id.* at 433.

The situation this Court finds itself faced with is the same in many respects. As Johnson & Johnson's own counsel framed the issue in his closing argument to the jury:

Whether it is fraud, contract, or the antitrust claims, basically running through all of them is Johnson & Johnson's good faith or lack of good faith (as I say) in, first, dealing with the plaintiffs, and second in running StimTech after it ac-

4. See pages 1341 1342, *infra.*

quired it in September of 1974. *If you find that we were in bad faith, then clearly there is liability on one or more of those theories.* If you find that we were not in bad faith, and that we made good faith and sincere efforts to deal with the plaintiffs and to run StimTech, then there is no liability on any of those claims. That is our position. That's our position. *That's the nutshell.*

Tr. 12,798–99, defendant's closing argument to jury. (Emphasis added)

This point was repeatedly made to the jury. Obviously, they found Johnson & Johnson to have acted in bad faith. The Court must agree with them. Nearly all of the defendant's witnesses either made admissions extremely damaging to its position and helpful to the plaintiffs or had their credibility seriously impeached. The plaintiffs' witnesses, on the other hand, were not impeached on any material fact or matter.

(b) Concerted Action

■■■ A violation of § 1 of the Sherman Act has always required some form of concerted behavior. *Silver v. New York Stock Exchange*, 373 U.S. 341, 364–65, 83 S.Ct. 1246, 1260–61, 10 L.Ed.2d 389 (1963); *Granddad Bread, Inc. v. Continental Baking Co.*, 612 F.2d 1105, 1111–12 (9th Cir. 1979); *Harold Friedman Inc. v. Kroger Co.*, 581 F.2d 1068, 1072 (3rd Cir. 1978). Generally, this has been satisfied by showing a conspiracy but this is not the only means as the statute also envisions contracts and combinations. Johnson & Johnson attacks the sufficiency of the evidence to establish the contract, combination, or conspiracy necessary for a violation of § 1. As defendant sees it, because the main actors involved in this case are Johnson & Johnson and a number of its affiliated companies, we are presented with a situation of an intra-enterprise conspiracy. These so-called "bathtub conspiracies" present boundary problems. The Eighth Circuit agrees with the Seventh and Ninth Circuits that the capacity of related corporations to conspire, in violation of Section 1, is a question of fact to be answered under the circumstances of

each case. *Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 588 (8th Cir. 1981). In *Fotomat*, the Court found a single enterprise because the related corporations referred to themselves as "the company," had the same officers, paid bonuses based only on the earnings of the parent corporation, and had no separate corporate headquarters. *Id.* at 589.

■■■ The evidence in the case at bar indicates that Johnson & Johnson and its subsidiaries operate as autonomous companies. Mr. Burke, Johnson & Johnson's Chairman of the Board, testified that Johnson & Johnson does not "function as the company. This is not a monolithic organization. It's very decentralized." Tr. 6159–60. Each of the defendant's subsidiaries have separate boards of management and each act as separate profit centers at different locations. Thus, the evidence clearly indicates that Johnson & Johnson and its subsidiaries do not operate as a single economic enterprise.

The defendant further argues that, regardless of where the boundaries are drawn, it is clear that there is no violation of § 1 unless the subsidiaries conspire to unreasonably restrain trade outside the corporate family. For support the defendant refers to the *Report of the Attorney General's National Committee to Study the Antitrust Laws (1955)* :

Nothing in these [Supreme Court] opinions should be interpreted as justifying the conclusion that concerted action solely between a parent and subsidiary or subsidiaries, the purpose and effect of which is not coercive restraint of the trade of strangers to the corporate family, violates Section 1. *Where such concerted action restrains no trade and is designed to restrain no trade other than that of the parent and its subsidiaries, Section 1 is not violated.* (emphasis added)

*Id.* at 34.

The problem with this argument is that it misses the point. Defendant's conspiratorial conduct was aimed at not only StimTech but all the companies in the TENS business.

Defendant's actions with respect to Stim-Tech were merely the vehicle to accomplish its overall aims of suppressing this new business. Thus, Johnson & Johnson's intercorporate conspiracies were directed at an entire industry and the new methods of treatment it espoused. Thus the conspiracy was aimed at persons and entities outside the corporate family.

Finally, the defendant argues that there is no showing that it entered into any intracorporate conspiracy or combination in furtherance of its effort to suppress the TENS industry. The facts, however, indicate that Johnson & Johnson entered into agreements with Devices to preclude StimTech from selling in foreign markets. The company also entered into agreements with PCD to stifle StimTech's electrode development program and misappropriate StimTech's knowhow and technology, including price fixing and market allocation agreements. Therefore, there is sufficient evidence that Johnson & Johnson conspired with one or more of its subsidiaries to unreasonably restrain trade in the TENS industry.

Proof of conspiratorial conduct, as mentioned above, is not the sole means by which to satisfy the concerted action requirement of § 1. Defendant's agreement for the acquisition of StimTech and plaintiffs' non-compete agreements, if used to accomplish or in furtherance of an unreasonable restraint of trade in the TENS industry, meet the concerted action requirement of § 1. The jury was so instructed and properly found concerted behavior. The evidence clearly establishes that both the acquisition and non-compete agreements were integral parts of Johnson & Johnson's course of conduct to restrain competition in the TENS industry.

(c) Sherman Act § 1 *Per Se* Charge to the Jury.

The defendant objects to the following jury instruction:

Under Section 1 of the Sherman Act, the intentional suppression of a potentially competitive product from a substantial market by a dominant competitor in the market is unlawful in and of itself. The antitrust laws are as much violated by the prevention of competition as by its destruction. Such suppression is unlawful in and of itself without regard to any other considerations. There can be no defense, justification, or consideration of effects in a relevant market where there has been such suppression. If you find that defendant was a dominant firm, that TENS was potentially competitive with defendant's products, and that defendant intentionally suppressed TENS from entering a substantial market, then defendant has committed a violation of Section 1 of the Sherman Act without regard to any considerations of reasonableness or effects in a relevant market. If you find such suppression, you need not inquire further as to the reasonableness of the suppression or its effects in any relevant market.

(Tr. 12,735–36)

 The defendant argues that before the concept of *per se* can be applied to a particular business practice it must be determined that the conduct was of a type so anticompetitive in nature as to be illegal without an inquiry into the exact extent of the anticompetitive harm.

*Per se* violations generally bring to mind such naked restraints as price fixing, *see United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), horizontal market division, *see United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and group boycotts or concerted refusals to deal, *see Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). This list, however, is not exhaustive.

The above instruction is based upon the Supreme Court's language in *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), that "it is unreasonable, *per se,* to foreclose competitors from any substantial market." *Id.* at 396, 68 S.Ct. at 15. The Supreme Court repeats this proposition again in *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948):

It is indeed "unreasonable, *per se*, to foreclose competitors from any substantial market." *International Salt Co. v. United States*, 332 U.S. 392, 396 [68 S.Ct. 12, 15, 92 L.Ed. 20]. The antitrust laws are as much violated by the prevention of competition as by its destruction. *United States v. Aluminum Co. of America, supra.* It follows *a fortiori* that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor is unlawful.

*Id.* at 107, 68 S.Ct. at 945. It is not surprising that the Supreme Court would find such a foreclosure *per se* unreasonable. The suppression of a competitive product from a substantial market works a pernicious effect upon competition. This practice is more harmful to the public than even price fixing. While price fixing causes consumers to pay a premium for a product, at least the product is available. Foreclosure entails that the public is denied the benefit of the product. In this case, Johnson & Johnson's actions resulted in countless individuals having to suffer the debilitating side effects of pain-killing drugs because a product which can afford them the relief they seek without such adverse effects was withheld from competition. There is absolutely no evidence in the record tending to show that the suppression of TENS had any pro-competitive or otherwise beneficial effects. Indeed, the evidence is such that had TENS not been suppressed, it could have benefitted millions of people throughout the world. If TENS had been used as a treatment of choice for acute and chronic pain, many patients would never become chronic pain patients or patients habituated and addicted to drugs. There is, quite simply, nothing Johnson & Johnson or any other defendant can say in defense of acquiring and suppressing a product simply to eliminate a competitive threat. No one except the malefactor benefits from such conduct. Therefore, *per se* treatment under § 1 is not only appropriate, but mandated. *See Arthur Murray, Inc. v. Reserve Plan, Inc.*, 406 F.2d 1138, 1145 (8th Cir. 1969); *United States v. United States Alkali Export Association*, 86

F.Supp. 59, 67 (S.D.N.Y.1949); *Fashion Originators Guild of America, Inc. v. Federal Trade Commission*, 114 F.2d 80, 85 (2d Cir. 1940) (Hand, J.), *aff'd* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Local 36 of International Fisherman v. United States*, 177 F.2d 320, 331 (9th Cir. 1949); *American Federation of Tobacco Growers v. Neal*, 183 F.2d 869, 873 (4th Cir. 1950); *Pennsylvania Water and Power Co. v. Consolidated Gas, Electric, Light & Power Co.*, 184 F.2d 552, 558 (4th Cir. 1950).

### 2. Section 2

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states ..." "The phrase 'attempt to monopolize' means the employment of methods means and practices which would if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it ..." *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *Central Savings & Loan Association v. Federal Home Loan Bank Board*, 422 F.2d 504, 509 (8th Cir. 1970); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 971 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). In addition to proving a dangerous probability of success, the essential elements which must be proved in a Section 2 attempt to monopolize case are a specific intent to monopolize or obtain monopoly power and predatory or anticompetitive conduct directed to accomplishing the unlawful purpose. *United States v. Empire Gas Corp.*, 537 F.2d 296, 298–99 (8th Cir. 1976); *Agrashell, Inc. v. Hammons Products Co.*, 479 F.2d 269, 284 (8th Cir. 1973).

Johnson & Johnson argues that the jury's verdict finding it to have attempted to monopolize some relevant market in violation of Section 2 of the Sherman Act was insufficient as a matter of law. Johnson & Johnson's argument is basically threefold;

the verdict cannot stand as; (1) the plaintiffs failed to define any relevant market, (2) there is no evidence of specific intent to monopolize any relevant market and (3) there is no evidence of predatory acts in furtherance of an attempt to monopolize any relevant market.[5]

Courts have developed a number of separate and distinct approaches for dealing with Sherman Act attempt cases. Basically, the treatments differ with respect to the market power element; i.e. the dangerous probability of success element. A number of courts have moved in a direction which greatly reduces the market power requirement. In some instances the requirement is explicitly rejected; *see Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir. 1964), *cert. denied* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *McCormack v. Theo. Hamm Brewing Co.*, 284 F.Supp. 158, 165 (D.Minn.1968), in others a combination of power, intent, and conduct is substituted for the independent importance of power; *see Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); in others anticompetitive acts from which intent can be inferred may substitute for showings of power; *see Ray v. United Family Life Insurance Co.*, 430 F.Supp. 1353, 1358 (W.D.N.C.1977); *Huron Valley Publishing Co. v. Booth Newspapers*, 336 F.Supp. 659, 662 (E.D.Mich.1972); still others have allowed the use of narrow market definitions which have the effect of overstating the defendant's position, *see Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1303–07 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). Insofar as the Eighth Circuit follows the more traditional approach of requiring a showing of market power the above authority serves merely as an interesting backdrop. The requirement of specific intent has not generated as much

controversy and it is with that element that our inquiry begins.

(a) Specific Intent

Because § 2 speaks in terms of "attempt to monopolize" an analogy to general criminal law is particularly appealing. Thus Judge Learned Hand in *Alcoa* noted:

Conduct falling short of monopoly, is not illegal unless it is part of a plan to monopolize, or to gain such other control of a market as is equally forbidden. To make it so, the plaintiff must prove what in the criminal law is known as a "specific intent"; an intent which goes beyond the mere intent to do the act. *United States v. Aluminum Co. of America*, 148 F.2d 416, 431–32 (2nd Cir. 1945).

While the 'specific intent' requirement goes beyond the mere intent to do the act there is no clear boundary. Without a doubt the mere intention to prevail over one's rivals is insufficient to establish specific intent to monopolize. *See Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971). Rather the more conventional notion of specific intent is the intention to prevail by improper means. *See Hiland Dairy v. Kroger Co.*, 402 F.2d 968, 975 (8th Cir. 1968). Therefore specific intent to monopolize or obtain monopoly power may be defined for purposes of Section 2 of the Sherman Act as the intention to control prices or restrict competition unreasonably.

Specific intent can be established by inferences drawn from proof of predatory or anticompetitive conduct directed at the unlawful purpose. *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 845 (9th Cir. 1980) (selling real estate to certain chain department stores at below cost in areas where vendor experiences competition but high and profitable prices where there is no competition sufficient to establish specific intent to monopolize); *United States v. Empire Gas Corp.*, 537 F.2d 296, 299 (8th Cir.

---

5. Johnson & Johnson also claims that because the company itself, as opposed to its many subsidiaries, does not sell any products within any of the relevant markets, it cannot be held to violate the attempt portion of § 2. However, as the company at no time moved for a directed verdict on this issue, the Court finds the company to have waived this defense. *See* F.R.Civ.P. 51.

1976) (evidence establishing a pattern of price cuts or threats thereof to influence competitors' prices or methods of competition sufficient to establish specific intent to monopolize); *Agrashell, Inc. v. Hammons Products Co.*, 479 F.2d 269, 284–85 (8th Cir. 1973) (statement that claimant "had no right in the walnut shell business. This is my domain," coupled with non-frivolous patent infringement suit against claimant insufficient to establish specific intent to monopolize); *Union Leader Corp. v. Newspapers of New England, Inc.*, 180 F.Supp. 125, 140 (D.Mass.1959) ("[T]here is no sharp distinction between (a) the existence of an intent to exclude and (b) the use of unfair means.").

The plaintiffs claim that Johnson & Johnson acquired StimTech with the intention of suppressing the TENS market and the pain control drug market, of which Johnson & Johnson, through its subsidiary McNeil Laboratories, was a major participant. At the same time, the plaintiffs argue, Johnson & Johnson was rapidly extending its market share in two relevant submarkets of the overall pain control market; i.e., the prescription and over-the-counter pain control drug markets.

■ Conduct proscribed by Section 1 generally will support a finding of specific intent:

[H]aving by the first section forbidden all means of monopolizing trade, that is, unduly restraining it by means of every contract, combination, etc., the second section seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted to be brought about or are brought about be not embraced within the general enumeration of the first section... The second section is thus harmonized with and made as it was intended to be the complement of the first...

*Standard Oil of New Jersey v. United States*, 221 U.S. 1, 61–62, 31 S.Ct. 502, 516–17, 55 L.Ed. 619 (1911); *see also Knutson v. Daily Review, Inc.*, 548 F.2d 795, 815 (9th Cir. 1976). In addition to the evidence establishing defendant's suppression of the TENS market the plaintiffs introduced evidence relating to Johnson & Johnson's business practices in the over-the-counter pain control remedy market. All of defendant's acts should be viewed together in determining whether there was an attempt to monopolize. *Morning Pioneer, Inc. v. Bismarck Tribune Co.*, 493 F.2d 383, 387 (8th Cir. 1974).

■ In May of 1975, Johnson & Johnson's top management became aware that one of its competitors, Bristol-Myers, had launched a product called Datril against Tylenol. Datril was priced lower than Tylenol and, unlike Tylenol which before 1975 was a prescription drug, was to be mass marketed directly to consumers. This information resulted in a series of top management planning meetings in which the ground work for a campaign against Datril was laid. The campaign took the form of a newly created Consumer Products Division of McNeil Laboratories. This new division was headed by some of Johnson & Johnson's top marketing executives and staffed with a sales force of 100 salesmen, which eventually reached 200, from the company's Domestic Operating Company. Johnson & Johnson then cut the price of Tylenol by 30% and gave rebates to stores selling Tylenol. These rebates amounted to the writing of $23 million in checks to pharmacists around the country in over just one week. Johnson & Johnson's effort to protect Tylenol and beat Datril out of the marketplace was highly successful. By the end of 1975, Tylenol had become the fastest growing of all major U.S. analgesics, aspirin and non-aspirin products. The Consumer Products Division was so successful that in 1976 it was spun off from McNeil Laboratories and incorporated as a separate subsidiary called McNeil Consumer Products. McNeil Laboratories still marketed over-the-counter Tylenol, now being manufactured by McNeil Consumer Products, to hospitals and health

care professionals. Interestingly, unlike StimTech's arrangement, this marketing activity for McNeil Consumer Products was done without transfer pricing. This effort was done with the help of hundreds of salesmen from other Johnson & Johnson companies. Similar assistance was promised to the plaintiffs and StimTech but never delivered.

Johnson & Johnson's suppression of StimTech alone was sufficient for a finding of specific intent. Its conduct with respect to the over-the-counter pain control drug market lends additional support to a finding that the defendant possessed a specific intent to control prices or restrict competition unreasonably.

(b) Dangerous Probability of Success

■ Because the showing of specific intent in almost all cases leads to the eliciting of predatory or anticompetitive conduct, our next inquiry concerns whether there was a dangerous probability that the defendant could succeed in his attempt to monopolize. As noted above, this Circuit requires such a showing. Additionally, there is no shortcut method of establishing liability; i.e., where proof of predatory or anticompetitive conduct which can serve as the basis for a substantial claim of restraint of trade will, in some circumstances, permit an inference not only of specific intent but in turn of dangerous probability. *See Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 845 (9th Cir. 1980); *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 854 (9th Cir. 1977). Furthermore, this Circuit follows the majority view that proof of a dangerous probability of success must include a showing of the relevant market within which that probability occurred. *United States v. Empire Gas Corp.*, 537 F.2d 296, 302 (8th Cir. 1976); *Morton Buildings*

*of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 919 (8th Cir. 1976); *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1240 (8th Cir. 1973).[6] There are two components in the concept of relevant markets; relevant product market and relevant geographic market.

■ The determination of the relevant market is essentially a fact question. *See United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 250, 79 S.Ct. 245, 250, 3 L.Ed.2d 270 (1959); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237, 1240 (8th Cir. 1973). Because it is essentially a fact question, the jury's finding is given a great deal of weight. Nevertheless, there are certain guidelines applicable to all cases. In *du Pont, supra*, the Supreme Court stated:

> The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). Because it is the plaintiffs' contention that through the suppression of StimTech and derivitively the entire TENS market the defendant was attempting to maintain or acquire the power to exclude competitors from or control prices within the pain control market, it is neces-

---

**6.** The Department of Justice has, without conspicuous success, opposed this view:

> In recent years the Government has argued strongly against limiting the attempted monopoly doctrine to circumstances where there is a showing of dangerous probability of monopolization within a relevant market ... To eliminate the "dangerous probability" and "market" requirements from Section

2 attempt to monopolize cases would make it a much more effective tool for treating with indefensible single firm conduct.

Remarks, Donald I. Baker, Director of Policy Planning, Antitrust Division, Department of Justice, Section 2 Enforcement. The View From The Trenches, Before the Section of Antitrust Law of the American Bar Association, San Francisco, August 16, 1972.

sary to examine the functional interchangeability of TENS devices with prescription and over-the-counter analgesic drugs. Once the evidence establishes that TENS devices were in competition with pain control drugs the jury quite properly could have interpreted Johnson & Johnson's conduct with respect to StimTech and the entire TENS industry in light of the information it had at its disposal concerning the dynamics of the various markets. In particular, there was evidence that TENS devices are relatively easy to make and have no patent protection. The market, once established, would then be rather easy to enter. Mr. Smale, Managing Director of Devices, testified "In my view it is a unit [TENS] where you could spend an enormous amount of money getting the market established and then somebody else can undercut you as easy as winking." Johnson & Johnson executives were aware of this market characteristic. Mr. Whitlock, vice-chairman of Johnson & Johnson's executive committee, knew the nature of the TENS business. He was after all the executive committee member in charge of StimTech. Interestingly, Mr. Whitlock was also the executive committee member in charge of McNeil Laboratories as well as the president of the Pharmaceutical Manufacturers Association and consequently knew that any benefit to be reaped by the suppression of the TENS business would be conferred on the entire pharmaceutical industry, but because of defendant's steadily increasing market share, Johnson & Johnson would benefit most favorably. He certainly knew of Johnson & Johnson's unqualified success in increasing its market share in both the over-the-counter and the prescription pain control drug markets. He was aware of the fact that it was difficult if not impossible to undercut the company in its drug operations. The Datril-Tylenol experience is convincing evidence that when it came to drugs Johnson & Johnson had no rival. Mr. Whitlock, as well as other Johnson & Johnson executives, knew the high investment and high potential the company had in its new painkiller, Zomax.

Significant competition from such a non-drug product as TENS could quite easily have troubled Johnson & Johnson's management as such competition jeopardizes its very successful drug business. It does so without the promise of an equally appealing alternative market. The evidence indicates that Johnson & Johnson would not be able to compete as strongly in a pain control market in which TENS devices played a significant role. The business Johnson & Johnson would have picked-up as a result of being in that market via StimTech would in no way make up for the business lost, in terms of sales or profits, from decreased drug usage.

Throughout the course of the proceedings, the defendant repeatedly argued that TENS devices did not compete with drugs. The gist of the argument appears to be that because drugs are consumable items taken on a short-term basis to relieve episodes of pain and because TENS units are marketed on a permanent basis, there is no cross-elasticity of demand. The defendant points to the cost differential between drugs and TENS devices, the former costing a few dollars whereas the latter retails for about $200–400. The plaintiffs counter with a number of marketing studies indicating that the potential market for TENS devices is tremendous. At present there may be 100,000 users of these devices; however, at a 25% to 50% effectiveness rate for long-term relief, there would be more than four to eight million patients that could benefit from owning a TENS unit. Furthermore, as usage increased, the price per unit would decrease.

Nearly all the experts testified, to one degree or another, that TENS devices were in competition with drugs. Dr. Long, Chairman of the Department of Neurosurgery at Johns Hopkins Medical Institution, testified that TENS devices should be used ahead of Tylenol with codeine for the treatment of chronic pain; i.e. pain lasting more than six months. He further testified that TENS devices, in his opinion, are the treatment of choice for the treatment of peripheral nerve injury, and post-operative pain. Chronic pain sufferers number around 20 to

25 million people in the United States, half of which can be treated effectively with TENS devices. Dr. Long's personal experience with such stimulator devices was that they provided the same relief for headaches as over-the-counter Tylenol. Dr. Long also noted that, unlike drugs, TENS devices cannot be misused and cannot harm the patient. Finally, he testified that TENS devices are cheaper than drugs. During the period from 1973 to 1975, the average chronic pain patient treated by Dr. Long spent between $100.00 to $200.00 per month on painkilling drugs. Although TENS units cost $400.00 or more, the investment is a one time expense. Dr. Shealy, another of the plaintiffs' experts, testified that in the case of acute pain, which is fresh pain right after an injury of some kind, 8 out of 10 patients, or 80% of the time the pain can be adequately controlled with a TENS device. Even the defendant's experts acknowledged that TENS devices are in competition with pain control drugs. Upon cross-examination Dr. Danoff, a Minneapolis neurosurgeon whose specialty is treating chronic pain patients, testified on behalf of the defendant that assuming TENS devices were readily available to doctors and that doctors knew what they were and how they were used there would be a significant decrease in the number of people who were on medication coming to see him and others. Dr. Danoff remarked that 10% to 20% of his chronic pain patients have ended up purchasing a TENS device because of its effectiveness in treating their pain. Another Johnson & Johnson expert, Mr. Wingrove, President of Medical Devices, Inc., a small TENS manufacturer, admitted that TENS devices are in competition with pain control drugs, particularly for the treatment of chronic pain. Mr. Wingrove testified to the effect that TENS devices are superior to drugs because they are not addictive and a user will not build up a tolerance. As to cost considerations, Mr. Wingrove stated that people with chronic pain spend $300.00 per month on drugs over a long period of time, and that "just cost" should make TENS an attractive alternative to drugs. Furthermore, he noted that plaintiffs' assumption in envisioning a $100.00 TENS unit, based on increased volume, was quite reasonable. Indeed, Mr. Wingrove stated that given eighteen months lead time, with sufficient volume, he could manufacture TENS devices for just a few dollars. The potential market sustaining such an increase in volume certainly exists. Nearly 20 million patients in the United States are considered to have chronic pain. Chronic pain syndromes cost the American people between $45 billion and $60 billion annually for health services, loss of work productivity and compensation payments. More than 15% of the adults in the United States suffer persistent low back pain at some time. This low back pain disables 7 million people per year in the United States. In addition, 21 million individuals suffer arthritis. Even headaches pose significant health and economic problems with over 25 million headache sufferers spending roughly $1 billion per year for over-the-counter headache remedies. Therefore, TENS devices were the kind of products that could go off prescription and compete with such over-the-counter painkillers as Tylenol. Mr. Maurer, President and Chief Executive Officer of Empi, another small TENS company, was called to testify by Johnson & Johnson. He repeatedly admitted that TENS devices are in competition with drugs. In the case of chronic pain patients, Mr. Maurer testified that if they were given stimulator devices then at least 50% of them would not need drugs. In the area of acute pain and post-operative pain, Mr. Maurer also admitted that TENS devices are competitive with pain control drugs. Even Johnson & Johnson's own executives, Frank DeAngeli and Dr. McConnell, acknowledged competition between TENS devices and drugs. Indeed, the Vice President of Marketing for McNeil Laboratories, Jack O'Brien stated that the only reason he would not testify that TENS competed with drugs was because TENS only had a small percentage of the market in the pain control area. He further testified that if the TENS sales increased, he would consider them to be competitive to drugs. This is a very curious theory. The most interesting

aspect of the theory is that the suppression of TENS is one of the causes of the small market share now held by TENS companies and thus, by suppressing the TENS industry, Johnson officials, by their own definition, have concluded that it is not in competition with drugs since it has only a small market share. It would seem under this theory that in any suppression case, the more successful the suppression, the less the product's percentage share of the market will be and thus in successful suppression cases, competition will not be found and the wrongdoer goes free.

Furthermore, the Court believes that there was sufficient evidence for the jury to have identified the relevant product and geographic market as the domestic pain control market and the relevant submarkets to consist of the stimulator (TENS) market, the prescription pain control market and the over-the-counter pain control market.

Much of the law pertaining to a dangerous probability of success centers around the issues of market share and barriers to entry. Generally speaking, the smaller a defendant's market share and the easier it is for others to enter the market, the more difficult it becomes to show that a dangerous probability exists. *Brager & Co., Inc. v. Leumi Securities Corp.*, 429 F.Supp. 1341, 1347 (S.D.N.Y.1977) (60% of the market in Israeli bonds sufficient to establish a dangerous probability); *Giant Paper & Film Corp. v. Albemarle Paper Co.*, 430 F.Supp. 981 (S.D.N.Y.1977) (14% of the market consisting of packaging materials derived from forest products insufficient to withstand defendant's summary judgment); *Harris v. Atlantic-Richfield Co.*, 469 F.Supp. 759, 763 (E.D.N.C.1978) (3% of the market for gasoline sales in North Carolina could not as a matter of law give rise to a dangerous probability); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems*, 491 F.Supp. 1199, 1220 (D.Hawaii 1980) (20–25% share of Hawaii car rental market by itself will not sustain a showing of a dangerous probability). Plaintiffs argue that the evidence is sufficient to establish that Johnson & Johnson possessed monopoly power in all relevant submarkets; i.e., the economic ability to charge unreasonably high prices or to exclude competition. *Telex Corp. v. International Business Machines Corp.*, 367 F.Supp. 258, 284–91 (N.D.Okla.1973). Therefore, the jury could also have found, *a fortiori*, that there was a dangerous probability of success that Johnson & Johnson would monopolize one and more of the relevant submarkets. Johnson & Johnson's suppression of the TENS market through the employment of monopoly power would constitute a classic example of an attempt to monopolize. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) ("Use of monopoly power 'to destroy threatened competition' is a violation of the 'attempt to monopolize' clause of § 2 of the Sherman Act." *Id.* at 377, 93 S.Ct. at 1029, *citing, Lorain Journal v. United States*, 342 U.S. 143, 154, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684 (1927)).

Courts have generally been reluctant to hold that a market percentage of less than 50% will sustain a monopolization claim.[7] Occasionally, one will run across a statement indicating that a 50% market share is

7. *See United States v. American Tobacco Co.*, 221 U.S. 106, 162, 31 S.Ct. 632, 641, 55 L.Ed. 663 (1911) (86% market share); *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 33, 31 S.Ct. 502, 505, 55 L.Ed. 619 (1911) (90% market share); *United States v. Eastman Kodak Co.*, 226 F. 62, 79 (W.D.N.Y.1915), *appeal dismissed* 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795 (75–80% market share); *United States v. Pullman Co.*, 50 F.Supp. 123, 135 (E.D.Pa. 1943), *aff'd per curiam* 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263 (100% market share); *United States v. Aluminum Co. of America*, 148 F.2d 416, 425 (2nd Cir. 1945) (90% market share); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 167, 68 S.Ct. 915, 933–34, 92 L.Ed. 1260 (1948) (70% market share); *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 343 (D.Mass.1953), *aff'd per curiam* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (75% market share); *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 249, 79 S.Ct. 245, 249, 3 L.Ed.2d 270 (1959) (81% market share); *United States v. Grinnell Corp.*, 384 U.S. 563, 567, 86 S.Ct. 1698, 1702, 16 L.Ed.2d 778 (1966) (87% market share).

a "prerequisite for finding of monopoly." *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969). For the most part, however, courts endeavor to give only weight and not conclusiveness to market share evidence. In other words, market share alone does not determine the presence or absence of monopoly power. *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975); *ILC Peripherals Leasing Corp. v. International Business Machines Corp.*, 458 F.Supp. 423, 425 (C.D.Cal.1978). Exclusive focus on market share percentages can produce a distorted picture of market power. *United States v. Columbia Steel Co.*, 334 U.S. 495, 527–28, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). Additional market characteristics, such as the barriers to entry, strength of the competition, consumer demand and the probable development of the industry, need to be considered. *Id.* at 527, 68 S.Ct. at 1124. The Eighth Circuit in choosing to follow this case by case approach has indicated that a market percentage of less than 50% might produce a monopoly under certain circumstances peculiar to the market concerned. *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 (8th Cir. 1968). One court has gone so far as to hold that a jury instruction precluding a finding of monopoly power if defendant's market share was less than 50% was in error. *Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 130 (2nd Cir. 1981).

The total market for pain control drugs (oral analgesics) in 1979 was approximately $867 million. This included approximately $300 million in prescription pain drugs and $546 million for over-the-counter pain drugs. Johnson & Johnson's Tylenol with codeine at present holds over 27% of the prescription oral analgesic submarket and the company's Zomax accounts for an additional 10% of the market. The defendant's market share in the over-the-counter oral analgesic market is somewhat less with Tylenol holding 27.1% of the sales.

Market shares tell only part of the story. The defendant's 37% share belies the company's true strength in the prescription pain control drug market. Johnson & Johnson's endeavors in the prescription pain control drug market center around two drugs, Tylenol with codeine and Zomax. Tylenol with codeine has grown from the 127th most prescribed U.S. prescription drug in 1971 to number 1 in 1980, passing even Valium in new prescriptions. This phenomenal growth was the direct result of a carefully orchestrated ten year program. Zomax also a prescription pain drug, is a non-steroidal anti-inflammatory drug with analgesic properties. It was promoted as a non-narcotic drug with the potency of morphine. Johnson & Johnson committed a great deal of resources in developing this drug. More than $14 million was spent to research and develop Zomax. Promotional spending was estimated at around another $10 million. Clearly, Johnson & Johnson had a lot riding on Zomax. Zomax has captured 10% of the prescription drug market in just over a year. There appears to be no reason to expect this pattern of tremendous growth to slow anytime soon.[8] Indeed, competing drugs, such as Darvon, have begun to steadily lose market share.

The company's strength in this market is also indicated by its pricing and marketing practices. Zomax is priced at $.20 per tablet. This is significantly above its nearest competitor's price of $.16 per tablet. Prescription cost to the patient per day was targeted at $1.10; the nearest competing drug is the company's own Tylenol with codeine at $1.00 per day. All other prescription pain drugs are under $1.00 per day. The high market price for Zomax does not appear to be solely related to cost. As part of the company's promotional campaign, 143 million Zomax tablets were given away in the first 12 months. Based upon a retail price of $.20 per tablet, this give away amounted to $29 million. The cost to make and distribute the samples, however,

---

**8.** Mr. DeAngeli testified that he was aware of sales forecasts for Zomax exceeding $100 million annually by 1985. Estimated annual sale forecasts as high as $385 million by 1985, more than 10 times present sales, were not considered ridiculous.

was only $7 million. The defendant justifies this price differential upon the drug's inherently superior qualities. The drug's superiority, at least at this stage of its development, is not so cut and dried as the defendant suggests.[9]

The company's promotional and marketing activities also played an important role in getting the drug known and accepted, thereby enabling it to charge a premium price. In addition to giving away large quantities of the drug, the company advertised in mass circulation medical journals, scheduled 200 speaker programs, set up numerous hospital and medical convention exhibits, prepared a marketing film, participated in a number of clinical studies and amassed a sales force of over 440 people. Total brand marketing expenses for Zomax was projected at $13,861,000.00 in the first 12 months. Interestingly, the research and development expenditures for the drug since 1973 were just a few thousand dollars more than one year's worth of marketing expenditures.

Defendant's market power in the over-the-counter pain control drug market is also significantly greater than its market share would indicate. The market structure shows that Johnson & Johnson's Tylenol with 27.1% of the market was larger than its next three competitors combined; Anacin 12.2%; Bufferin 7.3%; and Bayer 7%. As with the prescription market, Tylenol's share of the over-the-counter market increased dramatically with sales of adult Tylenol tripling between 1975 and 1979. The company's efforts in protecting its product from Bristol-Myers' Datril, which included a price cut of 30% and a rebate program involving the writing of $23 million in rebate checks in one week, shows that Johnson & Johnson had no difficulty in handling its competition.

Both the over-the-counter and the prescription markets exhibit high barriers to entry. The company's experience with Zomax indicates the large development and marketing expenses that are incurred in bringing a new product into the market. Compliance with Federal Food and Drug laws is costly. Furthermore, the markets are characterized by significant concentration. In both markets, the top four to five firms hold combined shares of 60% to 80%.

These additional market statistics coupled with the defendant's significant market shares in both submarkets provide a sufficient foundation for the jury to have found that the defendant possessed substantial market power in both submarkets and therefore there existed a dangerous probability of success to monopolize one or both of the submarkets. Thus all the necessary elements of the attempt to monopolize claim have been fully satisfied.

### D

### THE CLAIM OF INCONSISTENT VERDICTS

▬▬ Defendant argues that because the plaintiffs' entire antitrust case was based on the claimed acquisition and subsequent suppression of StimTech with resultant direct antitrust injury to plaintiffs, a jury could not find a violation of Section 1 or Section 2 of the Sherman Act unless it also found a violation of Section 7 of the Clayton Act.[10] Defendant's claim is grounded on the theory that the verdict for it on the Section 7 claim necessarily required the

---

**9.** Zomax has such undesirable side effects as nausea, gastrointestinal distress, diarrhea, abdominal pain, dyspepsia, constipation, flatulence, vomiting, dizziness, insomnia, edema, rash, muscle weakness, and urinary tract problems.

**10.** Section 7 (15 U.S.C. § 18) of the Clayton Act provides in pertinent part:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

jury to find either that there was no substantial lessening of competition in the TENS market or that plaintiffs did not suffer any direct antitrust injury, or both.

At the outset it should be noted that the defendant's argument has a curious ring to it as it suggests that, at least in the area of acquisitions, one or more of the antitrust laws is superfluous. Nevertheless, the argument has a certain amount of straightforward charm, and therefore should be addressed. There is a relatively well-established line of precedent which holds that the effect of an acquisition may be to substantially lessen competition within a line of commerce without attaining the status of an unreasonable restraint of trade. *United States v. Penn-Olin Co.*, 378 U.S. 158, 168, 84 S.Ct. 1710, 1715, 12 L.Ed.2d 775 (1964); *Page v. Work*, 290 F.2d 323 (9th Cir. 1961); *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 259 F.2d 524, 527 (2nd Cir. 1958). Not surprisingly, this could lead one to believe that if a party is unable to make out a Clayton 7 violation, in the case of an acquisition or merger, then that party should not be able to recover on a Sherman 1 count. Such reasoning, however, is faulty in one significant respect. As the Supreme Court has remarked several times, Section 7 of the Clayton Act is "a prophylactic measure, intended 'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil....'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 695, 50 L.Ed.2d 701 (1977), quoting *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 317–18, 82 S.Ct. 1502, 1519–20, 8 L.Ed.2d 510 (1962); *United States v. Philadelphia National Bank*, 374 U.S. 321, 362–63, 83 S.Ct. 1715, 1740–41, 10 L.Ed.2d 915 (1963); *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 170–71, 84 S.Ct. 1710, 1716, 12 L.Ed.2d 775 (1964); *United States v. Von's Grocery Co.*, 384 U.S. 270, 277, 86 S.Ct. 1478, 1482, 16 L.Ed.2d 555 (1966); *FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 577–78, 87 S.Ct. 1224, 1229–30, 18 L.Ed.2d 303 (1967); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 201, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974). As such, the Act's primary focus is the probable anticompetitive effect of a merger itself and not the restraining conduct of a party which occurs subsequent to and not as an inevitable result of a merger. Viewed in this light, the Court cannot, as a matter of law, find the jury's verdicts to be inconsistent. The Seventh amendment requires "that if there is a view of the case which makes the jury's answers to special interrogatories consistent, the court must adopt that view and enter judgment accordingly." 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 49.-03[4] at 49–29 (2nd ed. 1980); C. Wright & A. Miller, 9 Federal Practice & Procedure: Civil § 2510 (1971); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's findings inconsistent results in a collision with the Seventh Amendment.") *Gallick v. Baltimore & Ohio R. R.*, 372 U.S. 108, 114–15, 83 S.Ct. 659, 663–64, 9 L.Ed.2d 618 (1963); *International Shoe Machinery Corp. v. United Shoe Machinery Corp.*, 206 F.Supp. 949, 950 (D.Mass.1962), aff'd, 315 F.2d 449 (1st Cir. 1963), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963) (no inconsistency in jury's answers to interrogatories that defendant had a general monopoly in the shoe industry but not a monopoly in a particular portion of the shoe industry).

The jury could, quite conceivably, have found Johnson & Johnson's acquisition of StimTech to have no illegal anticompetitive effects but still have found that the company's later actions with respect to its subsidiary and the TENS market amounted to a restraint of trade. Similarly, the jury could have consistently found the acquisition itself to have caused no illegal monopolistic tendencies, yet the defendant's conduct after the acquisition to have been sufficient

for a finding of an attempt to monopolize the pain control market or a submarket thereof.

■■■ Defendant's argument that the verdict for it on the § 7 claim necessarily requires the jury to find that plaintiffs' suffered no antitrust injury is without merit. The jury could have consistently found that the plaintiffs suffered no direct antitrust injury from the defendant's acquisition yet, however, suffered such injury from defendant's subsequent conduct. In sum, to recover from a § 7 violation a party must: (1) show that a merger or acquisition lessens competition in a line of commerce and (2) that the merger or acquisition caused the party "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Merely because a jury chooses to find for a party on a Clayton § 7 claim but against it on both a Sherman § 1 and § 2 claim only indicates that (1) the merger or acquisition itself was found not to be illegal, or (2) although the merger or acquisition was violative of § 7, the anticompetitive effects due to this concentration did not directly cause the type of loss to the claimant that the claimed violation is likely to produce. In this case, the jury found Johnson & Johnson's acquisition of StimTech non-actionable. This finding in no way suggests that subsequent conduct by Johnson & Johnson could not rise to the level of an antitrust violation causing plaintiffs direct antitrust injury.

E

THE CONTRACT CLAIM

The defendant next argues that, as a matter of law, the plaintiffs failed to make out a case in support of the breach of contract claim and that the jury was erroneously instructed that it could base Johnson & Johnson's liability on a breach of a written as well as an oral contract.

The defendant correctly points out that the jury needed to find a bad faith breach in order to make out a violation of the 1974 Agreement. The plaintiffs' claims relating to the 1974 Agreement revolve around paragraph 10(a) which provides:

Stockholders [plaintiffs] and Johnson & Johnson recognize and acknowledge that *the relationship* which will exist between Johnson & Johnson, the Company [StimTech] and the Stockholders upon consummation of the transactions contemplated herein, *must be based on a high degree of mutual trust and confidence by the Company, Stockholders and Johnson & Johnson.* Stockholders and Johnson & Johnson agree that each will at all times act in respect to its dealings with the Company and its operations, and subject to its dealings with the Company and its operations, and subject to the exercise of reasonable business judgment, act [sic] in such a way as to promote to the extent reasonably possible the successful operation and growth of the Company. (Emphasis added)

■■■ Both the plaintiffs and the defendants testified at length regarding the circumstances surrounding the inclusion of paragraph 10(a) as a means to explain the precise obligations of the parties under this paragraph. Johnson & Johnson now argues that this Court erroneously allowed parol statements to be considered by the jury in interpreting this paragraph. However, it is well settled that parol evidence is proper to explain the circumstances surrounding the execution of a written contract in an effort to derive the appropriate meaning of general contract language. *Anderson v. Kammeier*, 262 N.W.2d 366, 370 n.2 (Minn.1977):

[P]arol evidence is admissible to explain the circumstances surrounding the execution of documents. While earlier decisions took a restrictive view of the admission of parol evidence for purposes of interpretation, the more recent decisions hold that questions of interpretation are not significantly affected by whether an agreement is integrated. *See, Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal. Rptr. 561, 442 P.2d 641 (1968); *Garden State Plaza Corp. v. S. S. Kresge Co.*, 78

N.J.Super. 485, 189 A.2d 448 (1963). See, generally, Farnsworth, "Meaning" in the Law of Contracts, 76 Yale L.J. 939 (1967). This is also the position of the restatement. See, Restatement, Contracts 2d Tentative Draft No. 5, §§ 238(1), 240(c). See also, Minnesota Statutes 366.2–202. Thus, as stated in comment *b* of Restatement, Contracts 2d Tent. Draft No. 5, § 238:

> It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, [§ 238(1)] is not limited to cases where it is determined that the language used is ambiguous. *Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties* . . . .

*Id.* (emphasis added)

■ Mr. Anderson, who was directed by top Johnson & Johnson management to negotiate the agreement, testified that paragraph 10(a) was placed into the agreement to cover items which were discussed but not specifically delineated in the written agreement. In fact, Mr. Galloway, the lawyer for Johnson & Johnson who drafted the agreement, testified that paragraph 10(a) of the 1974 Agreement incorporated an understanding that Johnson & Johnson would in good faith provide StimTech with administration expertise, financial backing, research and technology, marketing, and would remove the risks of business failure. Indeed, Mr. Galloway testified that by the time the final contract was being drafted and negotiated, the plaintiffs had become very mistrustful of Johnson & Johnson and expressed the feeling that Johnson & Johnson might not do the things it had promised to do in order to make StimTech successful and thus assure the earnout for the plaintiffs, i.e. provide administrative expertise, financial backing, research and technology, marketing and removing the risks of business failure. The plaintiffs took the position that these several promises of Johnson & Johnson noted above should be incorporated into the contract. Johnson & Johnson would not agree to do so but instead included paragraph 10(a) specifically to satisfy the promises which were acknowledged by Johnson & Johnson witnesses to be incorporated into paragraph 10(a). 10(a) was specifically written for this contract in an effort to satisfy the plaintiffs' fear concerning the level of effort to satisfy the plaintiffs' fear concerning the level of effort that Johnson & Johnson would expend in promoting and developing StimTech and its products. The fact that the defendant's witnesses concede that certain obligations were incorporated in the general language of paragraph 10(a) is ample reason to admit parol evidence to define the contracting parties' intended obligations and responsibilities.

■ The defendant next asserts that there was no evidence that Johnson & Johnson intentionally and in bad faith breached its obligations embodied in paragraph 10(a). The facts as outlined above in the discussion of the evidence relating to the defendant's actions subsequent to the 1974 Agreement could reasonably be construed by the jury to have been taken consciously and in bad faith. Johnson & Johnson acting through Mr. Anderson engaged in what could be seen as a systematic plan to stifle the StimTech business which would have been a violation of the good faith requirement imposed under paragraph 10(a). Bad faith need not be proved directly, and in fact is very rarely established directly. However, given the actions and omissions occasioned at the behest of Johnson & Johnson which so adversely affected the profitability of StimTech and its ability to compete in the "pain market" contrary to the promises embodied in paragraph 10(a) of the 1974 Agreement, the jury could reasonably find that Johnson & Johnson acted intentionally and in bad faith in dealing with StimTech. In fact, the defendant's argument that there was no evidence of a bad faith breach is belied by the closing argument of defense counsel. Defense counsel stated:

I think the line here is pretty clear. I mean, if Anderson—this is a crucial area in the case. A, we contend obviously—and I think this is quite right—obviously, we had an obligation to give this company adequate funds to develop their products. There is no question about that. And clearly if the plaintiffs' testimony is believed—all three of them testified this way—they all three testified that Anderson said R&D funds had to come out of profits ... *Clearly, if that's believed, it seems to me that goes a long way towards helping the plaintiffs' charge about bad faith ...* Their general range of credibility—this is a very crucial issue here that does go right to their credibility on our good faith. (Tr. 6,252–53) (Emphasis added)

Thus, he conceded that the evidence was present if the plaintiffs were believed. Actually Mr. Anderson admitted at trial that he did tell the plaintiffs that research and development for StimTech had to come from gross profits.

Q. And so the R&D is supposed to come out of gross profit, right?

A. Yes, that's correct.

Q. And that's what you told the plaintiffs, is that correct?

A. I said it had to come out of here.

Q. When you say "here," that's gross profit, right?

A. In effect.

Q. Well, it is, isn't it. Not "in effect." That's what it is, right?

A. It has to come out of the total revenue of the business, which, after you pay the costs, is gross profits, yes.

Q. *And that's what you told the plaintiffs, that their R&D had to come out of gross profit, is that correct?*

A. *That's correct.*

(Tr. 7,345–46) (Emphasis added)

In opposition to the plaintiffs' claim of a bad faith breach, the defendant argues that it invested some $9 million in StimTech. However, evidence adduced at trial indicated that research and development money, to be effective, must be "up front" at an early time so that the results of research and development give a company the competitive edge. The $9 million invested in StimTech by the defendant was more in the nature of providing StimTech with funds for operating expenses which if not paid would have bankrupted StimTech and thus allowed its purchase by another, e.g., a competitor.

▮▮▮ The defendant next argues that the plaintiff was able to show no damage from the breach of the 1974 Agreement. However, the evidence revealed that the plaintiffs expected great profits from StimTech, and that Johnson & Johnson encouraged that expectation; and as StimTech profited so would the plaintiffs. Mr. Anderson admitted that Johnson & Johnson did not provide substantial research and development funds to StimTech; he also testified that he told Mr. Whitlock in a report that if StimTech received substantial research and development funds, financial projections could be exceeded. Mr. Anderson also stated in his report that financial projections for StimTech were constructed in a conservative manner. The plaintiffs also submitted projections based upon assumed capital requirements which were accepted and approved by Mr. Anderson but whose implementation in terms of financial backing was never effected by Johnson & Johnson. There was ample evidence upon which the jury could reasonably conclude that StimTech could have been a success and that the plaintiffs would have realized their $7 million earn-out. There was likewise ample evidence that Johnson & Johnson in bad faith failed to assist StimTech's development as required under the 1974 Agreement. When, during the negotiations, the offer was cut by Johnson & Johnson from $12 million to $7 million, the plaintiffs hesitated to sign the contract, Mr. Whitlock came to them and cajoled and beguiled them by promising very many financial rewards as Johnson & Johnson executives. He pointed to his own salary of $500,000. The plaintiffs were impressed and convinced that this would happen for them but under the contract claim the jury was not

permitted to consider the value of these proffered extensive financial rewards as a part of the damages for the breach of contract.

■ The defendant also argues that the Court instructed the jury that if it found that Johnson & Johnson promised a $7 million earn-out to the plaintiffs and the plaintiffs failed to receive the $7 million, the defendant would be liable. This is not an accurate summary of this Court's charge to the jury. The Court's charge to the jury was that it had to find that the defendant intentionally and in bad faith breached the 1974 Agreement before it could award damages on the breach of contract claim. The Court stated, "[i]t is not enough for the plaintiffs to show that defendant did not perform; rather plaintiffs must show that defendant's nonperformance, if any, was the result of bad faith." (Tr. 12,673–74) The jury was repeatedly told during the trial, pursuant to counsel's agreement, and during the instructions that before any liability could attach on any of the plaintiffs' theories of recovery, it (the jury) must conclude from the evidence that there was a willful and intentional "bad faith" effort by Johnson & Johnson from the beginning to injure StimTech and the plaintiffs. The requirement of bad faith permeated the trial and was well understood by the jury.

■ The defendant's last argument on the plaintiffs' contract award is that the Court erroneously refused to charge the jury that if the defendant showed that the plaintiffs fraudulently concealed information from the defendant, the plaintiffs were barred from recovering on the 1974 Agreement. This Court did allow the defendant during trial to explore the area of potential non-disclosure on the part of the plaintiffs. The evidence revealed only that Mr. McDonald and Mr. Hagfors left their employment with a previous employer due to personality conflicts. The conflict in Mr. Hagfors' case may have involved his employer's dissatisfaction with Mr. Hagfors' performance. The defendant failed to provide evidence that the plaintiffs were fired for incompetence. The evidence would indicate

that Hagfors, McDonald and Jensen were already engaged in the TENS business and were progressing although somewhat handicapped by a cash shortage. A Johnson & Johnson representative sought them out made inquiries into their business and its potential, and offered to buy the business. Johnson & Johnson did not simply hire the plaintiffs as individuals and then find an omission in their employment record. They bought the three men and the business as a package. The men who made the decision to buy the business were Mr. Whitlock, Vice Chairman of the Executive Committee, Mr. Burke, Chairman of the Board, and the other members of the Executive Committee. The reasons which impelled them to decide to buy StimTech were never given. Mr. Anderson and Dr. McConnell were their agents to make the agreement, only after the decision to acquire was made. As a consequence, Mr. Anderson stated that he did not decide whether to buy StimTech; that he did not know why the company was purchased; and that he did not know whether the prior employment record would, in any way, affect the decision by his superiors to buy the company. Thus, his testimony that it would have affected his decision is irrelevant because he did not make the decision. Johnson & Johnson brought forth no one who played a part in making the decision to purchase to reveal what, if any, part these circumstances, if revealed, would have played in that decision. There is no evidence of any reliance upon this alleged non-disclosure. The word "alleged" is used since Mr. McDonald testified that he told Mr. Anderson of these circumstances while on an airplane trip to Hartford, Connecticut, during the negotiations.

As to materiality, several witnesses were called by the defendant to attempt to establish that the non-disclosure was of such a nature and magnitude as to be necessarily included in a stock offer prospectus. The defendant was unable to establish the point. Johnson & Johnson's own witnesses testified that the failure to include such information in a prospectus would not constitute

a material misrepresentation or omission. In any event, the purchase of this company cannot be equated with the public offering of stock. These plaintiffs were approached by sophisticated buyers who made a thorough analysis of the plaintiffs' business and their personal attributes before investing.

Finally, the defendant cites no legal authority for the submission of this *in pari delicto* defense to the jury. The cases cited by the defendant where such a defense is available involve suits between two fraudulent parties who conspired in fraud against innocent third parties. In those cases, the courts of Minnesota refuse to permit suits for injuries arising out of a fraud when the suit is between two parties who participated in that fraud. There is no such situation in this case. The alleged non-disclosure by the plaintiffs were submitted to the jury for other purposes, e.g., their credibility, the amount of their damage, etc. However, these non-disclosures are inappropriate as a complete defense on a contract claim.

F

## THE FRAUD CLAIM

The defendant's first attack on the plaintiffs' fraud claim is that there was insufficient evidence to support the jury's finding that the defendant fraudulently induced the plaintiffs to enter into the 1974 Agreement.

█ It should be noted at the outset that the plaintiffs' fraud claim is not based on misrepresentations of "existing facts" in the strict sense, but rather is based on a theory that the defendant made material promises to be performed in the future which were made with the intent to defraud and which were never intended to be performed by the defendant. This theory is consistent with Minnesota law relating to fraud. E.g., *Vandeputt v. Soderholm*, 298 Minn. 505, 216 N.W.2d 144, 147 (1974); *Belisle v. Southdale Realty Co.*, 283 Minn. 537, 168 N.W.2d 361, 363 (1969); *Proulx v. Hirsch Brothers, Inc.*, 279 Minn. 157, 155 N.W.2d 907 (1968); *Wojtkowski v. Peterson*, 234 Minn. 63, 47 N.W.2d 455, 458 (1951); *Phelps v. Aurora State Bank*, 186 Minn. 479, 243 N.W. 682 (1932).

The evidence adduced at the trial indicates that the jury could reasonably have found that representations made to the plaintiffs during the negotiations leading up to the 1974 Agreement were fraudulently made and were relied upon by the plaintiffs in entering into the 1974 Agreement. Mr. Whitlock admitted at the trial that he told the plaintiffs that Johnson & Johnson had the resources and would put them to work for StimTech in an effort to make StimTech "tops in the pacer business" and that the Johnson & Johnson name would be behind StimTech. The evidence revealed that the defendant represented that it would furnish substantial research and development funds, marketing assistance, administrative assistance, etc., in an effort to promote StimTech and its products to the fullest extent. Within six months of the acquisition, Johnson & Johnson imposed a number of restrictive and suppressive requirements upon StimTech, including: The hiring freeze; the imposition of the requirement that research and development be funded only out of gross profits; the transfer pricing policy; Devices' acquisition of exclusive distribution rights for StimTech products for the United Kingdom and Europe; the humiliation and demotion of Mr. McDonald; the prohibition against using the Johnson & Johnson name; the prohibition against expansion of international and domestic business; the prohibition against any mini-plants; the direction to cut inventories 40% when StimTech was experiencing shortages of inventories; the curtailment of StimTech's programmable pacemaker development; and the prohibition against StimTech displaying its products at Johnson & Johnson's annual meeting as other Johnson & Johnson companies were allowed to do. These actions could well be construed as willful steps designed intentionally to suppress StimTech and prohibit it from achieving its profit potential. Given the close proximity, in time, of these actions to the acquisition of StimTech, the jury could infer that Johnson & Johnson had no inten-

tion to actively promote StimTech and its products as it had promised when it acquired StimTech.

Additionally, all of the representations, admittedly made by Johnson & Johnson regarding marketing assistance, research and development, administration, etc., prior to the 1974 Agreement and incorporated therein, fly in the face of the actual conduct of Johnson & Johnson subsequent to the acquisition. The jury could reasonably conclude, based on the facts as outlined in the discussion of the evidence, that Johnson & Johnson at all times intended to suppress TENS, StimTech, and the plaintiffs, while assuring the plaintiffs that Johnson & Johnson's intentions were to make Stim-Tech number one in the TENS market.

The plaintiffs testified that had they known that Mr. McDonald would be demoted (3 months after the acquisition), that research and development would have to be funded out of gross profits (3 months after the acquisition), that StimTech would not be allowed to use the Johnson & Johnson name (3 months after the acquisition), they would not have sold to Johnson & Johnson. They also stated that had they known the manner in which Johnson & Johnson was going to run the business of StimTech after the acquisition, they would not have sold to Johnson & Johnson. The plaintiffs reasonably relied on the assurances of Johnson and Johnson that it would work toward making StimTech a leader in its field.

■ The defendant argues that the alleged representations made by Johnson & Johnson and upon which the plaintiffs base their fraud claim are contradicted by the 1974 Agreement and thus cannot be used to ground liability for fraud. As noted earlier, in the discussion of the contract claim, the lawyer who drafted the 1974 Agreement on behalf of the defendant and Mr. Anderson, an employee of the defendant, both testified that paragraph 10(a) of the 1974 Agreement incorporated representations that the defendant would provide marketing assistance, research and development, administrative assistance, etc. These representations clearly are not contrary to the 1974 Agreement since the evidence revealed that they were in fact part of the Agreement. There is no evidence supporting the defendant's claim that the representations upon which the plaintiffs rely are contradictory to the 1974 Agreement.

However, even if the jury had found that some of the representations relied upon by the plaintiffs in support of their fraud claim were contrary to the 1974 Agreement, they were instructed by this Court to disregard them. This Court charged:

In order to prove a claim for fraudulent inducement, plaintiffs must demonstrate that they relied on the allegedly false representation to their detriment. In addition, the plaintiffs' reliance must be reasonable under the circumstances. A party having knowledge of the falsity of a representation cannot have relied upon the representation. *Also, where the parties' contract contradicts the allegedly false representation, plaintiffs' reliance on the representation is not reasonable under the circumstances. Where the parties' contract does not contradict the allegedly false representation, plaintiffs' reliance on the representation may be reasonable under the circumstances.* (Emphasis added)

(Tr. 12,686–87)

■ The defendant also attacks the jury's award of damages to the plaintiffs on their fraud claim. The evidence supports the award of damages for the fraud that the jury found had been perpetrated by the defendant upon the plaintiffs. The jury awarded $6,275,000.00 to the plaintiffs in compensatory damages. The appropriate measure of compensatory damages is the difference between the value of the plaintiffs' stock in StimTech and what they actually received for it. The plaintiffs received $1.3 million in return for their stock. The plaintiffs testified that the stock was worth at least $7 million. Mr. Whitlock admitted that he sought authority from Johnson & Johnson's Executive Committee to purchase the StimTech stock for $8 million because that is what he thought it was worth. There was also substantial evidence that

the stock that the plaintiffs gave up had tremendous potential. Mr. Anderson even predicted that if StimTech received the promised commitment of funds in the early years, its performance would meet or exceed forecast levels. The forecast levels would have yielded the plaintiffs their $7 million earn-out. The potential for growth of StimTech adds to the value of the StimTech stock and the jury was justified in its award of compensatory damages for the fraud committed by the defendant. The executive benefits promised the plaintiffs by Mr. Whitlock were not claimed by the plaintiffs as contract damages.

The jury also awarded $25 million in punitive damages. The $25 million award of punitive damages is sustained by the circumstances surrounding Johnson & Johnson's actions. The jury was instructed that it could award punitive damages against the defendant only if it found clear and convincing evidence that the acts of the defendant showed a willful indifference to the rights of the plaintiffs. The jury was also properly instructed as to the meaning of "clear and convincing" evidence. Further the jury was instructed to measure any award of punitive damages by such factors as the amount of harm that the defendant's acts caused to the public, the profitability of the defendant's conduct, whether the defendant concealed the alleged wrongdoing; the defendant's attitude after discovery of the alleged wrongdoing; the number and level of employees of the defendant involved in the alleged misconduct; and the financial condition of the defendant. All of these instructions were in accordance with Minn.Stat. § 549.20 (1981) which sets forth Minnesota law on the award of punitive damages in civil actions.

The public harm in suppressing StimTech relates to the health and well-being of the public. This is probably the most basic concern of the public. Much of the evidence in this case was concerned with the benefits which could be bestowed upon the public by using TENS therapy which was not addictive, non-narcotic, had substantially no adverse side effects and was effective for 25% of those persons who are suffering from long-term or chronic pain. The evidence discloses that those suffering from intense and intractable pain will seek a remedy. If the remedy which they seek consists of drugs, the unrefuted evidence in this case indicates that the remedy will ultimately prove itself to have much worse effects on the patient than the original pain. It is unequivocally stated by the plaintiffs' witnesses and undenied by the defendant that pain killing drugs should be given to long-term pain patients only as a last resort and that their addicting qualities and side effects can cause more damage than the pain itself and must ultimately be discontinued altogether in many cases.

The people have over the years become accustomed to the fact that aspirin, which is fully as effective as Tylenol and the other analgesics, can be taken over long periods of time with some fairly minimal and obvious side effects (which can be usually eliminated by cutting back on the medication). These side effects include certain allergic reactions and gastrointestinal bleeding. On the other hand, the unrefuted testimony was that no other pain pills can be safely taken except in very minimal dosages and for short periods of time. The use of Tylenol and other recently concocted analgesics for long term pain control constitutes an abuse of the drugs themselves and poses very serious dangers to the patient. The side effects of Tylenol were not introduced in the record; however the side effects of Zomax were introduced. Zomax, the newly introduced pill which is taking over part of the market from which TENS can be found to have been suppressed, was revealed to produce nausea, gastrointestinal distress, diarrhea, abdominal pain, dyspepsia, constipation, flatulence, vomiting, dizziness, insomnia, edema, rash, muscle weakness, and urinary tract problems. The Food and Drug Administration report on Zomax which documents the above side effects on human beings further notes that animal tests have shown Zomax to be "a strong ulcerogen of the stomach in rats". Animal tests demonstrated that rats receiving Zomax developed cancerous adrenal tumors. Increased mor-

tality with repeated dosages was shown for other animals as well.

This startling evidence concerning the use of drugs and their side effects on the human beings of this world who are suffering from pain is well documented in this case. Johnson & Johnson does not dispute this fact. In terms of damage to a populace resulting from addiction to the several kinds of pain killing drugs, the damage is incalculable. The economic loss resulting therefrom is likewise incalculable. The debilitation, suffering, humility and physical and psychological hardship by the victim on an individual basis is tragic. Thus, when assessing the public interest, it is fully appropriate for the jury to give consideration to the fact that Johnson & Johnson deprived much of the public and the medical profession of a simple non-addictive pain control method with almost no adverse side effects. By so doing Johnson & Johnson caused millions of people to consume hundreds of millions of dollars worth of pain pills which in the long run will cause incalculable harm to the population. This was done to make profits without reference to the patients' welfare.

Johnson & Johnson in its company creed has stated that the patient comes first, that his welfare is the primary concern and the profit is secondary. It was never explained to the jury how a company operating under such a creed could deprive those people in this world who are suffering from pain, either short-term or long-term, of a device which would spare them the adverse side effects of drugs. The jury seems to have believed and appropriately could believe, that Johnson & Johnson deliberately suppressed this new technology, that it instead continued its customers on a diet of pills and drugs that would ultimately cause them great harm. The hundreds of millions of dollars of profits made by Johnson & Johnson in that segment of the pain control market which would have been treated by the TENS device, but for the Johnson & Johnson suppression, by far exceeds the $25 million that it is now asked to pay. Thus, even though it is paying these exemplary or punitive damages, Johnson & Johnson has

effectively escaped relatively unscathed with its profit structure intact, its company credo still in use, and its market arrangement still operating. It is still selling addictive, debilitating and, to some patients, drugs which in the long run poisons them, and it continues to suppress TENS therapy which would prevent such poisoning and permit patients to live a pain free existence with no side effects. It appears from the evidence that not only Johnson & Johnson, but every drug company which sells pain control pills is the beneficiary of the suppression of TENS therapy.

The $25 million in punitive damages is four times the amount of actual damages on the fraud claim. Such a ratio has been approved by the Eighth Circuit in *Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 587 (8th Cir. 1981). The jury had ample basis upon which it could reasonably base an award of punitive damages and in light of the circumstances surrounding the fraud as the jury found it, the award of punitive damages is not excessive.

The defendant also asserts that it had the right to have its *in pari delicto* defense submitted to the jury. For the reasons noted in the discussion of the plaintiffs' contract claim, this argument is without merit.

### G

### EVIDENTIARY RULINGS

██ The defendant next argues that this Court made erroneous evidentiary rulings which substantially prejudiced the defendant. The defendant first argues that the admission of the "Find Report" was prejudicial error. This report was used by the plaintiffs in computing projected TENS sales for the purpose of calculating damages. Mr. Hagfors testified that this project was the type of document upon which he relied to form his judgment as an expert to sell TENS products and that "this publication is used in the trade for manufacturers of TENS and they rely on it as important information for marketing."

(Tr. 3507–12) This is sufficient foundation for the receipt of this report into evidence under Rule 803(17) of the Federal Rules of Evidence as a "market report exception" to the rule excluding hearsay.

In any event, the defendant was not prejudiced by the admission of this report. Mr. Hagfors relied upon the report for the fact that there were 4.1 million chronic pain patients who could be helped by TENS devices. He used this figure in the calculation of the number of potential customers and thus of damages resulting from the alleged suppressive actions taken by Johnson & Johnson. The defendant's own expert, Mr. Maurer, testified that there were 10 million chronic pain patients. Thus, any claimed error in the admission of this report would have been harmless.

■ The defendant also argues that this Court erred in refusing to permit Mr. Maurer to testify as an expert on cardiac pacers. However, Mr. Maurer admitted that he was not a design engineer in pacemakers, that he was not involved at all with pacemakers while he was at Medtronic from 1973 to 1977, and that he was not involved in the sale of pacemakers. This evidence coupled with the defendant's failure to make an offer of proof as to Mr. Maurer's proposed expert testimony militates against the defendant's argument regarding Mr. Maurer's expert testimony on cardiac pacemakers.

■ The defendant also contends that this Court improperly permitted impeachment of one of its employee witnesses by prior inconsistent statements made by another employee of the defendant.

A corporation speaks with many voices. Each such voice, when appropriate within the sphere of duty and knowledge, can make admissions on behalf of the corporation. If an adversary cannot question the conflicts in the testimony of the various spokesmen for the corporation, then how is one to discern the posture of the company on any given issue? An attempt to reconcile the divergent views of corporate spokesmen by cross is appropriate and mandated. Such witnesses are not strangers to the action or to each other.

Without regard to the propriety of this questioning, the six occasions on which it occurred cannot be viewed as prejudicial when the defendant only objected to the questioning twice, on neither of these occasions was there a responsive answer to the impeaching question. Additionally, the defendant itself was permitted to engage in similar questioning. This trial lasted over five months and created a record of over 13,000 pages; this Court's failure to sustain these two objections by the defendant cannot be construed as harmful or wrongful.

The remaining evidentiary rulings which the defendant challenges were never preserved in the record. Most of these challenges dispute the relevance of some of the evidence introduced by the plaintiffs. None of these objections, if proved valid, would amount to plain error affecting substantial rights of the defendant. Thus, by failing to object at the time the evidence was introduced the defendant waived its rights to obtain review of these matters by failing to object at the time that the alleged impropriety occurred. However, this Court has reviewed all of these evidentiary objections and find that all of the evidence now objected to by defendant was relevant and in no way prejudicial to the rights of the defendant.

## H

## DAMAGES

The Court is most certainly aware that the jury's damage award is a lot of money. It would be a mistake, however, for any court to simply eyeball the total figure and conclude that it is excessive. Each component part of an award must be analyzed and the total be judged upon the reasonableness of each part. After all courts are not like lawyers reviewing final bills for unsuccessful clients. While lawyers may discount a bill on the basis of an eyeball analysis, judges must put aside their personal feelings of what constitutes too much. Courts must, therefore, assess the award on the basis of the record alone. This damage

award of some $93 million stands firm given its component elements. Because the Court has previously addressed the damage issues involved in the contract and fraud claims the following will focus upon the antitrust damage award.

The defendant claims that the plaintiffs' damage schedule is fatally flawed. The claim for lost profits and loss of value in the stock of StimTech from the lost sales of cardiac pacemakers, the defendant argues, is prohibited as there were no contentions at the trial that Johnson & Johnson sought to restrain trade or attempted to monopolize the cardiac pacemaker market. The defendant further argues that the damage schedule improperly seeks both lost profits and going concern value. Finally, the defendant contends that the facts in the plaintiffs' damage schedule have no relation to reality.

The defendant's objection to the use of the pacemaker sales figures is misdirected. The evidence indicates that the plaintiffs intended to finance the growth and development of their TENS business from the profits derived through the sale of their pacemakers. The defendant was fully aware that the pacemaker business was StimTech's "bread and butter" and was to be the bankroll for the company's TENS business. Thus, in order for Johnson & Johnson's suppression of the TENS industry to be successful it was necessary and inevitable that the company also suppress and destroy StimTech's pacemaker business. Because Johnson & Johnson intended to suppress StimTech's pacemaker business in furtherance of its plan to suppress TENS, and as it was successful, the plaintiffs' pacemaker business was the target of the defendant's violation and sustained direct injury. The plaintiffs, therefore, have the right to recover for injuries they sustained in the pacemaker business.

■ The defendant's argument that the plaintiffs cannot recover both lost profits and lost going concern value is valid only as it applies to lost future profits. There exists no double recovery where the award represents damages for lost past profits and lost going concern value. Indeed, both cases cited by the defendant explicitly state that it is *future* lost profits that cannot be recovered in conjunction with going concern value. *Arnott v. American Oil Co.*, 609 F.2d 873, 887 (8th Cir. 1979), *cert. denied* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Albrecht v. Herald Co.*, 452 F.2d 124, 129 (1971); *see also, Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 663–64 (5th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). It is quite proper to permit an award of both lost profits and going concern value. *See Story Parchment Co. v. Paterson P. Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th Cir. 1980). Plaintiffs clearly seek past profits and in fact they seek lost profits for only the last two years of their five-year earning out period inasmuch as they were going to reinvest all the profits for the first three years in the business itself. Therefore, the going concern value and the lost profits are separate and distinct damage claims.

■ Johnson & Johnson's more general attack on plaintiffs' damage schedule as mere fantasy is nothing more than a rearguing of the evidence. Furthermore, it should be noted that it is by no means clear that the jury even used the plaintiffs' damage schedule in arriving at their award. There is evidence in the record, independent of the plaintiffs' damage schedule that fully justifies the jury's $56.8 million antitrust damage award. For example, by employing a comparison approach the jury would have been justified in arriving at their antitrust verdict on the evidence pertaining to the pacemaker suppression alone. It is entirely appropriate for the plaintiffs in a case of this kind to make comparisons to other entities engaged in the same or similar businesses and to allow such comparisons to serve as a guide for the jury in arriving at the damages suffered by StimTech. *See Bigelow v. R.K.O. Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). In this instance, Mr. Hagfors compared StimTech with two pacemaker manufacturers.

Mr. Hagfors testified and the evidence demonstrated that as early as 1972–73, the plaintiffs planned and intended to market a programmable pacemaker and a lithium pacemaker although Mr. Hagfors at one time did express some doubts about the lithium battery. The evidence is that Johnson & Johnson stopped them from developing these pacemakers. Shortly after the plaintiffs went into the pacemaker business, Cardiac Pacemakers, Inc. (C.P.I.) and Intermedics entered the business and began to produce pacemakers very similar to those planned by the plaintiffs. As a result, they become very successful companies. In 1972, CPI had sales of $17,000. They had sales of $32,000,000 in 1977. Eli Lilly bought CPI for slightly more than $100,000,000 during 1977.

Mr. Hagfors compared StimTech without Johnson & Johnson's interference to CPI. To arrive at the going value of that business, he took after-tax profit of $7,900,000 and multiplied it by a multiple of 17. This is identical to the earnings multiple Johnson & Johnson used when computing the value of CPI in Project Summer in 1978. The soundness of this approach is attested to by Eli Lilly's purchase of CPI for approximately the same price computed by Johnson & Johnson under its valuation method, slightly in excess of $100 million. The resultant figure for the value of StimTech is $135,300,000; however, since the plaintiff would have only owned 50% of the stock, it is necessary to divide the going concern value by two for a total of $67,150,000. Add to that figure 50% of the last two years profit of $14,000,000 for a total damage claim of approximately $81,000,000.

Mr. Hagfors also made comparison between StimTech and Intermedics. This company commenced operation in 1974. It went from sales in 1975 of $188,000 to $61,000,000 in 1979. It is interesting to note that $31,000,000 of this $61,000,000 was because of a new programmed pacemaker containing the same features which had consistently been urged by the plaintiffs and systematically frustrated by the defendant. Although a programmable pacemaker was eventually developed by StimTech, it came so late due to Johnson & Johnson's delay that the edge had been taken off the market; but, even then, when Johnson & Johnson undertook to sell the programmable pacemaker to Biotronics, they made projections in the course of its selling which indicated that a programmable pacemaker was fully as valuable as Mr. Hagfors assumed it to be in his testimony.

It was Hagfors' testimony that, in the absence of Johnson & Johnson's interference, plaintiffs' business would have performed similarly to Intermedics. For the years 1975 to 1979, Intermedics had pre-tax profits of $30,977,000 with profits of $23,976,000 in the last two years. If plaintiff had raised capital by selling half of their business to other investors, plaintiffs' share of the profit for five years would have been $15,498,500 and for the past two years $11,938,000. To arrive at the going value of the concern, Mr. Hagfors testified that you take the after-tax profit for 1979 of $6,877,000 and multiply it again by a multiple of 17. This yields a going value of $116,909,000. Assuming that the plaintiffs would have retained half of the stock in that business, their share of the business would have been $58,454,500. Add that to the $11,938,000 which is half of the last two years' profit, and we arrive at a value of roughly $70,000,000. This $70,000,000 would equal the damage to the plaintiffs on the pacemaker business only, provided, of course, that StimTech would have fared as well as Intermedics in the marketplace, absent interference and obstruction by Johnson & Johnson.

It is the Court's conclusion, based upon the evidence, that Mr. Hagfors' comparisons between StimTech and CPI were entirely appropriate and justified by the evidence and rules of damages. Thus, if Mr. Hagfors and his damage schedule produced nothing else and had not even spoken of the TENS program, the jury would have been justified in returning its verdict of $58.6 million based upon the comparison with CPI or Intermedics alone.

This Court, which has heard the evidence between the two companies and StimTech, is of the opinion that there is a great deal of similarity. The people who built these three companies were friends and co-workers; they were all working with essentially the same experience and technological backgrounds and there was a good deal of similarity between the financing that was available to CPI and Intermedics and that would have been available to the plaintiffs had they continued their efforts to finance their company as they were doing when they were approached by Johnson & Johnson. It is the Court's opinion that the jury was fully justified in returning its verdict for damages based upon a comparison of either of these two companies.

We turn now to the evidence of the plaintiffs as it relates to their claimed damages resulting from the loss of profits and business value in the TENS industry. Mr. Hagfors testified to what he considered to be reasonable estimates of the profits the plaintiffs would have made, in the absence of Johnson & Johnson in several different categories. In addition, Mr. Hagfors testified to the value of the business plaintiffs would have had in each of the following categories.

1. TENS Sales for Acute Pain in the United States and Canada

The population of the United States and Canada is approximately 240 million. Over a five year period over half of the population, or 120 million people, complains of low back pain. Other acute pain conditions such as headaches and sports injuries bring the number of acute pain sufferers to above 120 million. Mr. Hagfors, however, computed lost profits and value only upon estimated TENS sales for low back pain. Mr. Hagfors assumed that TENS would be used to treat only one-half of this population group, or 60 million people. He further assumed a 20% market share for plaintiffs' business (down about 4% from StimTech's actual minimum market share), for total sales of 12 million units over five years to treat acute low back pain. Mr. Hagfors

further assumed a selling price of $100 per unit based on economics of scale in manufacturing due to increased sales. This would yield a total sales of $1.2 billion over five years. Assuming a 10% pre-tax profit (20% is normal) the business would have reached $120 million in pre-tax profits. Because the plaintiffs·would have reinvested their profits during the first three years Mr. Hagfors deleted 60% of the total profits leaving $48 million. Of the last two years, the plaintiffs' share would have been $24 million because they would have sold off half the business to raise capital. This represents 20% of the total profit, which is a conservative estimate inasmuch as the analysis does not assume a gradual buildup of sales and profits.

Mr. Hagfors computed lost value upon an earnings multiple of 17 times the companies' after-tax profits. This again was appropriate as Johnson & Johnson had used a similar multiple when evaluating CPI in its Project Summer analysis. Therefore, because the after-tax profit would have been roughly one-half of the pre-tax profit and the plaintiffs' share one-half of that, for a total of $6 million, the estimated lost capital value in the American and Canadian acute pain market would have been $102 million. Lost profits and lost capital value for the five year period would then have reached $126 million.

2. TENS Sales for Acute Pain in the United Kingdom and Europe

As expected, the estimation analysis for this category is identical that of acute pain in the U.S. and Canada. Mr. Hagfors began with a population of 331 million people as recorded in the Eli Lilly 1977 annual report. Relying upon Dr. Long's testimony that over a five year period one-half of the population of the industrial nations experiences episodic low back pain, Mr. Hagfors concluded that approximately 165.5 million would complain of low back pain in the U.K. and Europe. Again Mr. Hagfors assumed that TENS devices would be used to treat one-half of this population, or 82.75 million individuals, and further that Stim-

Tech would capture only 20% of the business, for a total of 16.55 million units sold over five years. Again assuming a price per unit of $100 total sales would reach $1.665 billion over five years. Total profits project out at $165 million based upon a 10% pre-tax profit figure. Again working under the assumption ·that plaintiffs were to share in the profits for only the last two years leaving $66.2 million (40% of $165 million) available for distribution. Therefore, plaintiffs' lost profits for this category were estimated at $33.1 million. Lost value was again computed by multiplying the estimated last years' after-tax profit for $16.5 million by 17 and halving it to reach plaintiffs' share, for a total $140.25 million. Thus, the total damages claimed for loss of TENS sales for acute pain in the U.K. and Europe were $33.1 million in lost profits and $140.25 million for lost value, for a total of $173.350 million.

### 3. TENS Sales for Chronic Pain

Mr. Hagfors began with a chronic pain population of 16.4 million individuals. He assumed a 25% effectiveness rate for TENS devices. This resulted in 4.1 million TENS sales for chronic pain. These estimates were based upon the FIND/SVP study. StimTech with 20% of the market would sell approximately 820,000 units at $100 per unit over this five year period for total sales of $82 million and estimated total pre-tax profits of $8.2 million. Of the $8.2 million pre-tax profit, the plaintiffs' share based upon a one-half interest in the business and a three year reinvestment policy would have been $1.64 million. The value of the business would have been equal to the last year's after-tax profit, approximately $820,-000 times the earnings multiple of 17, or $13.94 million. The plaintiffs' one-half share would have been $6.97 million. Thus, total damages claimed for lost TENS sales for chronic pain was $8.61 million.

### 4. TENS Sales in Japan

Mr. Hagfors first assumed that plaintiffs would have been able to enter into a licensing arrangement for the manufacture and sale of TENS devices in Japan. Such an arrangement was proposed by Seiko and other companies during the plaintiffs' earn-out period. He then assumed that under such a licensing arrangement, the plaintiffs would have done as well as the Advance Company, whose sales were stipulated to be 15,000 to 18,000 TENS units per month. This assumption was premised upon the fact that plaintiffs would have been licensing with Toshiba or Seiko; both companies were much larger than Advance. Annual sales would have been approximately 180,-000 units. Assuming a selling price of $100 and a royalty or license of 5%, annual royalties would have amounted to $900,000. Plaintiffs' royalties for the last two years would have amounted to $900,000 based upon their one-half share in StimTech. The value of the plaintiffs' share of the Japanese business would have been $3.825 million, based again upon an earnings multiple of 17. The total damages claimed for Japanese TENS sales were lost profits of $900,-000 and lost value of $3.825 million, for a combined total of $4,725 million.

### 5. TENS Sales for Post-Operative Pain

The plaintiffs' damage schedule for this category was based upon lost sales in the United States and Canada alone. The reason for this restriction was due to the fact Mr. Hagfors had similarly limited himself when computing lost profits for post-operative TENS electrodes due to the fact that he had relied upon PCD figures which were applicable only to those two areas. Mr. Hagfors began with the total number of hospital rooms in the United States and Canada as reported by the Eli Lilly 1977 annual report, for a total of 1.187 million rooms. He then assumed that, absent Johnson & Johnson's suppression, there would have been one TENS device for every ten hospital rooms over the five year period. The total post-operative TENS sales over five years would therefore be 118,700 units. StimTech's 20% market share would yield sales of 23,740 units over five years. Because post-operative TENS devices require more channels than a regular TENS unit, Mr. Hagfors assumed a selling price of

$500. This would result in total sales of $11.87 million. A 10% pre-tax profit margin results in 1.87 million total pre-tax profits. Plaintiffs' share based upon 50% interest in StimTech of these profits over the last two years have been $237,400. The lost value of the post-operative TENS business was computed as before yielding a total for the plaintiffs of $1,008,950. Thus, total damages claimed for lost post-operative sales were $1,246,350.

### 6. Sales of Chronic Pain Electrodes

As noted above, Mr. Hagfors estimated that plaintiffs would have sold 800,000 TENS devices for chronic pain over five years. Mr. Hagfors assumed that each device would utilize five pairs of electrodes per year. He testified that this was a conservative estimate insofar as electrodes ordinarily last no more than two weeks as chronic pain patients make heavy use of their devices. Twenty-five pairs of electrodes over a five-year period for 800,000 stimulators would have resulted in sales of 20 million pairs of electrodes for chronic pain. Mr. Hagfors' estimate that plaintiffs' profit margin on sales of electrodes would have been $.50 per pair of electrodes. This estimate, according to Mr. Hagfors, was conservative based upon StimTech's experience with the hydrocolloid electrode. In 1979 StimTech began to market these electrodes for $15 per pair with a profit margin substantially above $.50 per pair. Furthermore, PCD in planning to enter the TENS post-operative electrode and market had targeted a selling price of $3 per pair and a profit margin of $1. A $.50 profit margin for 20 million pairs of electrodes results in total profits of $10 million. Using forty percent of that figure to represent the total profit available after the plaintiffs' three year reinvestment plan and after accounting for the plaintiffs' sale of one-half of the business in an attempt to raise capital, one arrives at a lost profit total of $2 million. Lost value was again calculated upon an earning multiple of 17 times the last year's after-tax profit, for a lost capital value of $8.5 million.

### 7. Sales of Acute Pain Electrodes

Mr. Hagfors started by taking the total number of TENS devices that plaintiffs would have sold for acute pain in the United States and Canada (12 million units) and the United Kingdom and Europe (16.55 million units), for a total of 28.55 million units over five years. He further assumed that the plaintiffs would have sold 10 pairs of electrodes for each TENS unit over this five-year term for a total of 285.5 million pairs. Working again from a $.50 profit margin, Mr. Hagfors arrived at a total five-year profit of $142.750 million. After reinvestment $57.1 million would have been available for distribution. The plaintiffs' share after the sale of half of their business would have been $28.550 million. The lost capital value was computed as before yielding a total of $242.675 million with plaintiffs' one-half share equalling $121,337,500. The total damages claimed for TENS electrodes for acute pain were then $28.550 million in lost profits and $121,337,550 in lost capital value, for a total of $149,887,-550.

### 8. Sales of Post-Operative Electrodes

Mr. Hagfors began with the 1974–75 PCD market survey which estimated that the total market for electrodes post-operatively would be $22.7 million annually. Assuming a 20% share of that market for StimTech, Mr. Hagfors testified that total annual sales would reach $4.540 million. Mr. Hagfors used PCD's estimate of $1 profit on each $3 device. StimTech's profit would then have been $3.026 million for the last two years and the plaintiffs' one-half share $1.513 million. The lost capital value of this business was again reached by employment Johnson & Johnson's Project Summer analysis. The after-tax profit multiplied by 17 yields $12,860,500 and plaintiffs' one-half share amounts to $6,430,250. The total damages claimed for post-operative electrodes were then $1.513 million in lost profits and $6,430,250 in lost capital value, for a total of $7,943,250.

Obviously, any damage schedule that contemplates an award in excess of one-half billion dollars is in and of itself noteworthy. Similarly, a jury award of $56.800 million for antitrust damages and just under $37 million in non-antitrust damages necessarily garners a certain amount of interest. This, however, should not lead one to immediately conclude that therein lies error. A large damage award is not *a priori* unreasonable. The Court is satisfied that the assumptions underlying Mr. Hagfors' damage schedule are reasonable and consistent with reality. The evidence suggests that there would have been a tremendous demand for these devices absent Johnson & Johnson's suppression. It is not necessary that a plaintiff describe his damages with a great degree of certainty. Certainty plays a much more important role in the measure of proof necessary to establish that the plaintiff had in fact sustained some damage. Once this has been established, however, the question of the amount of damage can be ascertained through just and reasonable inference, even though the result be only approximate. *Story Parchment Co. v. Paterson Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Eastman Kodak Co. v. Southern Photo Material Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). The Court is of the opinion that the evidence would have easily enabled the jury to reach an award of nearly $500 million. Therefore, the damage award reached by the jury is *a fortiori* justified.

The damage schedule the defendants introduced into evidence also provides ample support for the jury's award. This schedule, which was originally prepared by an accountant for the plaintiffs early on in the case, employs projection or model analysis. This method is an alternative to the comparison or yardstick approach. *See, e.g. Lehrman v. Gulf Oil Corp.*, 500 F.2d 659 (5th Cir. 1974), *cert. denied* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). Based upon a business having the barest minimum support, as opposed to a complete absence of Johnson & Johnson, the damages set forth in the defendant's schedule show pretax profits ranging from approximately $15 million to $41 million, depending upon the assumptions used for StimTech's market penetration. Lost capital value, computed upon an earnings multiple of 10 ranges from $13.7 million to $39 million. The schedule did not assume any penetration by StimTech of the larger market held by painkilling drugs, but assumed only that StimTech attained a greater share of the existing TENS and pacemaker business, in addition to introducing post-operative and other disposable TENS electrodes by 1976. These conservative assumptions allow a total antitrust damage award of $80 million, consisting of $41 million for lost profits and an additional $39 million for lost capital value. This is $23.2 million over the jury's award. Once this damage schedule was placed into evidence by the defendant, it took no exception to it and raised no questions about its accuracy. It seemed to have adopted the $80 million figure as an appropriate damage award.

In an effort to directly attack the plaintiffs' schedule the defendant called Mr. Ronald Esau, a certified public accountant, to testify in connection with the capital requirements needed in order to achieve the sales and profit levels claimed by plaintiffs as damages. To assist him in this analysis, Mr. Esau prepared a computer model of the business containing debt/equity ratios and estimates of necessary working capital. Mr. Esau premised his model on an estimated sales growth of 474% per year. Had plaintiffs achieved this sales growth they would then have been able to raise the capital necessary to sustain those sales. He was unable to express an opinion as to whether plaintiffs would have been able to achieve the sales levels set forth in his computer model. There was, however, evidence to indicate that this sales growth was not unrealistic. In 1972 StimTech had sales of $85,500. In 1973 sales had risen to $472,000. This represents a growth rate of 454%. Mr. Esau noted that a number of industries experienced a 400% to 500% annual sales growth in the 1970s including small computers, airlines, oil, laser technology, and microprocessing. Significantly, if

plaintiffs had achieved the sales growth projected in Mr. Esau's model their damages would have been 2½ times higher than the damages claimed by plaintiffs. In other words using Mr. Esau's numbers plaintiffs would have had lost profits of $282 million rather than the $188 million claimed by the plaintiffs. Lost value computes out to $940 million or $690 over the $450 million claimed by the plaintiffs. In order to achieve their lost profits claim of $118 million plaintiffs would have needed sales of only $1.9 million in 1975 rather than $4.6 million as projected by Mr. Esau. This pattern repeats itself through the remaining four years. With reduced sales numbers, the capital requirements for the business would also be reduced to 40% of the amounts used by Mr. Esau. Thus plaintiffs could have attained their profit claims with a much smaller business, with much smaller capital requirements, than the business Mr. Esau chose to portray in his computer model. Therefore, this Court finds no reason to reject plaintiffs' damage schedule.

## V. CONCLUSION

As the presiding Judge who heard the evidence during the five and one-half month trial, this Court has no doubt as to the wisdom and propriety of the jury's verdict. It is the opinion of this Court that the jury's verdict was reasonable and appropriate and amply supported by the evidence in the case. Although the post-trial arguments of the defendant, when viewed without regard to a consideration of all of the evidence, may sound very persuasive, nonetheless, upon close scrutiny, they do not stand up in the face of the overwhelming factual proof.

Therefore, IT IS HEREBY ORDERED That the defendant's motions are in all things denied.

## APPENDIX OF CAST OF CHARACTERS

*Anderson, Charles M.* —President Johnson & Johnson Development Co.; Chairman of StimTech 1974–76; also Chairman of Devices, Ltd. 1974–76.

*Ardito, James* —Sales Manager StimTech 1973–75.

*Bailey, Bill* —Pacemaker engineer StimTech 1976–80.

*Berg, Dr. Jeff* —Patient Care Division scientist; claimed inventor of hydrocolloid electrode.

*Berman, Steven E.* —Johnson & Johnson corporate patent attorney working on hydrocolloid patent.

*Burke, James E.* —Johnson & Johnson Chairman of the Board 1976—present.

*Cassis, John* —Former assistant to Charles Anderson placed at Patient Care.

*Clark, Frank M.* —Executive vice-president marketing StimTech 1975–76; came to StimTech from Ethnor, a Johnson & Johnson subsidiary.

*Collins, David E.* —Johnson & Johnson corporate counsel; later became president of McNeil Laboratories, pain drug subsidiary.

*Cornish, Brian K.* —Marketing director at McNeil until 1975; moved to Devices, Ltd. in 1975 as marketing director and later managing director.

*Danoff, Dr. David* —Minneapolis neurosurgeon, called by Johnson & Johnson.

*DeAngeli, Frank* —Member Johnson & Johnson executive committee; responsible for international operations; chairman of StimTech and Devices 1977–79; active with Whitlock in Pharmaceutical Manufacturers Association.

*Esau, Ronald* —Accountant, called by Johnson & Johnson to testify as to damages.

*Galloway, Peter S.* —Johnson & Johnson corporate attorney; negotiated StimTech contract.

*Gibori, Shimon* —StimTech international salesman 1976.

*Gussin, Robert* —McNeil director of research.

*Hagfors, Norman R.* —Plaintiff; president of StimTech 1972–77; inventor; engineer.

*Hartman, Charles M.* —Patient Care Division director of new products.

*Hollen, Gene E.* —Patient Care Division vice-president and general manager through 1976.

*Hymes, Dr. Alan C.* —Consultant; surgeon; inventor Karaya TENS electrode.

*Jackson, Jerry* —StimTech treasurer 1974–78.

*Jensen, Clayton M.* —Plaintiff; vice-president manufacturing for StimTech 1972–77; engineer.

*Keller, J. Walter* —Consultant to StimTech; engineer; world-renown expert in pacemakers.

*Lazar, Larry* —Patient Care Division chemist hired in late 1975 to develop hydrocolloid electrode.

*Long, Dr. Donlin* —Consultant to StimTech; chief of neurosurgery Johns Hopkins 1973 —present.

*Mashburn, M. Laine* —President of StimTech 1979–80; moved to StimTech from Johnson & Johnson Australian operations.

*Maurer, Donald* —President Empi, small TENS company, called by Johnson & Johnson.

*McConnell, Dr. Jack B.* —Director new product development for McNeil Laboratories until 1969; Director of Johnson & Johnson corporate development at time of StimTech acquisition; reported to Foster Whitlock.

*McDonald, Stanley L.* —Plaintiff; vice-president of StimTech 1972–77; sales and marketing; founder of Midwest Pain Control Centers, president 1977-present.

*O'Brien, Jack* —McNeil vice-president of marketing.

*Perry, Paul* —Single salesman hired by Devices to sell TENS in U.K., Europe, and the Far East 1974–77.

*Reynolds, P. J.* —One of owners of Devices, Ltd.; head of sales and marketing before Johnson & Johnson and for short time after.

*Scheer, DeWayne* —Accountant retained by plaintiffs whose damage study was offered in evidence by Johnson & Johnson.

*Schwalm, Art* —President Cardiac Pacemakers, Inc., pacemaker company bought by Eli Lilly for $100 million in 1978; CPI referred to as "Summer" in Johnson & Johnson's "Project Summer".

*Sellars, Richard* —Burke's predecessor as Johnson & Johnson chairman.

*Shealy, Dr. C. Norman* —Expert on pain; pioneer in use of TENS.

*Sigurdson, Lawrence* —Advertising manager for StimTech 1977–79.

*Simkanich, John* —Johnson & Johnson corporate patent attorney working on karaya electrode patent.

*Smale, Alan J.* —One of owners of Devices, Ltd., managing director under Johnson & Johnson 1975–77, thereafter, director of research; made first pacemaker in U.K.; engineer.

*Sommer, A.A.* —Former chairman SEC, called by Johnson & Johnson.

*Steel, Edwin* —Director of advertising for McNeil.

*Stolzer, Herbert* —Johnson & Johnson executive committee member responsible for Patient Care Division of Domestic Operating Co.

*Sullivan, Michael P.* —Minneapolis attorney representing plaintiffs in sale of StimTech to Johnson & Johnson.

*Whitlock, Foster B.* —Johnson & Johnson vice-president until 1977; head of all Johnson & Johnson pharmaceutical operations; president Pharmaceutical Manufacturers Association.

*Wingrove, Robert* —President Medical Devices, Inc., small TENS company; called as witness by Johnson & Johnson.